**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:20-cv-203 |
| Plaintiffs, | |
| v. | |
| KING COUNTY, WASHINGTON; DOW CONSTANTINE, in his official capacity as King County Executive | **COMPLAINT** |
| Defendant. | |

The United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

### PRELIMINARY STATEMENT

1.      In this action, the United States seeks a declaration invalidating and permanently enjoining the enforcement of King County Executive Order PFC-7-1-EO, "King County International Airport—Prohibition on immigration deportations" ("Airport EO"), signed April 23, 2019, attached hereto as Exhibit A.

2.      The Government of the United States has "broad, undoubted" inherent power as a sovereign nation, and enumerated constitutional and statutory power, to regulate matters pertaining to immigration and the status of aliens. *Arizona v. United States*, 567 U.S. 387, 394 (2012) (citing *Toll v. Moreno*, 458 U.S. 1 (1982)); *Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893) ("The right of a nation to expel or deport foreigners who have not been naturalized, or taken any steps towards becoming citizens of the country . . . is as absolute and unqualified, as

COMPLAINT - 1
*United States v. King County, WA*, No. 2:20-cv-203.

**U.S. DEPARTMENT OF JUSTICE**
**1100 L St., NW**
**Washington, DC 20005**
**Tel: (202) 616-0680**

the right to prohibit and prevent their entrance into the country."). *But see Yamataya v. Fisher*, 189 U.S. 86, 100–01 (1903) (discussing due process constraints on removal power).

3.    Federal law also explicitly preempts State and local governments, such as King County, from enacting or enforcing laws "related to a price, route, or service of an air carrier that may provide air transportation." 49 U.S.C. § 41713(b)(1).

4.    The Airport EO requires that "all future leases, operating permits, and other authorizations for commercial activity at King County International Airport [also known as Boeing Field] contain a prohibition against providing aeronautical or non-aeronautical services to enterprises engaged in the business of deporting immigration detainees (except for federal government aircraft), to the maximum extent permitted by applicable law." Ex. A ¶ 3.

5.    The Airport EO also directs officials to "[d]evelop procedures for exercising King County's rights under existing leases . . . [and] to ensure strict lessee compliance with applicable laws, ordinances, rules, regulations and policies of King County regarding human trafficking and the servicing of any aircraft engaged in the business of deportation of immigration detainees, including, without limitation King County Code Chapter 2.15 and this Executive Order."  Ex. A ¶ 4.

6.    The Airport EO has both the purpose and effect of prohibiting federal immigration authorities from using Boeing Field to remove individuals with final orders of removal from the United States or to transport immigration detainees within the United States.  Since issuance of the Airport EO, fixed-base operators ("FBOs") at Boeing Field, which provide basic aeronautical services to charter flight operators, no longer will service flights by U.S. Immigration and Customs Enforcement ("ICE") Air Operations ("IAO").

7.    Because ICE flights cannot use any of the FBOs at Boeing Field, ICE has had to relocate its flight operations to Yakima, Washington.  This relocation has restricted ICE's operations, such that it interferes with ICE's ability to enforce federal immigration law.  The Airport EO therefore violates the Supremacy Clause.

COMPLAINT - 2
*United States v. King County, WA*, No. 2:20-cv-203.

**U.S. DEPARTMENT OF JUSTICE**
**1100 L St., NW**
**Washington, DC 20005**
**Tel: (202) 616-0680**

8.      The Supremacy Clause and federal law do not allow King County to discriminate against those who contract with the United States, to regulate in a field where Congress has expressly preempted state and local regulation, or to impose obstacles to the enforcement of federal immigration law. Accordingly, the Airport EO is unlawful and invalid.

### JURISDICTION & VENUE

9.      The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345 and 2201.

10.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because Defendants reside within this judicial district and because a substantial part of the acts or omissions giving rise to this action arose from events occurring within this judicial district.

11.     The Court has the authority to provide the relief requested under the Supremacy Clause, U.S. Const. art. VI, cl. 2, as well as 28 U.S.C. §§ 1651, 2201, and 2202, and the Court's inherent equitable powers.

### PARTIES

12.     Plaintiff, the United States, regulates immigration under its constitutional and statutory authorities, and it enforces the immigration laws through its Executive Branch agencies, e.g., the Department of Justice and the Department of Homeland Security ("DHS"), including its component agencies ICE and U.S. Customs and Border Protection ("CBP").  Plaintiff also is responsible for regulating the air transportation industry through its Executive Branch agency, the U.S. Department of Transportation, including its component agency, the Federal Aviation Administration.

13.     Defendant King County is a political subdivision of the State of Washington.  King County is the owner of Boeing Field, pursuant to an "Instrument of Transfer" executed by the United States and King County in 1948.  The "Instrument of Transfer" is attached hereto as Exhibit B.

COMPLAINT - 3
*United States v. King County, WA*, No. 2:20-cv-203.

**U.S. DEPARTMENT OF JUSTICE**
**1100 L St., NW**
**Washington, DC 20005**
**Tel: (202) 616-0680**

14.     Defendant Dow Constantine is the King County Executive and is being sued in his official capacity.

## FEDERAL IMMIGRATION LAW

15.     The Constitution affords Congress the power to "establish an uniform Rule of Naturalization," U.S. Const., art. I § 8, cl. 4, and to "regulate Commerce with foreign Nations, and among the several States," U.S. Const., art. I § 8, cl. 3.  It also affords the President of the United States the authority to "take Care that the Laws be faithfully executed." U.S. Const., art. II § 3.

16.     The Supremacy Clause of the Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. Thus, a state or local enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or if it "discriminate[s] against the United States or those with whom it deals," *South Carolina v. Baker*, 485 U.S. 505, 523 (1988).

17.     Based on its enumerated powers and its constitutional power as a sovereign to control and conduct relations with foreign nations, the United States has broad authority to establish immigration laws, the execution of which the States and their political subdivisions cannot obstruct or discriminate against. *See Arizona v. United States*, 567 U.S. 387, 394-95 (2012); *accord North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality); *id.* at 444-47 (Scalia, J., concurring).

18.     Congress has exercised its authority to make laws governing the entry, admission, presence, status, and removal of aliens within the United States by enacting various provisions of the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 et seq., and other laws regulating immigration.

**U.S. DEPARTMENT OF JUSTICE**
**1100 L St., NW**
**Washington, DC 20005**
**Tel: (202) 616-0680**

19.     These laws codify the Executive Branch's authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully in the United States. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231, 1357.

### ICE'S RESPONSIBILITY TO TRANSPORT IMMIGRATION DETAINEES

20.     ICE, through Enforcement and Removal Operations ("ERO"), is responsible for managing all aspects of the immigration enforcement process, including identification and arrest, domestic transportation, detention, bond management, and supervised release, including alternatives to detention. In addition, ERO removes aliens ordered removed from the United States to more than 170 countries around the world.   *See* U.S. Immigration & Customs Enforcement, *About*, https://www.ice.gov/about (last visited February 10, 2020).

21.     ICE supports the enforcement of immigration law by facilitating the transportation and removal of aliens via commercial flights.  Since 2006, ICE Air Operations has used air charter services to transport individuals in ICE custody within the United States and to remove individuals from the United States. *See* U.S. Immigration & Customs Enforcement, *Fact Sheet: ICE Air Operations*, https://www.ice.gov/factsheets/ice-air-operations (last visited February 10, 2020).

### THE AIRLINE DEREGULATION ACT

22.     Pursuant to Congress's power to "regulate Commerce with foreign Nations, and among the several States," U.S. Const., art. I § 8, cl. 3, Congress has established a comprehensive scheme for the regulation of interstate air carriers.

23.     In 1978, Congress determined that efficiency, low prices, variety, and quality would be furthered by reliance on competitive market forces rather than pervasive federal regulation.  *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1262 (9th Cir. 1998) (discussing H.R. Conf. Rep. No. 95–1779, 95th Cong., 2d Sess. 53 (1978)); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992).

24.     In order to prevent state and local governments from undoing federal deregulation by enacting their own regulations, the Airline Deregulation Act ("ADA") provides that a "political

COMPLAINT - 5
*United States v. King County, WA*, No. 2:20-cv-203.

**U.S. DEPARTMENT OF JUSTICE**
**1100 L St., NW**
**Washington, DC 20005**
**Tel: (202) 616-0680**

subdivision of a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route or service of an air carrier that may provide air transportation under this subpart."   49 U.S.C. § 41713(b)(1).   This provision bars local governments from prohibiting or restricting particular types of air transportation, whether directly or as an indirect effect of other regulations.

## THE AIRPORT EXECUTIVE ORDER

25.   On April 23, 2019, Mr. Constantine signed the Airport EO.

26.   The            Airport            EO            directs            that            "the [King County] Department of Executive Services shall coordinate with [Boeing Field] and the Facilities Management Division" to take actions to ensure that Boeing Field "shall not support the transportation and deportation of immigration detainees in the custody of Immigration and Customs Enforcement, either traveling within or arriving or departing the United States or its territories." Ex. A at 2.

27.   The Airport EO instructs King County's executive agencies to "[e]nsure that all future leases, operating permits and other authorizations for commercial activity at [Boeing Field] contain a prohibition against providing aeronautical or non-aeronautical services to enterprises engaged in the business of deporting immigration detainees (except for federal government aircraft), to the maximum extent permitted by applicable law." *Id.* ¶ 3.

28.   The Airport EO further instructs King County's executive agencies to "[d]evelop procedures for exercising King County's rights under existing leases at [Boeing Field] to ensure strict lessee compliance with applicable laws, ordinances, rules, regulations and policies of King County regarding human trafficking and the servicing of any aircraft engaged in the business of deportation of immigration detainees, including, without limitation King County Code Chapter 2.15 and this Executive Order."   *Id.* ¶ 4.

29.   After signing the Executive Order, Mr. Constantine asserted, "Our goal is to ban flights of immigrant detainees from our publicly owned airport, and I hope members of Congress

COMPLAINT - 6
*United States v. King County, WA*, No. 2:20-cv-203.

**U.S. DEPARTMENT OF JUSTICE**
**1100 L St., NW**
**Washington, DC 20005**
**Tel: (202) 616-0680**

shine a light on this practice and how it is currently funded."  King County, *Executive Constantine Directs Actions Against ICE Detainee Flights From King County Airport*, Apr. 23, 2019, https://www.kingcounty.gov/elected/executive/constantine/news/release/2019/April/23-ICE-KCIA.aspx (last visited February 10, 2020).

## IMPACT OF THE AIRPORT EXECUTIVE ORDER

30.     The Airport EO has had a significant impact on ICE's operations in the Northwest United States.

31.     Since issuance of the Airport EO, the FBO at Boeing Field that once serviced flights by ICE's contractors and sub-contractors will no longer do so, and ICE's contractors and sub-contractors have not been able to obtain a replacement FBO at Boeing Field or conduct flight operations on behalf of ICE.

32.     Because Boeing Field's FBOs will not service ICE planes, these planes no longer have the ability to fly into or out of Boeing Field, which is the airport closest to ICE's Northwest Detention Facility in Tacoma, Washington.

33.     ICE has been forced to relocate its flights to an airport in Yakima, Washington, located approximately 150 miles away from Tacoma by road, which has resulted in significant fiscal and public safety costs impeding ICE operations.

34.     The "Instrument of Transfer" between King County and the United States provides "[t]hat the United States of America . . . through any of its employees or agents shall at all times have the right to make nonexclusive use of the landing area of the airport at which any of the property transferred by this instrument is located or used, without charge."  Ex. B at 15.

## CLAIMS FOR RELIEF

### Count One

35.     Plaintiff hereby incorporates paragraphs 1 through 34 as if fully set forth herein.

36.     The Airport EO discriminates against private parties based on their relationship with federal immigration officials.

COMPLAINT - 7
*United States v. King County, WA*, No. 2:20-cv-203.

**U.S. DEPARTMENT OF JUSTICE**
**1100 L St., NW**
**Washington, DC 20005**
**Tel: (202) 616-0680**

37.     The Airport EO significantly obstructs and burdens federal activities, and interferes with federal rights under the Instrument of Transfer.

38.     The Airport EO therefore violates the Supremacy Clause and is invalid.

**Count Two**

39.     Plaintiff hereby incorporates paragraphs 1 through 38 as if fully set forth herein.

40.     The intent of the Airport EO is to prevent ICE's contractors and sub-contractors from conducting lawful air carrier operations, properly authorized under federal law, at Boeing Field.

41.     By prohibiting Boeing Field lessees from "providing aeronautical or non-aeronautical services to enterprises engaged in the business of deporting immigration detainees," the Airport EO prevents ICE's contractors and sub-contractors from obtaining necessary aircraft services such as fuel and water at Boeing Field.  Because the Airport EO prevents ICE's contractors and sub-contractors from providing air carrier services to ICE at Boeing Field, these contract carriers are unable to conduct operations at Boeing Field, and ICE must therefore re-route its contract carriers to an airport in Yakima, Washington.

42.     The Airport EO is therefore a "law, regulation, or other provision having the force and effect of law related to a price, route or service of an air carrier that may provide air transportation under this subpart."  49 U.S.C. § 41713(b)(1).

43.     The Airport EO thus violates the ADA's preemption provision and is invalid under the Supremacy Clause.

**PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests the following relief:

1.      That this Court enter a judgment declaring the Airport EO violates the Supremacy Clause and is therefore invalid;

2.      That this Court permanently enjoin Defendant as well as their successors, agents, and employees, from enforcing the Airport EO;

3.    That this Court award the United States its costs in this action; and

4.    That this Court award any other relief it deems just and proper.


Dated:  February 10, 2020                    Respectfully submitted,

                                             JOSEPH H. HUNT
                                             Assistant Attorney General

                                             BRIAN T. MORAN
                                             United States Attorney

                                             ALEXANDER K. HAAS
                                             Director

                                             JACQUELINE COLEMAN SNEAD
                                             Assistant Branch Director


                                             Michael J. Gerardi (D.C. Bar No. 1017949)
                                             Trial Attorney
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             1100 L St. NW, Room 12212
                                             Washington, D.C. 20005
                                             Tel: (202) 616-0680
                                             Fax: (202) 616-8460
                                             E-mail: michael.j.gerardi@usdoj.gov

                                             *Attorneys for Plaintiff*

COMPLAINT - 9
*United States v. King County, WA*, No. 2:20-cv-203.

U.S. DEPARTMENT OF JUSTICE
1100 L St., NW
Washington, DC 20005
Tel: (202) 616-0680

# EXHIBIT A

**Document Code No.:** PFC7-PEO
**Title:** King County International Airport – Prohibition on immigrant deportations
**Keywords:** Airport, Immigrant, Prohibition on Deportations,
Immigration and Customs Enforcement
**Sponsoring Agency:** County Executive Office



**King County**

---

**PREAMBLE.** King County proudly upholds the fundamental, self-evident truth announced at our nation's founding: that all people are created equal, while embracing the basic American value that we are a nation of opportunity for all. Immigrants and refugees are welcome in King County, and our region has acted decisively to become more inclusive, removing barriers to affordable housing, transit, health, economic opportunity and promoting strong childhood development for everyone. King County continues to uphold the same values and move forward with effective actions that set our region apart as a leader in protecting the rights of all people in our communities, and continues to not tolerate discrimination, harassment, expressions of hate, or any behavior intended to promote fear, intimidation, or isolation.

**WHEREAS,** effective policies have been put in place to guarantee that King County does not partner nor collaborate with the United States Immigration and Customs Enforcement, demonstrated by King County's refusal to honor Immigration and Customs Enforcement detention detainers without a valid court order with regard to its correctional facilities;

**WHEREAS,** King County International Airport is not a party to any contracts with Immigration and Customs Enforcement, or any other government agency involved in the deportation of immigration detainees. In 2018, King County became aware that aircraft operated by charter operators were providing services to Immigration and Customs Enforcement at the airport and using King County International Airport as a location for transportation of immigration detainees. At the direction of the King County Executive, King County supported the efforts of interested advocacy groups in the community and began formulating a response to the issues raised by these troubling immigration practices;

**WHEREAS,** Immigration and Customs Enforcement uses airports across the United States, and charters flights to transport immigration detainees;

**WHEREAS,** none of the charter operators who conduct operations for Immigration and Customs Enforcement has been specifically authorized to conduct business at, or has a lease to conduct a business at, King County International Airport;

**WHEREAS,** recent research has documented that the use of King County International Airport as a location for the transportation of detainees could lead to human rights abuses and violations in contravention of the policies and ordinances of King County and international treaty obligations concerning human rights;

**WHEREAS,** the use of King County International Airport in this manner is inconsistent with the County's obligation to operate the airport in a safe and efficient manner for all persons, not just citizens, and further use of King County International Airport in this manner would be detrimental

to the public welfare and could adversely affect the willingness or ability of other persons to use, or engage in businesses at, King County International Airport with a negative effect on the financial sustainability of King County International Airport;

**WHEREAS**, because deportations raise deeply troubling human rights concerns which are inconsistent with the values of King County, including  separations of families, increases of racial disproportionality in policing, deportations of people into unsafe situations in other countries, and constitutional concerns of due process, King County shall take affirmative steps to bring transparency and accountability to the business practices of its airport businesses regarding the use of the facilities for deportation flights.

**NOW, THEREFORE,** I, Dow Constantine, King County Executive do hereby order and direct:

King County International Airport shall not support the transportation and deportation of immigration detainees in the custody of Immigration and Customs Enforcement, either traveling within or arriving or departing the United States or its territories. King County shall adhere to any rulings or orders of any court of competent jurisdiction in carrying out the directives provided herein. The Department of Executive Services shall coordinate with King County International Airport and the Facilities Management Division to take the following action:

    1.  Take appropriate actions, consistent with the County's federal obligations, to minimize County cooperation with, facilitation of, and permission for, operations associated with transportation of immigration detainees.

    2.  Work with our Congressional delegation to change the law to address the deportation practices that give rise to abuses of human and civil rights.

    3.  Ensure that all future leases, operating permits and other authorizations for commercial activity at King County International Airport contain a prohibition against providing aeronautical or non-aeronautical services to enterprises engaged in the business of deporting immigration detainees (except for federal government aircraft), to the maximum extent permitted by applicable law.

    4.  Develop procedures for exercising King County's rights under existing leases at King County International Airport to ensure strict lessee compliance with applicable laws, ordinances, rules, regulations and policies of King County regarding human trafficking and the servicing of any aircraft engaged in the business of deportation of immigration detainees, including, without limitation King County Code Chapter 2.15 and this Executive Order.

    5.  Revise and formally adopt the King County International Airport Minimum Standards and develop other rules and regulations as needed to require operating permits for charter carriers, and create reporting responsibilities and audit procedures, with respect to human trafficking and immigration detainee deportation activities, for King County International Airport lessees involved in the provision of aeronautical services.

6.  Revise and formally adopt amendments to existing rules and regulations and King County Code Title 15 in a manner consistent with King County Code Chapter 2.15 and this Executive Order.

7.  Work with King County International Airport and the Facilities Management Division to study the feasibility of installing security cameras in the vicinity of the airfield and adjacent aprons and ramps.

8.  Prepare updates on a quarterly basis detailing the progress of implementing the policies provided herein.

Dated and effective this ___23___ day of ___APRIL___, 20_19_.


Dow Constantine

King County Executive


Attest:


Norm Alberg
Director, Records and Licensing Services Division, Department of Executive Services

# EXHIBIT B

VOL 2915 PAGE 134

3985080

INSTRUMENT OF TRANSFER

THIS INDENTURE, made as of the 26th day of May, 1948, between THE UNITED STATES OF AMERICA, acting by and through the General Services Administrator, under and pursuant to the powers and authority contained in the provisions of the Federal Property and Administrative Services Act of 1949 and the Surplus Property Act of 1944 (58 Stat. 765) as amended thereby and regulations and orders promulgated thereunder, party of the first part and KING COUNTY, WASHINGTON, a municipal corporation under the laws of the State of Washington, acting by and through its Board of County Commissioners, party of the second part.

WITNESSETH: That the said party of the first part, for and in consideration of the assumption by the party of the second part of all the obligations and its taking subject to certain reservations, restrictions and conditions and its covenant to abide by and agreement to certain other reservations, restrictions and conditions, all as set out hereinafter, conveys and quitclaims to the said party of the second part, its successors and assigns, under and subject to the reservations, restrictions and conditions, exceptions, and reservation of fissionable materials and rights hereinafter set out, all its right, title and interest in the following described property situate in the City of Seattle, County of King, State of Washington, to-wit:

(TRACT 1)

Beginning at a point on the centerline of Airport Way in King County, Washington, said point being marked by a City of Seattle Monument in a case, at the Northerly end of a curve on said Airport Way, said Monument bearing North 38° 48' 18.4" West a distance of 496.35 feet from the point of intersection of the two tangents to said curve; thence South 51° 13' 41.6" West a distance of 355.0 feet; thence South 38° 46' 18.4" East a distance of 157.28 feet to the true point of beginning; thence continuing South 38° 46' 18.4" East a distance of 400.0 feet; thence North 51° 13' 41.6" East a distance of 245.87 feet; thence along the arc of a curve to the left, having a radius of 2068.92 feet; and an initial course of North 26° 56' 02.4" West a distance of 5.28 feet; thence North 27° 04' 48.4" West a distance of 210.11 feet; thence along the arc of a curve to the left having a radius of 1709.24 feet and central angle of 6° 24' 43" a distance of 191.28 feet; thence South 51° 13' 41.6" West a distance of 317.73 feet to the true point of beginning;

(TRACT 34A)

Beginning at a point on the line between the East and West halves of Luther M. Collins Donation Land Claim No. 46, in Section 29, Township 24 North, Range 4 East, Willamette Meridian, in King County, Washington, said point being 50 feet North of the Northwest corner of Block A, Queen Addition Supplement; thence South 0° 16' 05" West along said line, a distance of 391.3 feet; thence West a distance of 382.7 feet; thence North 11° 56' East, a distance of 400 feet; thence East a distance of 300 feet to the point of beginning;

(TRACT 34B)

Beginning at the Southeast corner of Block 2, Elizabeth Addition to the City of Seattle, Washington, said point being on the line between the East and West halves of Luther M. Collins Donation Land Claim No. 46; thence South 0° 16' 05" West along said line, a distance of 466.4 feet; thence West 300 feet; thence North 11° 56' East, a distance of 477.2 feet, more or less, to the South line of said Block 2, Elizabeth Addition; thence South 89° 56' East, along said South line, a distance of 210 feet to the point of beginning;

(TRACT 34C)

Beginning at a point on the line between the East and West halves of Luther M. Collins Donation Land Claim No. 46 in Section 29, Township 24 North, Range 4 East, Willamette Meridian, in King County, Washington, said point being 26.7 feet North of the intersection of said line with the Meander line of the Duwamish River; thence South 0° 16' 05" West, a distance of 26.7 feet to the said Meander line; thence along said Meander Line, South 70° 50' 35" West, a distance of 47.29 feet; thence continuing along said Meander line, South 46° 15' 49" West, a distance of 192.38 feet; thence continuing along said Meander line, South 52° 16' 21" West, a distance of 286.96 feet; thence continuing along said Meander line, South 33° 28' 16" West, a distance of 135 feet, more or less, to an intersection with a line drawn parallel to and 250 feet Easterly from the East line of Ellis Avenue; thence North 11° 56' East along said line parallel to and 250 feet Easterly from the East line of Ellis Avenue a distance of 475 feet, more or less, to a point which bears due West from the point of beginning; thence East 382.7 feet to the point of beginning;

(TRACTS 34D, 34E and 34F)

Beginning at a point on the East line of Ellis Avenue North 11° 56' East a distance of 203.2 feet from the point of intersection of said East line of Ellis Avenue and the South line of the Collins donation land claim No. 46; thence continuing along said East line of Ellis Avenue North 11° 56' East a distance of 339.7 feet to the point of intersection of said East line with the extended centerline of Willow Street, which point is South 77° 44' 15" East a distance of 30 feet from the City monument located on the centerline of Ellis Avenue; thence South 77° 44' 15" East along the extended centerline of Willow Street a distance of 222 feet to a point of intersection with the meander line of the old waterway; thence South 33° 28' 16" West a distance of 68 feet more or less to an angle point on said meander line; thence South 14° 26' 16" West following said meander line a distance of 54.00 feet to an angle point on said meander line; thence South 2° 15' 13" East a distance of 162.02 feet to an angle point on said meander line; thence South 87° 01' West a distance of 240 feet to the point of beginning;

(TRACTS: 34F, partial; 34G; 34H and 34I)

Beginning at a point on the East line of Ellis Avenue, which point is South 77° 44' 15" East, a distance of 30 feet from a city monument located at the point of intersection of the center lines of Willow Street and Ellis Avenue; thence North 11° 56' East along the east line of Ellis Avenue to a point on the East line of Ellis Avenue 1216.9 feet distant from the point of intersection of the East line of Ellis Avenue and the South line of Luther M. Collins Donation Land Claim No. 46; thence North 87° East, a distance of 252.8 feet; thence South 11° 56' West, a distance of 674.0 feet, more or less, to the Meander line of Duwamish River; thence along said Meander line South 33° 28' 16" West, a distance of 68.0 feet to a point of intersection of said Meander line with the center line of Willow Street extended Southeasterly; thence along said extended center line of Willow Street, North 77° 44' 15" West, a distance of 222.0 feet to the point of beginning;

(TRACT 34J)

Beginning at a point on the East line of Ellis Avenue in the City of Seattle, Washington, said point being North 11° 56' East a distance of

VOL. 2915 PAGE 136

1216.9 feet from the intersection of said East line with the South line
of Luther M. Collins Donation Land Claim No. 46; thence North 11° 56'
East along said East line of Ellis Avenue, a distance of 103.4 feet;
thence North 87° East, a distance of 252.8 feet; thence South 11°
56' West a distance of 103.4 feet; thence South 87° West, a distance of
252.8 feet, to the point of beginning;

(TRACTS 34K, 34L and 34M)

Beginning at a point on the East line of Ellis Avenue in the City
of Seattle, Washington, said point being North 11° 56' East, a distance
of 1320.3 feet from the intersection of said East line with the South
line of Luther M. Collins Donation Land Claim No. 46; thence North 11°
56' East along said East line of Ellis Avenue, a distance of 578.8
feet, more or less, to the South line of Block 2, Elizabeth Addition;
thence South 89° 56' East along said South line of Block 2, a distance
of 249.7 feet; thence South 11° 56' West, a distance of 574.8 feet,
more or less, to a point which bears North 87° East from the point of
beginning; thence South 87° West, a distance of 252.8 feet to the point
of beginning;

Together with a perpetual easement and right of way to construct, maintain, repair,

operate, patrol, replace and/or remove a drainage system over and through, under,

along and across certain real property situate in the County of King, State of

Washington, more particularly described in the following easement deeds from the

grantors indicated:

(a)  Isaacson Iron Works, a Washington corporation, to the United
States of America, dated January 30, 1947, and recorded February 6,
1947 in Volume 2585 of Deeds, page 531, records of King County,
Washington;

(b)  Teresa Greco to the United States of America, dated December 24,
1946 and recorded January 16, 1947 in Volume 2577 of Deeds, page 109,
records of King County, Washington;

Together with appurtenant avigation easements, and buildings, structures, improve-

ments and equipment described as follows:

| | | |
|---|---|---|
| T-101 | 5' x 7' | Guard House |
| T-102 | 76' x 270' | School Bldg. |
| T-103 | 76' x 270' | B. O. Q. |
| T-105 | 35' High | Flag Pole |
| T-106 | 18' x 30' | Bridge |
| T-107 | 20' x 100' | Laundry |
| T-108 | 20' x 72' | Recreation Bldg. |
| T-109 | 25'4" x 28'2" | Latrine |
| T-110 | 20' x 100' | Supply Room |
| T-111 | 20' x 84' | Recreation Building |
| T-112 | 67' x 220' | Mess Hall |
| | w/Wings: 39' x | |
| | 56'6" and 40' x | |
| | 53'6", w/Addns: | |
| | 18' x 56'6" | |
| T-112A | 4' High | Incinerator, 4' High |
| T-113 | 20' x 100' | Barracks |
| T-114 | 12' x 20' | Shop |
| T-115 | 20' x 100' | Barracks |
| T-116 | 20' x 40' | Latrine |
| T-117 | 20' x 56' | Latrine |
| T-118 | 20' x 100' | Barracks |
| T-119 | 20' x 100' | Barracks |
| T-120 | 20' x 100' | Barracks |
| T-121 | 20' x 100', w/ | Post Exchange |
| | Wings: 30'x40', | |
| | 30'x38', and | |
| | 10' x 22' | |

- 3 -

| | | |
|---|---|---|
| T-122 | 20' x 100' | Barracks |
| T-123 | 20' x 100' | Barracks |
| T-124 | 20' x 100' | Barracks |
| T-125 | 20' x 56' | Latrine |
| T-126 | 20' x 100' | Barracks |
| T-127 | 20' x 100' | Barracks |
| T-128 | 82' x 36' w/ Wings: 23' x 39', 16' x 69', 16' x 60', & 15' x 69' | Post Engineer |
| T-129 | 20' x 100' | Barracks |
| T-130 | 20' x 84', w/ Addns: 20' x 24' | Post Office Building |
| T-131 | 20' x 100' | Barracks |
| T-132 | 10' x 10' | Platform Shelter |
| T-133 | 25'4" x 57'2" | Latrine |
| T-134 | 20' x 40' | Latrine |
| T-135 | 6' x 8' | Clock House |
| T-136 | 20' x 100' | Barracks |
| T-137 | 20' x 100' | Barracks |
| T-138 | 20' x 100' | Barracks |
| T-140 | 20' x 100' | Barracks |
| T-141 | 20' x 72' | Chapel |
| T-142 | 20' x 84' | Day Room |
| T-143 | 25'4" x 48'2" | Latrine |
| T-145 | 25' x 124' | Dispensary |
| T-150 | 20' x 100' | Medical Supply |
| T-152 | 20' x 100' | Barracks |
| T-156 | 20' x 100' | Barracks |
| T-158 | 20' x 100' | Barracks |
| T-162 | 20' x 100' | Barracks |
| T-164 | 20' x 84' | Day Room |
| T-168 | 20' x 100' | Barracks |
| T-170 | 20' x 100' | Barracks |
| T-171 | 20' x 100' | Barracks |
| T-172 | 20' x 100' | Barracks |
| T-174 | 20' x 100' | Barracks |
| T-176 | 20' x 84' | Supply Building |
| T-178 | 25'4" x 57'2" | Latrine |
| T-180 | 20' x 100' | Barracks |
| T-181 | 20' x 100' | Barracks |
| T-182 | 20' x 100' | Barracks |
| T-184 | 20' x 100' | Barracks |
| T-186 | 20' x 100' | Barracks |
| T-187 | 20' x 100' | Barracks |
| T-188 | 20' x 100' | Barracks |
| T-190 | 20' x 100' | Barracks |
| T-191 | 58' x 112', w/ Addns 22' x 30' & 20' x 20' | Gym |
| T-192 | 20' x 100' | Barracks |
| T-193 | 15' x 37' | Bridge |
| T-195 | 20' x 72' | Recreation & Shipping |
| T-197 | 10' x 10' x 2" | Coal Bunker (Serves Bldg. T-199) |
| RLB T-198 | 50' x 103', w/ Wings 22' x 25' & 12' x 24' | Theatre |
| T-199 | 20' x 100', w/ Addn. 20' x 20' | B. O. Q. |
| T-301 | Hangar, 117' x 202' w/Addns: 18'2" x 40'10" | Hangar |
| T-303 | 10' x 10' x 2" | Coal Bunker (Attached to T-301) |
| T-304 | 20' x 30' | Rack, Wash, Concrete |
| T-305 | 6' x 8' | Clock House |
| T-306 | 11' x 18' | Paint Storage |
| T-308 | 4' x 32' | Rack, Grease, Concrete |
| T-309 | 5' x 5' | Guard House |
| T-310 | 25'4" x 54' | Oil & Dope Storage |
| T-311 | 16' x 18', w/ Addns: 7'4" x 18' | Mock-Up, Engine Run |

VOL. 2915 PAGE 138

| | | |
|---|---|---|
| T-312 | | Gas Pump & Tank |
| T-314 | 80'2" x 122'3", | Hangar |
| | w/Addn: 16' x 86'8" | |
| | & Coal bunker 5'x28' | |
| T-316 | 80'2" x 122'3", | Hangar |
| | w/Addns: 16'x68'8" | |
| | and 5' x 28' | |
| T-318 | 76' x 159', w/ | A. C. Supply Bldg. |
| | 20' x 25' Addn. | |
| T-326 | 10' x 16' | Dope & Oil Storage Warehouse |
| T-320 | 9' x 6' | Shed, Portable, skid mounted |
| T-320A | 9' x 6' | Shed, Portable, skid mounted |
| T-330 | 20' x 28', w/20' | Storeroom |
| | x 30' lean-to addn. | |
| T-332 | 13' x 39' | Pump House, (North) |
| T-500 | 20' x 58' | Barracks |
| T-507 | 18' x 36' | Latrine |
| T-509 | 18' x 36' | Latrine |
| T-511 | 18' x 36' | Latrine |
| T-513 | 18' x 36' | Latrine |
| T-515 | 7' x 15' | Shed |
| T-516 | 21' x 30' | Shed |
| T-517 | 9' x 73' | Grease Rack |
| T-519 | 20' x 34', w/ | Garage |
| T-521 | 33' x 34', w/ | |
| | Wings: 13' x 15½' | |
| T-523 | 8' x 15' | Tank, Oil Storage |
| T-525 | 18' x 54', w/wings | Barracks, w/wings: 14' x 20' |
| T-527 | 16' x 36' | Barracks |
| T-527A | 10' x 12' | Oil Storage |
| T-528 | 20' x 40' | Barracks |
| T-531 | 18' x 54', w/wings | Barracks, w/wings: 14' x 20' |
| T-532 | 20' x 40' | Barracks |
| T-533 | 20' x 100', w/ | Warehouse |
| | Wings: 12' x 60' | |
| | & 24' x 24' | |
| T-534 | 20' x 40', w/wings | Barracks |
| | 20' x 12' | |
| T-535 | 20' x 48' | Barracks, E.M. |
| T-536 | 20' x 48' | Barracks, E.M. |
| T-537 | 20' x 34', w/ | Barracks |
| | Wings: 14' x 20' | |
| T-538 | 20' x 34', w/ | Barracks |
| | Wings: 14' x 20' | |
| T-539 | 20' x 80' | Barracks |
| T-540 | 18' x 18' | Paint Storage |
| T-541 | 25' x 63', w/wing | Barracks |
| | 8' x 8' | |
| T-542 | 15' x 15' | AA Gun Emplacement |
| T-542A | 10' x 10' | Earth Mound for Ammo. Storage |
| T-543 | 25' x 63', w/ | Barracks |
| | 9' x 12' addn. | |
| T-544 | 15' x 15' | Oil & Dope Storage |
| T-545 | 25' x 63', w/ | Barracks |
| | 4' x 6' Addn. | |
| T-547 | 25' x 63' | Barracks |
| T-549 | 25' x 63' | Barracks |
| T-551 | 20' x 48', w/wings | Barracks |
| | 20' x 12' | |
| T-553 | 18' x 21' | Latrine |
| T-555 | 20' x 25' | Barracks |
| T-558 | 20' x 48' | Barracks |
| T-559 | 20' x 32' | Open Lumber Storage Shed |
| T-560 | 20' x 48' | Barracks |
| T-561 | 20' x 32' | Shed |
| T-563 | 10'6" x 16' | Mess Kit Shelter |
| T-564 | 20' x 56' | Barracks |
| T-571 | 20' x 100' | Barracks |
| T-573 | 20' x 100' | Barracks |
| T-575 | 20' x 100' | Barracks |
| T-577 | 20' x 100' | Barracks |
| T-578 | 20' x 48' | Barracks |

- 5 -

VOL. 2915 PAGE 139

| | | |
|---|---|---|
| T-579 | 20' x 46', w/ Addn: 6' x 9' | Latrine |
| T-581 | 20' x 100' | Barracks |
| T-583 | 20' x 40' | Barracks |
| T-585 | 20' x 76', w/wing 20' x 40' | Mess Hall |
| T-589 | 20' x 100' | Barracks |
| T-591 | 20' x 100' | Barracks |
| T-609 | | Incinerator |
| T-622 | 16' x 32' | Shed |
| T-624 | 90' x 156', w/ 2nd floor- 90' x 17'8" | Warehouse |
| T-629 | 20' x 96' (2-20' x 48' bldgs. combined) | Storehouse |
| T-631 | 20' x 88', w/wings 20' x 40' & 12' x 16' | Mess Hall |
| T-633 | 20' x 112', 20' x 72' &, 20' x 112', 20' x 24' | Quarters, w/Latrine |
| T-635 | 16' x 48', w/ Wings: 8' x 16' - 4' x 8' | Garage |
| T-641 | 48' x 48', 16' x 32', 20' x 56', w/wings: 20' x 32', 20' x 32', & 12' x 12' | Fire Station, w/hose tower & concrete coal bunker |
| T-649 | 7'5" x 9'5", w/ wings: 4' x 4' | Sewage Pump House |
| T-653 | 16' x 16' | Shed |
| T-655 | 10' x 12' | Shed |
| T-661 | 10' x 13' | Compressor House #1 |
| T-663 | 48' x 128' | Field Service Bldg. |
| T-665 | 7' x 15' | Septic Tank |
| T-637 | 125' x 177' | Hangar, XB-29 |
| T-639 | 21' x 22', w/addn. 8' x 16' | Boiler House |
| T-643 | 75,000 Gal. | Water Tank |
| T-645 | 20' x 26' | Pump House |
| T-647 | 75,000 Gal. | Water Tank |
| T-673 | 20' x 60' | Shop Building |
| T-675 | 20' x 10' | Shed |
| T-675A | 10' x 6' | Shed |
| T-675B | 10' x 6' | Shelter, Plywood |
| T-675C | 10' x 6' | Shelter, Plywood |
| T-677 | 120' x 120' | Gun Revetment |
| T-700 | 92' x 118', w/roofed over area 11' x 92', w/fence, wood, 420 lin. ft. x 7'8" hi., w/link wire gate 14'6" | Salvage Yard |
| T-730 | 20' x 40' | Barracks |
| T-732 | 10' x 13' | Compressor House |
| T-734 | 48' x 128' | Field Service Bldg. |
| T-736 | | Septic Tank, Underground |
| T-764 | 48' x 140', w/ Wings: 2 ea. 20' x 24' | Flight Delivery Service Bldg. |
| T-768 | 30' x 114' | Office Building |
| T-785 | 13' x 55' | So. Drainage Pump House |
| T-1702 | 8' x 4', w/inlet | Coal Bunker (T-102) |
| T-1703 | 10' x 10' x 2", w/shelter | "    "    " (T-103) |
| T-1707 | 10' x 10' x 2" | "    "    " (T-107) |
| T-1708 | "    "    " | "    "    " (T-108) |
| T-1709 | "    "    " | "    "    " (T-109) |
| T-1712 | "    "    " | "    "    " (T-112) |

VOL. 2915 PAGE 140

| | | | |
|---|---|---|---|
| T-1713 | 10' x 10' x 2" | Coal Bunker | (T-113) |
| T-1716 | " | " | (T-116) |
| T-1717 | " | " | (T-117) |
| T-1720 | " | " | (T-120) |
| T-1724 | " | " | (T-124) |
| T-1725 | " | " | (T-125) |
| T-1729 | " | " | (T-129) |
| T-1733 | " | " | (T-133) |
| T-1734 | " | " | (T-134) |
| T-1736 | " | " | (T-136) |
| T-1740 | " | " | (T-140) |
| T-1743 | " | " | (T-143) |
| T-1745 | " | " | (T-145) |
| T-1750 | " | " | (T-150) |
| T-1752 | " | " | (T-152) |
| T-1762 | " | " | (T-162) |
| T-1776 | " | " | (T-176) |
| T-1778 | " | " | (T-178) |
| T-1780 | " | " | (T-180) |
| T-1784 | " | " | (T-184) |
| T-1788 | " | " | (T-188) |

Coal Bunkers Attached to
Bldgs. T-573, T-579, T-593,
T-631, T-633

Together with all attached fixtures and equipment contained in and used in connection with said buildings above listed including all government owned attached fixtures and equipment in Building T-529 owned by King County;

All runways, taxiways, aprons, roads, spoilers, fencing and other improvements situated on the property herein conveyed and leased property surrendered;

All of the sewer system, water system, compressed air system, drainage system, electrical system including ruby lights for fire reporting stations and field markings and lighting situated on the property herein conveyed and leased property surrendered;

1   Grader, "Caterpillar", Diesel, Ser. IR-999, Eng. #20P6687, 1942, Mod. 212, with:
    2 Tires and Tubes, 6:50 x 20
    4 Tires and Tubes, 1000 x 24
    1 Extinguisher, Fire, 00/2, 42#
    6 Extra Blades for Grader
1   Mower, "McCormack & Deering", Mod. #7, with:
    2 Tires and Tubes, 500 x 21
1   Snowplow, "Ross", mfgr. Burch Corp., Mod. R2-8-9-ft., Ser. #43284
1   Snowplow "Duplex", Angle type, Ser. #DD-1143
1   Tractor, "Cletrac", Overhead Loader, Ser. #6D608, Eng. #1806940 DJXG, Size-3-3/4 x 4-1/2, Mod. BD 44, Mfgr. "Cleveland Tractor Co.", Bore 3-3/4", Stroke 4 1/2", Diesel, Attachments: Overhead Loading attachment, w/1/2 cu. yd. bucket w/winch, "Sargent", Mod. #38
1   Tractor, Mower, VA-1, "Case", Ser. #12536 (eng) Chassis #4700680, 1942, Mod. CD-14, with attachment and cutting bar, w/power takeoff and power lift, Accessories:
    2 Tires and Tubes, front 600 x 16
    2 Tires and Tubes, back 900 x 24
    1 Cultivating attachment
    2 Extra blades
    1 "2-way" plow
1   Tractor, "Caterpillar", Bulldozer, U.S.A. No. 354, Ser. #5E3215-SP, Hydraulic Lift, with attachment Trail Builder, LaPlante Choate Bulldozer, Ser. #RBL-35-20, USA #1400
1   Truck, Ford V-8, Converted to all Wheel Drive by Marmon-Herrington, Chassis #MM5-4-54, Motor #547316 with Klawer Snogo - R1, Mod. LTR, Ser. #1060, Truck Loader Ser. #712, Gas driven; Eng. "International", 6-cylinder No. UHM-5575, Accessories:
    4 Tires and Tubes 8.25 x 20

- 7 -

VOL. 2915 PAGE 141

1   Truck, Fire, Ford #2, Motor #21T-5086, 1-1/2 ton USA #501526.
    American Barton Fire Pump, 500 gallon capacity, Ser. #C-54952.
    Equipped with:
      1 Light, signal, Mars
      6 Tires and Tubes, 7.50 x 20
      1 Unit, Radio, Communication, 2-way
      1 Extinguisher, Fire, CTC, 1 Qt.
      1 Ladder, roof, 14' long
      1 Ladder, ext. 24' long
      2 Suction hoses, 4", hard rubber, 10' sections
      4 Belts, safety
      2 Wrenches, spanner, 2-1/2"
      1 Applicator, 6"
      1 Applicator, 8'
      1 Pole, pike, 8'
      1 Adapter, 2-1/2" to 1-1/2"
      2 Nozzles, shut-off, w/5/8" tips, 2-1/2"
      2 "Y", gates, 2-1/2" to 1-1/2"
      2 Connectors, double female, 2-1/2"
      2 Connectors, double male, 2-1/2"
      2 Connectors, double female, 4-1/2" to 4-1/2"
   1000 Ft. Hose, double jacket, 2-1/2"
    250 Ft. Hose, double jacket, 1-1/2"
      2 Nozzles, Comb. Fog & Straight Stream, 1-1/2"
      1 Wrench, Spanner, double, 2-1/2"
      1 Clamp, hose
      1 Axe, fire, pick head
      1 Wrench, hydrant, Adj.
      1 Wrench, ground valve
      1 Bar, pinch
      1 Bar, hook claw
      1 Gal. CTC, Fire Extinguisher
      1 Extinguisher, fire, foam, 2-1/2 gal.
      1 Indian back-pack, water pump can, 5-gal.
      1 Thomson light
     15 Ft. Hose, fire, cotton, soft suction, 4-1/2"
      1 Connector, double, female, 4-1/2" x 4"
      4 Tips, nozzle, fire, 2-3/4"
      1 Hard suction screen
      1 Hose jacket
      1 "Y", Straight, 2-1/2" to 2-1/2"
      1 Shovel, round point
    200 Ft. Booster line, w/nozzle & shut-off, 1"
      1 Tip, 3/8"
      1 Cap, 4"
      1 Reducer, 4" to 2-1/2"
      2 Caps, 2-1/2"
      1 Wrench, spanner, 4-1/2"
      1 Wrench, Crescent, 12"
      1 Wrench, Spanner, 2-1/2"
      2 Lights, spot

1   Truck, Fire, "International", #506887, 2x4, Mod. HF-65526, Motor,
    #GRD-253 38844, "Central Pacific Fire Corp.", mod. 1300A, Ser.
    #QA-135 (1944), 500 gal. pumper, w/following accessories:
      6 Tires & Tubes 700 x 20
      1 Wrench, Lug
      1 Wrench, Sparkplug
      2 Wrenches, Wheel
      1 Spare Wheel
      1 Reducer, 4-1/2" to 4"
      1 Reducer, 4-1/2" to 2-1/2"
     15 Ft. Hose, Cotton, Soft suction, 4-1/2"
      2 Caps, brass, 4-1/2"
      2 Hoses, fire, hard suction, rubber, 4", 10' lengths
      3 Caps, brass, 2-1/2"
      2 Adapters, 2-1/2" to 1-1/2"
      1 Wye, gate, 2-1/2" to 2-1/2" to 2-1/2"
      1 Clamp, hose, "Hebert"
      1 Tip, nozzle, 1-1/8"
      1 Tip, nozzle, 1-1/4"
      2 Nozzles, shut-off, w/1" tips, 2-1/2"

VOL.2916 PAGE 142

```
   1 Screen, hard suction
   2 Connectors, double female, 2-1/2"
   3 Connectors, double, male, 2-1/2"
   2 Wyes, gates, 2-1/2" to 1-1/2"
   2 Playpipes, 2-1/2"
   1 Applicator, 6'
   1 Applicator, 8'
   1 Pole, pike, 8'
   7 Belts, safety, leather
1000 Ft. Hose, fire, cotton, D.J., 2-1/2"
   1 Wrench, hydrant, double, 2-1/2"
   1 Ladder, roof, 14'
   1 Ladder, ext., 24'
   1 Extinguisher, fire, water, pump, 2-1/2 gal.
 200 Ft. Rope, 3/4"
   1 Shovel, L.H., R.P.
   1 Wye, Straight, 2-1/2" to 2-1/2"
   1 Pump, tire, hand
   1 Kit, first aid, 16-unit
   1 Nozzle, foam
   1 Light, "Thomson", w/dry cell battery & metal case
   1 Kit, crash
   5 Wrenches, spanner, 2-1/2"
   1 Reducer, 2-1/2" to 1-1/2"
   1 Bag, tool, canvas
  14 Wrenches, double, open end
   1 Wrench, comb. open & spanner
   1 Wrench, spanner, 1-1/2"
   1 Wrench, single, open end
   1 Wrench, comb. box & open end
   1 Wrench, Monkey, 14"
   1 Screwdriver, common, 10"
   1 Gun, grease, hand
   1 Wrench, sparkplug
   1 Wrench, wheel, double end
   1 Wrench, pipe, 18", adj.
   1 Jack, 3-ton, hydraulic, w/handle
   2 Irons, tire
   1 Belt, safety
   2 Cans Solution, foam, 2-gal. each
   4 Spotlights, 5"
   1 Siren, fire
 300 Ft. Hose, fire, cotton, 1-1/2"
   2 Nozzles, fog, shut-off, 1-1/2"
   1 Extinguisher, fire, CTC, 1-qt.
   1 Extinguisher, fire, CO/2, 15#
   1 Axe, fire, pickhead
   1 Bar, claw, hook
   1 Wrench, ground valve
   1 Reel, hose
 200 Ft. Hose, rubber, booster, 1"
   1 Nozzle, fog, combination, 1"
   1 Cutter, wire, 1"
   2 Spanners, 4-1/2"
   3 Wrenches, auto, adj.
   1 Clamp, hose
   1 Wrench, spanner, hydrant, 2-1/2"

(Extra Fire-Fighting Gear in T-134 - Fire Dept. in Hangar Building)
   1 Strap, safety
   1 Playpipe & tip, straight, 2-1/2"
   2 Nozzles, playpipe, 2-1/2" to 1-1/2"
   3 Nozzles, shut-off, 1-1/2"
   2 Tips, nozzle, 1-1/4"
   1 Playpipe, 2-1/2" to 1"
   1 Nozzle, tip, 1"
   1 Nozzle, shut-off, 1-1/2", w/1-1/8" nozzle tip
   1 Tip, 1-1/8"
   2 Nozzles, shut-off, 1", Booster with 3/8" tip
   1 Nozzle, Comb. fog & spray and straight stream, 3/4"
   2 Connectors, Double, Female, 2-1/2"
   1 Connector, Double, Male, 2-1/2"
```

VOL 2915 PAGE 143

```
3    Reducers, double, female, 2-1/2" to 1-1/2"
1    Wye, Straight, 2-1/2" to 2-1/2"
4    Wyes, Gates, 2-1/2" to 1-1/2"
4    Nozzles, Fog with shut-off, 1-1/2"
2    Wrenches, hydrant, Adj.
1    Wrench, Spanner, double
1    Wrench, Spanner, 2-1/2"
1    Wrench, Spanner, combination, 2-1/2"
1    Connector, Siamese, "Y", 2-1/2"
1    Broom, Rotary, Tractor-driven, Ser. #TTS 446, 1943, Mod. No.
       same as Ser. No., "Frank T. Hough Co.", size, 30" x 96"
       Accessories:
         2 Tires and Tubes, 6.00 x 16
         2 Tires and Tubes, 6.00 x 9
         2 Brushes
9    Padlocks: "Best"
1    Truck, Fire, crash, "International", gasoline powered, class 125,
       USA #504365, Ser. #SMS09-1616, Eng. #BF-2104, Pump #1654,
       Accessories:
         1 Set Chains, tire
         4 Cans Solution, Foam, 2-gal.
         1 Coil, Rope, 3/4"
         1 Kit, crash
         2 Wrenches, hydrant
         7 Hoods, asbestos
         1 Kit, tool
         1 Wrench, pipe, "Stilson", 18"
         1 Mask, gas
         2 Suits, asbestos
         1 Kit, first-aid
         4 Wrenches, spanner
         1 Wrench, wheel
         2 Guns, grease, "Alimite", mod. #5585
         1 Hammer
         1 Crank, starting
         1 Jack, hydraulic, 3-ton, w/handle
         2 Nozzles, foam
       300 Ft. Hose, high pressure
         2 Nozzles, Silver Spray, "Meyers"
         1 Light, Thompson (battery but no light)
         3 Extinguishers, fire, CO, 15 lb.
         1 Extinguisher, fire, CTC, 1-gal.
         2 Extinguishers, fire, CTC, 1-qt.
         1 Axe, fire
         1 Pole, pike
         1 Bar, claw, hook
         1 Bar, pinch
         1 Coupling, Q.M.
         1 Cap, 2-1/2"
         1 Siren, flasher
         3 Lights, spot
         1 Mirror, rear view
         1 Ladder, folding, 12'
         1 Wrench, monkey, 12"
         3 Wrenches, Open-end
         4 Connectors (2-#14, 1-#16, 1-#18)
         2 Screwdrivers
         1 Tool, tire
         1 Spotlight, portable
1    Truck, Fire, crash, "Chevrolet", gasoline powered, class 125,
       USA #506703, Ser. #IMS01-4863, Eng. #BF-350293, Pump #1626; High
       pressure, fog-foam, mounted on Commercial 1-1/2 ton 4 x 2 chassis;
       Accessories:
         1 Kit, crash
         1 Light, "Thompson", w/battery
         2 Suits, asbestos
         6 Hoods, asbestos
         1 Mask, gas
         1 Pr. Gloves
         1 Axe, fire
         2 Nozzles, foam
```

VOL 2915 PAGE 144

```
 5 Nozzles, "Meyers"
 2 Extinguishers, fire, Foam, 2-1/2 gal.
 1 Bar, claw, hook
 1 Pole, pike
 1 Ladder, folding, 12'
 1 Jack, hydraulic, 3-ton, w/handle
 1 Crank, starting
 1 Tool, rim, tire
 1 Gun, grease
 3 Spotlights
 3 Reels, high pressure hose, 100' lengths
 1 Extinguisher, fire, CO2, 20 lb.
 1 Coupling, D.M., 2-1/2"
 1 Cap, 2-1/2"
 1 Extinguisher, fire, CTC, 1-qt.
 1 Mirror, rear view
```

Equipment in Guard House:
```
300 Ft. 1" high pressure rubber hose in 6-50' lengths
 17 2-gal. cans liquid foam
  6 Coal oil lanterns
  1 2-1/2" play pipe - 1" tip
  3 2-1/2" pipes complete
  1 2-1/2" nozzle valve and tip
  2 1-1/2" fog nozzles with tips - combination
  2 1-1/2" fog nozzles without tips - combination
  2 1-1/2" nozzles with tips
  2 1" Elkhart fog nozzles
  1 1-1/4" tip
  2 2-1/2" double female couplings
  1 2-1/2" double male coupling
  1 1" double male coupling
  3 2-1/2" to 1-1/2" double female adapters
  1 2-1/2" to 1" reducer
  1 2" to 1-1/2" reducer
  1 2-1/2" Wye
  1 2-1/2" Siamese coupling
  4 2-1/2" to 1-1/2" Wyes, Single female, double male, w/shutoffs
  2 Hose belt tails
  2 2-1/2" spanners
  2 Hydrant wrenches
  3 Male hose couplings
  3 Female hose couplings
  1 Fog nozzle spreader tip, shop made
  1 2" plug
  1 Small roll rubber packing
  1 Miscellaneous rubber gaskets (Box)
  1 6" funnel
  7 4# CO2 Extinguishers
  4 3# CO2 Extinguishers
  2 CO2 nozzles
    Several pcs. rubber hose for CO2 extinguishers, approx. 15'
  1 5-1/2" to 4-1/2" female adapter
  2 10' plaster hooks
  1 Large can misc. fittings, CO2 valves, gaskets, pipe fittings, etc.
  1 CO2 dehydrater
  3 Incomplete pump cans
 14 2-1/2 gal. babcocks - soda & acid
 24 1-qt. pyrenes
250 Ft. 2-1/2" single jacket hose in 50' lengths
  2 Cases Batteries for hand light
  2 6' applicators
  2 10' applicators
  1 Box Pyrene hangers - approx. 20
  5 Lbs. Soda
  3 Sets Skid chains
  1 5-gal. can liquid foam
  1 15# CO2 extinguisher
  1 Rear vision mirror with extension arm
  6 Bottles Sulphuric Acid (7#)
```

- 11 -

VOL 2915 PAGE 145

being the same land acquired by the United States of America under Declaration

of Taking filed February 15, 1943, in cause entitled United States v 13.33 Acres

of land in Seattle, King County, Washington, Civil Docket No. 656, in the District

Court of the United States for the Western District of Washington, Northern Division;

and by purchase from various owners under deeds all of record in the office of the

County Auditor of King County, Washington.

The above described premises are transferred subject to existing easements

for public roads and highways, public utilities, railroad rights of way and pipe

lines, and also subject to an easement granted by Horton Investment Company to

Puget Sound Traction, Light and Power Company dated September 8, 1915, filed for

record October 21, 1915, File No. 1024007 in Volume 902 of Deeds, Page 560, records

of the County Auditor, King County, State of Washington and further subject to the

conditions, reservations and restrictions contained in the deeds and Declaration of

Taking under which the United States of America acquired title.

EXCEPTING, HOWEVER, from this conveyance all right, title and interest in

and to all its property in the nature of equipment, furnishings and other personal

property located on the above described premises or the premises leased from party

of the second part which can be removed from the land without material injury to

the land or structures located thereon, other than property of such nature located

on the premises conveyed hereby which is reasonably necessary for the operation or

maintenance of the airport or for the operation or maintenance of the structures and

improvements specifically listed hereinabove as being transferred hereby, for any

reasonable use for which such structures or improvements are readily adaptable; and

further excepting from this conveyance all its structures on said premises other

than structures specifically described or enumerated above as being conveyed here-

under; and reserving to the party of the first part for itself and its lessees,

licensees, permittees, agents and assigns the right to use the property and structures

excepted hereby in such a manner as will not materially and adversely affect the

development, improvement, operation or maintenance of the airport and the right of

removal from said premises of such property and structures, all within a reasonable

period of time after the date hereof, which shall not be construed to mean any period

more than one (1) year after the date of this instrument, together with a right of

ingress to and egress from said premises for such purposes.

And further excepting from this conveyance and reserving to the party of

the first part, in accordance with Executive Order 9908, approved on December 5,

1947, (12 F. R. 8223), all uranium, thorium, and all other materials determined

pursuant to section 5 (b) (1) of the Atomic Energy Act of 1946 (60 Stat. 761), to be

VOL 2915 PAGE 146

peculiarly essential to the production of fissionable material, contained, in whatever concentration, in deposits in the lands covered by this instrument which are hereby reserved for the use of the United States, together with the right of the United States through its authorized agents or representatives at any time to enter upon the land and prospect for, mine and remove the same, making just compensation for any damage or injury occasioned thereby. However, such land may be used, and any rights otherwise acquired by this disposition may be exercised, as if no reservation of such materials had been made; except that, when such use results in the extraction of any such material from the land in quantities which may not be transferred or delivered without a license under the Atomic Energy Act of 1946, as it now exists or may hereafter be amended, such material shall be the property of the United States Atomic Energy Commission, and the Commission may require delivery of such material to it by any possessor thereof after such material has been separated as such from the ores in which it was contained. If the Commission requires the delivery of such material to it, it shall pay to the person mining or extracting the same, or to such other person as the Commission determines to be entitled thereto, such sums, including profits, as the Commission deems fair and reasonable for the discovery, mining, development, production, extraction, and other services performed with respect to such material prior to such delivery, but such payment shall not include any amount on account of the value of such material before removal from its place of deposit in nature. If the Commission does not require delivery of such material to it, the reservation hereby made shall be of no further force or effect.

Further, the party of the first part, for the considerations hereinabove expressed, does hereby surrender, subject to the terms and conditions of this instrument to the party of the second part the former's leasehold interest in and to the premises set forth and described in lease No. W04-193-eng-3584 dated September 1, 1943, and lease No. W04-193-eng-1528 dated July 6, 1943, from King County, Washington, to the United States of America including 451.75 acres, more or less, of land situated in the City of Seattle, County of King, State of Washington.

Said property transferred hereby was duly declared surplus and was assigned to the War Assets Administrator for disposal, acting pursuant to the provisions of the above mentioned Act, as amended, Executive Order 9689, and applicable rules, regulations and orders.

TO HAVE AND TO HOLD said premises, with appurtenances, except the fissionable materials and other property excepted above and the rights reserved above, and under and subject to the reservations, restrictions and conditions set forth in this instrument, unto the said party of the second part, its successors and assigns

By the acceptance of this deed or any rights hereunder, the said party of the second part, for itself, its successors and assigns agrees that the transfer of the property transferred by this instrument, is accepted subject to the following restrictions set forth in subparagraphs (1) and (2) of this paragraph, which shall run with the land, imposed pursuant to the authority of Article 4, Section 3, Clause 2 of the Constitution of the United States of America, the Federal Property and Administrative Services Act of 1949, the Surplus Property Act of 1944, as amended thereby, and applicable rules, regulations and orders:

(1) That, except as provided in subparagraph (6) of the next succeeding unnumbered paragraph, the land, buildings, structures, improvements and equipment in which this instrument transfers any interest shall be used for public airport purposes for the use and benefit of the public, on reasonable terms and without unjust discrimination and without grant or exercise of any exclusive right for use of the airport within the meaning of the terms "exclusive right" as used in subparagraph (4) of the next succeeding paragraph. As used in this instrument, the term "airport" shall be deemed to include at least all such land, buildings, structures, improvements and equipment.

(2) That, except as provided in subparagraph (6) of the next succeeding paragraph, the entire landing area, as defined in WAA Regulation 16, dated June 26, 1946, and all structures, improvements, facilities and equipment in which this instrument transfers any interest shall be maintained for the use and benefit of the public at all times in good and serviceable condition, provided however, that such maintenance shall be required as to structures, improvements, facilities and equipment only during the remainder of their estimated life, as determined by the Civil Aeronautics Administrator or his successor. In the event materials are required to rehabilitate or repair certain of the aforementioned structures, improvements, facilities or equipment, they may be procured by demolition of other structures, improvements, facilities or equipment transferred hereby and located on the above described premises which have outlived their use as airport property in the opinion of the Civil Aeronautics Administrator or his successor.

By the acceptance of this deed or any rights hereunder, the said party of the second part for itself, its successors and assigns, also assumes the obligations of, covenants to abide by and agrees to, and this transfer is made subject to, the following reservations and restrictions set forth in subparagraphs (1) to (7), inclusive, of this paragraph, which shall run with the land, imposed pursuant to the authority of Article 4, Section 3, Clause 2 of the Constitution of the United States of America, the Federal Property and Administrative Services Act of 1949, the Surplus

VOL 2915 PAGE 148

Property Act of 1944, as amended thereby, and applicable rules, regulations and orders:

(1) That insofar as it is within its powers, the party of the second part shall adequately clear and protect the aerial approaches to the airport by removing, lowering, relocating, marking or lighting or otherwise mitigating existing airport hazards and by preventing the establishment or creation of future airport hazards.

(2) That the United States of America (hereinafter sometimes referred to as the "Government") through any of its employees or agents shall at all times have the right to make nonexclusive use of the landing area of the airport at which any of the property transferred by this instrument is located or used, without charge; Provided, however, that such use may be limited as may be determined at any time by the Civil Aeronautics Administrator or his successor to be necessary to prevent undue interference with use by other authorized aircraft; Provided, further, that the Government shall be obligated to pay for damages caused by such use, or if its use of the landing area is substantial, to contribute a reasonable share of the cost of maintaining and operating the landing area, commensurate with the use made by it.

(3) That during any national emergency declared by the President of the United States of America or the Congress thereof, the Government shall have the right to make exclusive or nonexclusive use and have exclusive or nonexclusive control and possession, without charge, of the airport at which any of the property transferred by this instrument is located or used, or of such portion thereof as it may desire, provided, however, that the Government shall be responsible for the entire cost of maintaining such part of the airport as it may use exclusively, or over which it may have exclusive possession or control, during the period of such use, possession, or control, and shall be obligated to contribute a reasonable share, commensurate with the use made by it, of the cost of maintenance of such property as it may use nonexclusively or over which it may have nonexclusive control and possession; Provided, further, that the Government shall pay a fair rental for its use, control, or possession, exclusively or non-exclusively of any improvements to the airport made without United States aid.

(4) That no exclusive right for the use of the airport at which the property transferred by this instrument is located shall be vested (directly or indirectly) in any person or persons to the exclusion of others in the same class, the term "exclusive right" being defined to mean

(1) any exclusive right to use the airport for conducting any particular aeronautical activity requiring operation of aircraft;

(2) any exclusive right to engage in the sale or supplying

of aircraft, aircraft accessories, equipment, or supplies

(excluding the sale of gasoline and oil), or aircraft services

necessary for the operation of aircraft (including the main-

tenance and repair of aircraft, aircraft engines, propellers,

and appliances).

(5) That, except as provided in subparagraph (6) of this paragraph, the

property transferred hereby may be successively transferred only with the proviso

that any such subsequent transferee assumes all the obligations imposed upon the party

of the second part by the provisions of this instrument.

(6) That no property transferred by this instrument shall be used, leased,

sold, salvaged, or disposed of by the party of the second part for other than airport

purposes without the written consent of the Civil Aeronautics Administrator, which

shall be granted only if said Administrator determines that the property can be used,

leased, sold, salvaged or disposed of for other than airport purposes without

materially and adversely affecting the development, improvement, operation or main-

tenance of the airport at which such property is located; Provided, that no structures

disposed of hereunder shall be used as an industrial plant, factory, or similar

facility within the meaning of Section 23 of the Surplus Property Act of 1944, as

amended, unless the party of the second part shall pay to the United States such sum

as the General Services Administrator or his successor in function shall determine to

be a fair consideration for the removal of the restriction imposed by this proviso.

(7) The party of the second part does hereby release the Government, and

will take whatever action may be required by the General Services Administrator to

assure the complete release of the Government from any and all liability the Govern-

ment may be under for restoration or other damages under any lease or other agreement

covering the use by the Government of the airport, or part thereof, owned, controlled

or operated by the party of the second part, upon which, adjacent to which, or in

connection with which, any property transferred by this instrument was located or used;

Provided, that no such release shall be construed as depriving the party of the second

part of any right it may otherwise have to receive reimbursement under Section 17 of

the Federal Airport Act for the necessary rehabilitation or report of public airports

heretofore or hereafter substantially damaged by any Federal agency.

By acceptance of this instrument or any rights hereunder, the party of the

second part further agrees with the party of the first part as follows:

(1) That in the event that any of the aforesaid terms, conditions, reserva-

tions or restrictions is not met, observed, or complied with by the party of the

VOL 2915 PAGE 150

second part or any subsequent transferee, whether caused by the legal inability of said party of the second part or subsequent transferees to perform any of the obligations herein set out, or otherwise, the title, right of possession and all other rights transferred by this instrument to the party of the second part, or any portion thereof, shall at the option of the party of the first part revert to the party of the first part sixty (60) days following the date upon which demand to this effect is made in writing by the Civil Aeronautics Administrator or his successor in function, unless within said sixty (60) days such default or violation shall have been cured and all such terms, conditions, reservations and restrictions shall have been met, observed or complied with, in which event said reversion shall not occur and title, right of possession, and all other rights transferred hereby, except such, if any, as shall have previously reverted, shall remain vested in the party of the second part, its transferees, successors and assigns.

(2) That if the construction as covenants of any of the foregoing reservations and restrictions recited herein as covenants or the application of the same as covenants in any particular instance is held invalid, the particular reservations or restrictions in question shall be construed instead merely as conditions upon the breach of which the Government may exercise its option to cause the title, right of possession and all other rights transferred to the party of the second part, or any portion thereof, to revert to it, and the application of such reservations or restrictions as covenants in any other instance and the construction of the remainder of such reservations and restrictions as covenants shall not be affected thereby.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be executed as of the day and year first above written.

THE UNITED STATES OF AMERICA
Acting by and through
The General Services Administrator

By _R. E. Blackburn_
    R. E. BLACKBURN
    Associate Regional Director
    11th Region, Liquidation Service

KING COUNTY, WASHINGTON
A Municipal Corporation

ATTEST:

By _____
Deputy Chairman, Board of County
       Commissioners

_Robert A. Morris_
County Auditor and
Ex-officio Clerk of the Board

(SEAL)

Approved as to Form:

_David W. Anderson_
Assistant Regional Counsel
Real Property Division
Liquidation Service

- 17 -

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Plaintiff(s)* | ) |  |
| v. | ) | Civil Action No. |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Defendant(s)* | ) |  |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                                    *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

.

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | |
| *Plaintiff(s)* ) | |
| v. ) | Civil Action No. |
| ) | |
| ) | |
| ) | |
| ) | |
| *Defendant(s)* ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____        _____
                                                                    *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*
_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America

### DEFENDANTS

King County, Washington; Dow Constantine, in his official capacity as King County Executive

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    King
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Michael J. Gerardi (US DOJ, Civil Div., Federal Programs Branch, 1100 L St. NW, No. 12212, Washington, DC 20005, (202) 616-0680)

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government Plaintiff

☐ 3   Federal Question
       *(U.S. Government Not a Party)*

☐ 2   U.S. Government Defendant

☐ 4   Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ |  |  | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury |  | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability |  | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability |  | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** |  | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise |  |  | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
|  |  |  |  | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General |  |  | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** |  | ☒ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application |  |  |
|  | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions |  |  |
|  |  | ☐ 550 Civil Rights |  |  |  |
|  |  | ☐ 555 Prison Condition |  |  |  |
|  |  | ☐ 560 Civil Detainee - Conditions of Confinement |  |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation - Transfer   ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Supremacy Clause, U.S. Constitution

Brief description of cause:
Injunctive and declaratory relief challenging constitutionality of King County E.O. PFC-7-1-EO

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*:

JUDGE                                DOCKET NUMBER

DATE  2 / 10 / 2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #            AMOUNT            APPLYING IFP            JUDGE            MAG. JUDGE