HONORABLE ROBERT J. BRYAN

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9   UNITED STATES OF AMERICA,

10                    Plaintiff,

11        v.

12   KING COUNTY, WASHINGTON; DOW
     CONSTANTINE, in his official capacity as
13   King County Executive,

14                    Defendants.

15

16

17

18

19

20

21

22

23

24

25

Case No.   2:20-cv-203 RJB

DEFENDANTS' RESPONSE TO PLAINTIFF'S
MOTION FOR JUDGMENT ON THE
PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY
JUDGMENT

**NOTED ON MOTION CALENDAR:
FEBRUARY 15, 2023**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    FACTS ............................................................................................................... 2

      A.    The County Owns and Operates Boeing Field. ........................................ 2

      B.    The County Executive Office Becomes Aware of Immigration-Related Flights Occurring out of Boeing Field. ..................................................... 3

      C.    The County Adopted the Airport EO in Response to These Legitimate Concerns. .. 5

      D.    Modern Makes the Independent Business Decision to Stop Servicing Immigration Flights in May 2019, after Servicing Two Post-Airport EO Immigration Flights; No other FBO Decides to Start Servicing the Flights.................................................... 6

      E.    Every Other Western Washington FBO and Airport Contacted by the Government Likewise Refuses to Service Immigration Flights. ..................................... 7

      F.    The Government Relocates its Immigration-Related Flight Operations to Yakima, at No Additional Cost to the Government. ...................................... 8

      G.    The Government Cannot Show that the Relief it Seeks will Redress Its Alleged Injury. ............................................................................................................. 8

III.    ARGUMENT ..................................................................................................... 9

      A.    Legal Standards.............................................................................................. 9

      B.    The Government's "Renewed" Motion for Judgment on the Pleadings is Procedurally Improper, Lacks Merit, and Should be Denied. ................................. 10

      C.    The County, Not the Government, is Entitled to Summary Judgment on Standing. 12

           1.    The Government Has Not Demonstrated an Injury in Fact. ...................... 12

           2.    The Government Cannot Demonstrate that Any Injury It Suffered Is Traceable to the County, as Opposed to Modern's Business Decisions...... 13

           3.    The Government Cannot Demonstrate that Invalidation of the Airport EO Will Cause Modern to Begin Servicing ICE Flights. ................................. 15

      D.    The Government's Claims Are Not Ripe.............................................................. 16

      E.    The County is Entitled to Summary Judgment on its Tenth Amendment Anticommandeering Defense, Entitling the County to Dismissal of the Government's Intergovernmental Immunity and "Immigration Law" Preemption Claims. ............................................................................................................. 18

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - i
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

F.     The County is Entitled to Summary Judgment on its Market Participant Defense, which Requires Dismissal of the Government's Preemption and Intergovernmental Immunity Claims under the Supremacy Clause........................................................ 20

G.     The County is Entitled to Summary Judgment on the Government's Intergovernmental Immunity Claim; the Airport EO does not Discriminate Against the Government or Those With Whom it Deals. ...................................................... 22

H.     The County is Entitled to Summary Judgment on the Government's Claim for Preemption under Immigration Law. ......................................................................... 24

I.     The County is Entitled to Summary Judgment on the Government's ADA Claim. 27

     1.     The Government's Immigration-Related Flights do not Constitute "Air Transportation" under the ADA................................................................. 27

     2.     The Government has Not Met Its Burden of Establishing that the Airport EO has the Force and Effect of Law. ................................................................. 29

     3.     The Airport EO Does Not have Any Effect on Competition and Does Not Implicate "Prices, Routes, or Service"........................................................ 29

     4.     The County Adopted the Airport EO through an Exercise of Propriety Power, Which Congress Expressly Intended to Exempt from Preemption. 31

J.     The County, Not the Government, is Entitled to Summary Judgment on the Government's Instrument of Transfer Claim.......................................................... 33

IV.     CONCLUSION............................................................................................................ 35

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - ii
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

# TABLE OF AUTHORITIES

**Page**

## Cases

*Air Cal, Inc. v. City and County of San Francisco,*
    865 F.2d 1112 (9th Cir. 1989) ........................................................32

*Air Transport Ass'n of Am. v. City and County of San Francisco,*
    266 F.3d 1064 (9th Cir. 2001) .......................................................30

*Airlines for Am. v. City and County of San Francisco (A4A),*
    598 F. Supp 3d 748 (N. D. Cal. 2022) .................................20, 21, 22

*Airline Serv. Providers Ass'n v. Los Angeles World Airports (LAWA)*
    873 F.3d 1074 (9th Cir. 2017) ............................................... *passim*

*Alaska Airlines, Inc. v.City of Long Beach,*
    951 F.2d 977 (9th Cir. 1991) ...................................................31, 33

*American Airlines, Inc. v. Dep't of Transp.,*
    202 F.3d 788 (5th Cir. 2000) .........................................................31

*Arizona v. United States,*
    567 U.S. 387 (2012).......................................................................25

*Arapahoe Cnty. Pub. Airport Auth. v. F.A.A.,*
    242 F.3d 1213 (10th Cir. 2001) ....................................................31

*Barrientos v. 1801-1825 Morton, LLC,*
    2007 WL 7213974 (C.D. Cal. Sep. 11, 2007)...............................25

*Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.,*
    507 U.S. 218 (1993) ......................................................................20

*Branche v. Airtran Airways, Inc.,*
    342 F.3d 1248 (11th Cir. 2003) ....................................................31

*Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Tex.,*
    180 F.3d 686 (5th Cir. 1996) .......................................................21

*Ctr. for Biological Diversity v. Exp.-Imp. Bank of the United States,*
    894 F.3d 1005 (9th Cir. 2018) ......................................................15

*Chamber of Com. of the United States v. Whiting,*
    563 U.S. 582 (2011).......................................................................25

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

*Charas v. Trans. World Airlines, Inc.*,
  160 F.3d 1259 (9th Cir. 1998) .................................................................30

*Christensen v. Harris County*,
  529 U.S. 576 (2010) ..............................................................................26

*City and County of San Francisco v. Garland*,
  42 F.4th 1078 (9th Cir. 2022) .................................................................26

*City of El Cenizo v. Texas*,
  890 F.3d 164 (5th Cir. 2018) ............................................................18, 26

*Colorado v. United States*,
  455 F.Supp.3d 1034 (D. Colo. 2020) .......................................................27

*County of Ocean v. Grewal*,
  475 F. Supp. 3d 355 (D.N.J. 2020) .........................................................27

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*,
  637 F.3d 408 (D.C. Cir. 2011) ................................................................28

*Davis v. Michigan Dep't. of Treasury*,
  489 U.S. 803 (1989)................................................................................23

*Dep't of Com. v. New York*,
  139 S. Ct. 2551 (2019)............................................................................11

*Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*,
  249 F.3d 1132 (9th Cir. 2001) ..............................................................9, 10

*Fellner v. Tri-Union Seafoods, L.L.C.*,
  539 F.3d 237 (3d Cir. 2008)....................................................................26

*Galarza v. Szalczyk*,
  745 F.3d 634 (3d Cir. 2014)....................................................................19

*Geo Group v. Newsom*,
  50 F.4th 745 (9th Cir. 2022) ...............................................10, 13, 19, 35

*Goldstein v. California*,
  412 U.S. 546 (1973)................................................................................26

*Gundy v. United States.*,
  139 S. Ct. 2116 (2019)............................................................................30

*Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*,
  896 F.2d 1542 (9th Cir. 1989) ..................................................................9

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - iv
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Hodges v. Delta Airlines, Inc.,*
    4 F.3d 350 (5th Cir. 1993) ...................................................................31

*Johnson v. Am. Home Mortg. Corp.,*
    No 16-1085, 2017 WL 2909410 (C.D. Cal. May 8, 2017) ...................................9

*Kansas v. Garcia,*
    140 S. Ct. 791 (2020) .................................................................24

*Kelly v. Washington ex rel. Foss Co.,*
    302 U.S. 1 (1937) .....................................................................27

*Las Vegas Hacienda, Inc. v. C.A.B.,*
    298 F.2d 430 (9th Cir. 1962) .......................................................28

*Loretto v. Teleprompter Manhattan CATV Corp.,*
    458 U.S. 419 (1982) ..................................................................25

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ..............................................................12, 15

*Maya v. Centex Corp.,*
    658 F.3d 1060 (9th Cir. 2011) .......................................................13

*McHenry County v. Raoul,*
    44 F.4th 581 (7th Cir. 2022) ............................................... *passim*

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) ..................................................................30

*Mendia v. Garcia,*
    768 F.3d 1009 (9th Cir. 2014) .................................................13, 14

*Montauk-Caribbean Airways, Inc. v. Hope,*
    784 F.2d 91 (2d Cir. 1986) ..........................................................32

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) ..................................................................29

*Murphy v. NCAA,*
    138 S. Ct. 1461 (2018) ...........................................................19, 27

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) ..................................................................16

*Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw, Inc.,*
    277 P.3d 18 (Wash. Ct. App. 2012) ................................................34

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - v
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

*North Dakota v. United States,*
    495 U.S. 423 (1990).................................................................24

*Oneok, Inc. v. Learjet, Inc.,*
    575 U.S. 373 (2015).................................................................24

*Parents for Priv. v. Dallas Sch. Dist. No. 2,*
    326 F. Supp. 3d 1075 (D. Or. 2018) ...........................................14, 15

*Pelly v. Panasyuk,*
    413 P.3d 619 (Wash. Ct. App. 2018).............................................34

*Pit River Tribe v. Bureau of Land Mgmt.,*
    793 F.3d 1147 (9th Cir. 2015) .....................................................9

*Reid v. Johnson & Johnson,*
    780 F.3d 952 (2015)................................................................26

*Santa Monica Airport Ass'n v. City of Santa Monica,*
    659 F.2d 100 (9th Cir. 1981) .....................................................32

*S.D. Myers, Inc. v. City and County of San Francisco,*
    253 F.3d 461 (9th Cir. 2001) .....................................................32

*Spokeo, Inc. v. Robbins,*
    578 U.S. 330 (2016)................................................................12

*Taj Mahal Travel, Inc. v. Delta Airlines, Inc.,*
    164 F.3d 186 (3rd Cir. 1998) .....................................................31

*Texas v. United States,*
    523 U.S. 296 (1998)................................................................17

*Thomas v. Anchorage Equal Rights Comm'n,*
    220 F.3d 1134 (9th Cir. 2000) ...................................................17

*Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,*
    73 F.3d 1423 (7th Cir. 1996) .....................................................31

*Trump v. New York*
    141 S. Ct. 530 (2020)..............................................................17

*United States v. California* ("*California I*"),
    314 F. Supp. 3d 1077 (E.D. Cal. 2018)........................................19, 27

*United States v. California* ("*California II*"),
    921 F.3d 865 (9th Cir. 2019) ..........................................18, 19, 23, 26

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - vi
(Case No. 2:20-cv-203 RJB)

*United States v. Mexico,*
        455 U.S. 720 (1982)................................................................................35

*United States v. Washington,*
        142 S. Ct. 1976 (2022)....................................................................11, 22

*Vilas v. City of Manila,*
        220 U.S. 345 (1911)........................................................................20, 22

*Virginia Uranium, Inc. v. Warren,*
        139 S. Ct. 1894 (2019)............................................................................25

**Statutes and Rules**

8 U.S.C. § 1101................................................................................................25

8 U.S.C. § 1103(a)(11)(B)................................................................................26

8 U.S.C. § 1231................................................................................................25

8 U.S.C. § 1357................................................................................................26

8 U.S.C. § 1357(g)(1)......................................................................................26

8 U.S.C. § 1357(g)(9)......................................................................................26

49 U.S.C. § 40101(a)(6)...................................................................................30

49 U.S.C. § 40102(5)........................................................................................28

49 U.S.C. § 40105(25)......................................................................................28

49 U.S.C. § 41713............................................................................................28

Fed. R. Civ. P. 12(c).......................................................................................2, 9

Fed. R. Civ. P. 56(c)...........................................................................................9

King County Charter, §210..........................................................................17, 29

King County Charter, §220.20......................................................................17, 29

King County Charter, §320.20...........................................................................29

King County Code Chapter 2.15........................................................................17

King County Code Chapter 2.98.020..................................................................29

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - vii
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

King County Code Title 15............................................................................17

King County Code 15.12.020 ......................................................................17

LCR 7(h) ......................................................................................................10

RCW 14.08.120(1)(d) ..................................................................................25

RCW 14.08.120(1)(f) ...................................................................................25

RCW 14.08.120(1)(j) ...................................................................................25

**Other Authorities**

H.R. Rep. No. 95-1799 (1978)......................................................................30

H.R. Rep. No. 95-1211 (1978)......................................................................30

Wash. Const. art. XI, § 11............................................................................25

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - viii
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1

## I.    INTRODUCTION

2      The United States (the Government) sued King County and its Executive, Dow Constantine

3  (the County), to invalidate an Executive Order issued by the County on April 23, 2019 (the Airport

4  EO).  The Airport EO directs County personnel on certain executive policy goals relating to its

5  tenants' use of the County's airport, King County International Airport (Boeing Field), that might

6  indirectly support the Government's immigration activities.

7      The Airport EO does not discriminate against the federal government or its contractors.

8  The Airport EO has no present effect on the servicing of immigration flights at Boeing Field; any

9  restrictions would not have taken effect for at least 25 years given its fixed base operator, Modern

10 Aviation's, existing leases.  Nor does it restrict the Government or its contractors from conducting

11 immigration flights from any other airport in King County (i.e., Sea-Tac or Renton Municipal).

12     The Airport EO is a valid exercise of the County's constitutional rights under the Tenth

13 Amendment and its rights as the owner of Boeing Field.  The Government's claims to the contrary,

14 including that the Airport EO is preempted by immigration law generally and the Airline

15 Deregulation Act (ADA); that it violates the intergovernmental immunity doctrine by

16 discriminating against the Government and its contractors; and that the Airport EO is a breach of

17 an "Instrument of Transfer" between the Government and the County, are without merit.

18     Moreover, the County has asserted meritorious affirmative defenses.  These include that (1)

19 Plaintiff lacks standing because any harm it suffered was caused by the independent business

20 decisions of fixed base operators (FBOs) at Boeing Field to stop servicing immigration flights and

21 there is no evidence that invalidating the Airport EO would result in any FBO agreeing to begin

22 servicing them; (2) the Tenth Amendment's anti-commandeering doctrine bars the Government's

23 intergovernmental immunity and immigration law preemption claims; (3) the County was acting as

24 a market participant rather than a regulatory entity in adopting the Airport EO; (4) the ADA does

25 not apply to non-commercial government immigration flights; and (5) the Parties never intended

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 1
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1   the Instrument of Transfer to cover third-party flights operated by Government contractors.

2       The Parties have filed cross-motions for summary judgment.  The Government has also

3   filed an untimely motion for reconsideration improperly styled as a "renewed" motion for

4   judgment on the pleadings.  For all the reasons set forth below, the County asks that the Court

5   grant its motion for summary judgment and deny the Government's motions.  The County

6   answered the Government's complaint, denying the factual allegations contained therein and

7   asserting affirmative defenses (Dkt. No. 13; 22), which led the Court to correctly deny the

8   Government's first Rule 12(c) motion (Dkt. No. 26).  Nothing in the Government's renewed

9   motion merits changing that decision.  And the County now presents evidence supporting those

10  same denials and affirmative defenses, creating at minimum factual issues that necessitate denial of

11  the Government's motion for summary judgment.  It is the County, not the Government, that has

12  established an entitlement to summary judgment, as shown below.

13                          **II.      FACTS**

14  **A.      The County Owns and Operates Boeing Field.**

15      The County has owned and operated Boeing Field for nearly a century.  The airport is a

16  large regional employer, directly supporting more than 16,000 jobs, and creating $2 billion in labor

17  income in King County.  Cramer Decl., Ex. 1.[1]  More than 100 tenants lease space at the airport.

18  *Id.*  These tenants serve small commercial passenger airlines, cargo carriers, private aircraft

19  owners, helicopters, corporate jets, military, and other aircraft.  *Id.*

20      While the airport is owned by the taxpayers of King County, it must operate as a going

21  concern because it is not funded through the County's general fund, which uses property tax and

22  sales tax money, but instead is financed through revenues generated at the airport.  Ex. 2 (Parrott

23  Tr. at 20:12-21:4) ([The airport is] "a self-sufficient little bubble with business within the

24  county."); *see also* Ex. 3 ("[Boeing Field] is financed by fees paid by airport tenants and

25

---

[1] All references to "Ex. __" in the County's brief refer to the Declaration of Shane P. Cramer filed herewith.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 2
(Case No. 2:20-cv-203 RJB)

1   customers, and receives no general tax revenues.").  This means that the County must act in the

2   best financial interests of the airport as a business, including by "maintaining good tenant

3   relationships and ensuring that the airport business model continues to function as an enterprise

4   fund of the county."  Ex. 2 (Parrott Tr. at 19:13-20:11).

5        Among the County's tenants at Boeing Field are FBOs.  FBOs are privately owned

6   companies that provide services like fuel, flight stairs, and cleaning to aircraft using the airport.

7   Ex. 4 (Carmen Tr. at 31:14-32:8); Ex. 5 (Wilcox Tr. at 60:24-61:10).  The FBOs operate under

8   long-term ground leases with the County.  Modern Aviation, the FBO that previously serviced the

9   Government's contractor-operated immigration flights, currently has two long-term ground leases

10  with the County, one through 2048 and another through 2052.  Ex. 4 (Carmen Tr. at 79:6-15).[2]

11  **B.    The County Executive Office Becomes Aware of Immigration-Related Flights
          Occurring out of Boeing Field.**

12        Immigration issues, including the treatment of immigrant detainees, dominated the public

13  sphere nationally in 2017 and 2018.  This was true in King County too.  For example, in 2017, a

14  significant protest disrupted operations at Sea-Tac following an Executive Order signed by former

15  President Trump to temporarily suspend entry of refugees into the United States, among other

16  immigration-related policy changes.  Ex. 6.  Another immigration protest of more than 10,000

17  people took place in 2018 outside of an immigration detention center located in SeaTac,

18  Washington.  Ex. 7.  Similar protests occurred at other ICE facilities in Seattle and Tacoma,

19  including at ICE's offices and outside the Northwest Detention Center, the latter of which resulted

20  in a protestor being shot and killed by law enforcement.  Ex. 5 (Wilcox Tr. at 44:11-46:19); Ex. 8

21  (Cordero Tr. 194:6-212:12).

22        The County Executive's Office first learned in June 2018 that Boeing Field was being used

23

24
25  [2] Modern also had a third ground lease for a small triangular piece of property until June 2020, but the County
    subsequently leased it to UPS as part of a new long-term lease to maximize the highest and best possible use of its
    airport property.  Ex. 2 (Parrott Tr. at 214:21-215:6).  There is no evidence that the non-renewal of this lease had
    anything to do with Modern's servicing of immigration flights.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 3
(Case No. 2:20-cv-203 RJB)

1    to conduct immigration flights.  Ex. 2 (Parrott Tr. at 37:2-15).  Given the heightened tensions

2    around immigration issues and the potential for disruptive protests, County officials were

3    concerned about the financial and operational risks posed by these flights, and that permitting them

4    to occur might be inconsistent with the County's values and ordinances.  The County needed to

5    mitigate the potential for negative effects on its operation of Boeing Field.  *Id.* (at 127:17-22).  To

6    identify an appropriate solution, County officials met with County personnel, stakeholders, and

7    community groups to better understand the extent of Boeing Field's involvement in these flights

8    over the next several months.  *Id.* (at 94:12-95:12).

9            On April 16, 2019, the University of Washington Center for Human Rights (UWCHR) sent

10   the County drafts of two reports detailing the County's purported facilitation of ICE's deportation

11   practices that it planned to release publicly on April 24, 2019.  The first was titled "Hidden in Plain

12   Sight: ICE Air and the Machinery of Mass Deportation."  The second, a companion piece, was

13   titled, "Hidden in Plain Sight: King County Collaboration with ICE Air Deportation Flights at

14   Boeing Field," and detailed the use of Boeing Field for deportation flights.  Ex. 9.

15           The County was concerned about the timing of UWCHR's release in late April.  Seattle has

16   historically seen significant immigration-related protest activities on May 1 (i.e., May Day), and

17   May 1, 2019 was no different.  Ex. 10.  The County was therefore well aware of the significant risk

18   presented by protest activity when it issued the Airport EO.  Ex. 2 (Parrott Tr. at 136:25-137:13)

19   ("[I]f ICE flights continued… [the County was] very likely to see protests and disruptions of

20   business at the airport and at that point [the County's] tenants[,] both the FBOs and corporate

21   individual tenants[,] could very well decide that this was not the airport they wanted to operate at

22   and take their business elsewhere.").

23           Modern, which was identified by name in the UWCHR report as the FBO servicing these

24   flights, also was deeply concerned about the effect protests and its association with deportation

25   flights would have on its business.  Ex. 4 (Carmen Tr. at 139:11-40:21).  ICE itself recognized

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 4
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1    these protests could be disruptive.  Ex. 8 (Cordero Tr. at 194:6-212:12).  And Classic Air Charter,

2    the Government's immigration flight contractor, likewise recognized that significant protests can

3    lead to an airport being unsafe to operate out of.  Ex. 11 (Carson Tr. at 85:10-92:12).[3]

4           The County also understood that UWCHR's report release would expose the County to

5    boycott risk by current or future customers because of perceived entanglement with ICE's

6    deportation policies.  Ex. 2 (Parrott Tr. at 127:17-22).  The County was not alone in this concern.

7    Modern too was worried that its involvement with ICE could negatively impact its other clients'

8    willingness to do business with it once the UWCHR report was publicly released.  Ex. 4 (Carmen

9    Tr. at 139:11-40:21).  Even ICE recognized that these types of concerns are legitimate reasons why

10   it might not be "viable" to use a particular airport, writing in an internal memo that Portland

11   International Airport was not a viable location for immigration flights because it "may cause PDX

12   businesses to assume additional expense in arranging for security and other measures to mitigate

13   potential risk to the Airport and its users" and because "the sole [FBO] who has agreed to support

14   such flight operations may reconsider their position due to increased public scrutiny and disruption

15   to their operations or other corporate customers and potential loss of business."  Ex. 12.

16   **C.      The County Adopted the Airport EO in Response to These Legitimate Concerns.**

17          The County Executive, working with the King County Airport Director and other key

18   County personnel, addressed these concerns in the Airport EO.  The Airport EO is limited in

19   scope.  Consistent with the limited effect of County executive orders generally, the Airport EO

20   simply directed airport personnel as to the Executive's goals and policy aims.  Ex. 13.  It was not

21   enacted by the County's legislative body (the King County Council) as an ordinance, nor is it an

22   administrative rule.

23

24   _____

     [3] In fact, Classic testified that if ICE deemed an airport unsafe due to protest concerns, Classic would not use it to
25   conduct immigration flights, and that ICE would similarly respect any safety concerns that Classic had about using a
     particular airport.  Ex. 11 (Carson Tr. at 88:7-89:23).  Apparently, according to the Government, the only party without
     any voice is the airport owner, who would be on the front line dealing with protestors and potentially liable for any
     damages or harm caused.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 5
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

The Government challenges three directives to County personnel in the Airport EO to:

- "Ensure that all **future** leases, operating permits and other authorizations for commercial activity at King County International Airport contain a prohibition against providing aeronautical or non-aeronautical services to enterprises engaged in the business of deporting immigration detainees (except for federal government aircraft), to the maximum extent permitted by applicable law";

- "Develop procedures for exercising King County's rights under existing leases at King County International Airport to ensure strict lessee compliance with applicable laws, ordinances, rules, regulations and policies of King County regarding human trafficking and the servicing of any aircraft engaged in the business of deportation of immigrant detainees, including, without limitation King County Code Chapter 2.15 and this Executive Order."

- "Revise and formally adopt amendments to existing rules and regulations and King County Code Title 15 [which addresses the "Airport"] in a manner consistent with King County Code Chapter 2.15 and this Executive Order."

Dkt. No. 69, at 9 (emphasis added).

Modern's leases do not terminate for at least 25 years.  Ex. 4 (Carmen Tr. at 79:6-15).  No procedures have been developed with respect to King County's existing leases.  *See* Ex. 2 (Parrott Tr. at 146:21-154:25).  The Government does not allege that any of the "applicable laws, ordinances, rules, regulations and policies of King County regarding human trafficking and the servicing of any aircraft engaged in the business of deportation," including any provisions contained in KCC 2.15, violate federal law or are otherwise unenforceable.

Nor has the County acted to adopt amendments to the Airport Rules and Regulations and KCC Title 15, given Modern's decision to stop servicing the flights and the Government's filing of this action.  *See id.*  Doing so likely would require an act of the King County Council or formal rule-making, neither of which occurred.  *See* Ex. 2 (Parrott Tr. at 152:15-53:6) (describing County Council's involvement); King County Charter, §§ 210; 220.20; KCC 15.12.020.

**D.      Modern Makes the Independent Business Decision to Stop Servicing Immigration Flights in May 2019, after Servicing Two Post-Airport EO Immigration Flights; No other FBO Decides to Start Servicing the Flights.**

Following the Airport EO's adoption, Modern serviced two additional immigration flights

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 6
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

at Boeing Field, on April 23 and April 29, 2019.  Ex. 2 (Parrott Tr. at p. 215:19-216:2); Ex. 14 (at p. 9).  The County took no action to stop them, because the Airport EO did not expressly prohibit Modern from servicing the flights.  At some point in late April 2019, Modern made the independent business decision to stop servicing immigration flights.  Ex. 4 (Carmen Tr. at 198:18-21).  The County did not direct or even ask Modern to do so.  Ex. 2 (Parrott Tr. at 214:5-20); Ex. 4 (Carmen Tr. at 198:24-199:10).  At his deposition, Modern's CEO explained why he decided to sever his business relationship with Classic, including primarily that he was concerned about protests, possible "financial impact," "and "potential disruption to [Modern's] existing customer base."  Ex. 4 (Carmen Tr. at 196:18-198:23).

Modern then requested a meeting with the County to inform them of this decision, which occurred on May 1, 2019.  At that meeting, "[Modern] told [the County] they were going to cease operating the [ICE] flights."  Ex. 2 (Parrott Tr. at 192:17-24).  The County had had no discussions with Modern between the Airport EO's issuance and this meeting.  *Id.* (at 192:17-193:24).  Modern told the County that it was making this decision "to be a good tenant, [and a] good community member of King County and reflect the values of the people in the [C]ounty."  *Id.* (at 195:6-18).  At the meeting, Executive Constantine offered that Modern could "blame the County" if Modern thought it would be helpful in its discussions with Classic.  *Id.* (at 193:5-96:21).  As the Government acknowledges, Modern took him up on the offer the next day.  *Id.* (at 4:18-5:12).

**E.      Every Other Western Washington FBO and Airport Contacted by the Government Likewise Refuses to Service Immigration Flights.**

Modern was not alone in making this business calculus.  After Modern stopped servicing the flights, the other two FBOs operating at Boeing Field informed Classic and the County that they too were not interested in servicing immigration flights.  Ex. 2 (Parrott Tr. at 202:21-203:14); Ex. 11 (Carson Tr. at 95:20-96:1).  Classic and ICE then reached out to the FBO at Paine Field in Everett, who also declined, citing concerns about becoming involved with ICE's immigration

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 7 (Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1   flights.  Ex. 15.  ICE then contacted an FBO at Sea-Tac International Airport and the Port of

2   Seattle directly.  Both declined.  Ex. 8 (Cordero Tr. at 131:21-134:22).  The FBO at Bellingham

3   International Airport similarly refused after the Port of Bellingham decided that immigration

4   flights were not "politically aligned with what they want to do."  *Id.* (at 137:18-141:16).

5       The Government then sought to use the airfield at Joint Base Lewis McChord (JBLM),

6   which is a Government-owned facility.  Like every other Western Washington airport, JBLM

7   refused ICE's request.  *Id.* (at 175:16-178:210).[4]

8       None of these airports are owned by King County, and the Airport EO does not apply to

9   them.  The Government has taken no enforcement action against these other airports, and concedes

10  that FBOs can choose to not do business with ICE or its contractors.  *Id.* (at 147:1-148:3).

11  **F.    The Government Relocates its Immigration-Related Flight Operations to Yakima, at
           No Additional Cost to the Government.**

12

13      Within hours of being informed that Modern would no longer service its immigration

14  flights, the Government had reached agreement with the City of Yakima, as the proprietor of

    Yakima Air Terminal, and its FBO to do so.  Ex. 11 (Carson Tr. at 97:4-100:22).  Classic began
15
    using Yakima on May 7, 2019 and has continued to operate the Government's immigration flights
16
    out of Yakima for more than three years.  Ex. 16 (at p. 7).  The Government has admitted that the
17
    switch from Boeing Field to Yakima has not increased its costs.  Ex. 8 (Cordero Tr. at 50:5-17;
18
    81:15-20).  Classic has also confirmed that it did not pass on any additional cost to the Government
19
    because of this move.  Ex. 11 (Carson Tr. at 53:19-21).
20
    **G.    The Government Cannot Show that the Relief it Seeks will Redress Its Alleged Injury.**
21
        The Government filed this action on February 10, 2020, asking the Court to "enter a
22
23  judgment declaring the Airport EO violates the Supremacy Clause and is therefore invalid; and to

24

25  ---
    [4] It was as part of ICE's internal efforts to get clearance to use JBLM that they drafted the internal white paper
    explaining why Portland International Airport was "not a viable option."  Ex. 12.  The reasons, which mirror all of the
    legitimate concerns that led the County to execute the Airport EO, undercut the Government's portrayal of the
    County's actions as obstructionist, as opposed to local and proprietary.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 8
(Case No. 2:20-cv-203 RJB)

1    "enjoin Defendant as well as their successors, agents, and employees, from enforcing the Airport

2    EO." (Dkt. No. 1, at 8). Despite ample discovery, there is no evidence that invalidating the

3    Airport EO will lead Modern or any other FBO to start servicing immigration flights, given their

4    contentious nature.

### III.    ARGUMENT

6    **A.    Legal Standards.**

7            *Motion for Judgment on the Pleadings*. While Rule 12(c) allows a plaintiff to move for

8    judgment on the pleadings, such a move is "highly irregular." *See Johnson v. Am. Home Mortg. Corp.*,

9    No. 16-1085, 2017 WL 2909410, at *1 (C.D. Cal. May 8, 2017). When considering a plaintiff's Rule

10   12(c) motion, "the allegations of the non-moving party must be accepted as true, while the allegations

11   of the moving party which have been denied are assumed to be false." *Hal Roach Studios, Inc. v.*

12   *Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989). As a result, "a plaintiff is not

13   entitled to judgment on the pleadings if the defendant's answer raises issues of fact or affirmative

14   defenses." *Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147, 1159 (9th Cir. 2015). For this

15   reason, "[a] plaintiff will rarely satisfy [its] burden on the basis of the complaint alone." *Johnson*, 2017

16   WL 2909410, at *2. Because the County's answer both denies the majority of the Government's

17   allegations and asserts affirmative defenses which cannot be adjudicated on the pleadings, the

18   Government's renewed Rule 12(c) motion must be denied.

19           *Summary Judgment*. Summary judgment is appropriate when, viewing the facts in the

20   light most favorable to the nonmoving party, there is no genuine issue of material fact which

21   would preclude summary judgment as a matter of law. Fed. R. Civ. P. 56(c). "[W]hen parties

22   submit cross-motions for summary judgment, each motion must be considered on its own merits."

23   *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001)

24   (alteration and internal quotation marks omitted). Thus, "[t]he court must rule on each party's

25   motion on an individual and separate basis, determining, for each side, whether a judgment may be

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 9
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1   entered in accordance with the Rule 56 standard." *Id.* (quotations omitted).  However, the court

2   must consider the evidence proffered by both sets of motions before ruling on either one.  *Id.* at

3   1135-36.  Under this standard, the County is entitled to summary judgment; the Government's

4   motion, on the other hand, should be denied because—at minimum—the County has presented

5   material issues of disputed facts on each of the Government's claims.

6   **B.**   **The Government's "Renewed" Motion for Judgment on the Pleadings is Procedurally**
        **Improper, Lacks Merit, and Should be Denied.**

7          The Government's "renewed" Rule 12(c) motion simply re-argues the same points the

8   Court rejected the first time around, relying on many of the same cases and a smattering of new

9   ones that simply restate settled law.  In this District, motions for reconsideration, like the

10  Government's "renewed" Rule 12(c) motion, are "disfavored."  LCR 7(h).  "The court will

11  ordinarily deny such motions in the absence of a showing of manifest error in the prior ruling or a

12  showing of new facts or legal authority which could not have been brought to its attention earlier

13  with reasonable diligence."  *Id*.  The deadline for filing such a motion is 14 days.  *Id.*

14         The Government does not contend the Court's earlier decision was manifest error, nor does

15  it cite any new facts or a change in the law that would justify the Court's reconsideration of its

16  earlier order.  Instead, the Government tries to leverage two new cases to try to convince the Court

17  there is no need to actually analyze the merits of this dispute.

18         The Government argues that the Ninth Circuit's recent decision in *Geo Group v. Newsom*,

19  50 F.4th 745 (9th Cir. 2022) demonstrates the Government's standing as a matter of law.  Not so.

20  First, *Geo Group* involved an appeal from a denial of preliminary injunction, wherein the Court

21  considered the actual evidence presented by the parties with respect to standing.  It cannot be read

22  to say that simply alleging standing is enough to establish it, particularly where the defendant, like

23  the County here, has specifically denied that standing exists.

24         Second, the plaintiffs in *Geo Group* included ICE and Geo Group, both of which

25

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 10
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1   challenged a California law prohibiting certain private detention centers (which Geo Group

2   operates as an ICE contractor).  There was no absent third party.  Here, in sharp contrast, Modern

3   is not a party to the suit, and the County alleged (and has now demonstrated) that any harm

4   incurred by the Government was caused by Modern's decision to stop servicing immigration

5   flights, not the County's Airport EO.  Nor does *Geo Group* excuse a plaintiff from establishing

6   redressability, which was a central reason why the Court denied the Government's first Rule 12(c)

7   motion (and which the Government still cannot satisfy).

8        The Government next argues that the Court should grant its Rule 12(c) motion on its

9   intergovernmental immunity claim, again over the specific denials and affirmative defenses of the

10  County, based on the Supreme Court's recent decision in *United States v. Washington*, 142 S. Ct.

11  1976 (2022).  But *Washington* was decided on summary judgment, after the Court had considered

12  the facts presented by the parties and was primarily concerned with assessing when a

13  Congressional waiver might apply in the context of an intergovernmental immunity claim.  It does

14  not mean that the Court can ignore a defendant's denials and affirmative defenses and grant

15  judgment on the merits simply because a plaintiff asks for it.  While doing so in any context would

16  be error, to do so here would be extraordinary.  More, just as with *Geo Group*, the law at-issue in

17  *Washington* directly targeted the Government contractor; there was no absent third party that

18  independently severed the chain of causation.[5]

19       The County asserted several affirmative defenses, including that it was acting within its

20  authority under the Tenth Amendment and as a market participant.  Numerous recent cases make it

21  clear that a municipality cannot be compelled to facilitate the Government's immigration program.

22  This includes the sovereign right to preclude the Government from using municipally-owned

23  facilities (like Boeing Field).  *E.g.*, *McHenry County v. Raoul*, 44 F.4th 581 (7th Cir. 2022)

24

25  [5] The Government also cites *Dep't of Com. v. New York,* 139 S. Ct. 2551, 2566 (2019), for the proposition that this
    Court can assume the Airport EO had a "predictable" effect on the FBOs, but the Supreme Court held no such thing.
    There, the Court reviewed the "evidence at trial" that the plaintiffs submitted to establish causation and redressability.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 11
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

(recognizing that, under the 10th Amendment, a state cannot be forced to allow ICE to use municipally-owned facilities for immigration purposes).  And the Ninth Circuit has made it clear that an airport owner's acts do not fall within the scope of the Supremacy Clause when the airport is acting as a market participant vis-à-vis its tenants.  *Airline Serv. Providers Ass'n v. Los Angeles World Airports*, 873 F.3d 1074 (9th Cir. 2017) (*LAWA*).  The County will not repeat the rest of its arguments against the Government's Rule 12(c) motion here but incorporates its original response (Dkt. No. 22) by this reference.

The Court should deny the Government's Rule 12(c) motion, particularly because a review of the merits demonstrates that the County, not the Government, should prevail.

**C.    The County, Not the Government, is Entitled to Summary Judgment on Standing.**

Standing is a threshold issue.  To survive summary judgment, the Government must establish that it (1) "suffered an injury in fact," (2) caused by the defendants' conduct, and (3) "that [the injury] is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  The Government has the burden of establishing each of these elements.  *Id.*  This requires the plaintiff come forward with evidence of "specific facts" supporting these elements.  *Lujan*, 504 U.S. at 561. The Government cannot do so.

**1.    The Government Has Not Demonstrated an Injury in Fact.**

"To establish injury in fact, a plaintiff must show that [they] suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339.

The Government's claims rely upon the hypothetical possibility that, at some unforeseen point in the future, the County might re-negotiate certain leases that might indirectly affect the Government's immigration-related flight operations.  That is pure conjecture.  "A 'concrete' injury must be '*de facto*'; that is, it must actually exist."  *Id.* at 340 (emphasis in original).

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 12 (Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1    Plaintiff has not even clearly identified what "legally protected interest" the County has

2    allegedly invaded.  The Government admits that neither it nor Classic had a contract with Modern

3    for FBO services.  The Government also admits that it has no right to compel Modern or any other

4    FBO to perform FBO services for its immigration flights.  Ex. 8 (Cordero Tr. 147:1-48:3).  By its

5    terms, the Airport EO does not preclude any aircraft, including aircraft operated by the government

6    or its contractors, from landing or taking off at Boeing Field, and the Government has not

7    identified the source of any legal right it has to a particular FBO's services.  The Airport EO does

8    not preclude any FBO from providing services under their existing long-term leases, which in

9    Modern's case extend through at least 2048.[6]  Nor can the Government prove any actual costs

10   related to any alleged increased burden, despite having over two years in discovery to establish

11   such a factual record.  *See id.* at 50:5-17; 81:15-20.

12       The Government invokes the Ninth Circuit's recent decision in *GEO Group* to argue that it

13   is entitled to litigate its alleged injury now, even though any injury arising from the Airport EO is

14   entirely speculative.  Mot. at 9-10.  But in *GEO Group*, the court was persuaded because GEO's

15   injuries were going to occur next year, and therefore were "sufficiently imminent."  50 F.4th at

16   753-54.  Here, the County's leases with Modern, which are the only ones that the Government

17   points to, do not expire until at least 2048, which is hardly imminent.  The Government has not

18   established that it has suffered an injury in fact.

19       **2.    The Government Cannot Demonstrate that Any Injury It Suffered Is
              Traceable to the County, as Opposed to Modern's Business Decisions.**

20

21       To survive summary judgment, the Government must come forward with specific facts

22   demonstrating that its "injury is 'fairly traceable to the challenged action of the defendant, and not

23   the result of the independent action of some third party not before the court."  *Mendia v. Garcia*,

24   768 F.3d 1009, 1012 (9th Cir. 2014); *see also Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir.

25

---

[6] The Government cites to Parrott's testimony that the County's goal was to ban ICE flights, but ignores his testimony that County had no intention of doing so in the short term.  Ex. 2 (Parrott Tr. at 159:15-60:6).

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 13
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1   2011) ("In cases where a chain of causation 'involves numerous third parties' whose 'independent

2   decisions' collectively have a 'significant effect' on plaintiffs' injuries, the Supreme Court and this

3   court have found the causal chain too weak to support standing….").  At a minimum, the

4   Government must demonstrate that the Airport EO was "at least a substantial factor motivating the

5   third parties' actions," which cannot be based on "speculation or guesswork" about the third

6   parties' motivations.  *Mendia*, 768 F.3d at 1013; *Parents for Priv. v. Dallas Sch. Dist. No. 2*, 326 F.

7   Supp. 3d 1075 (D. Or. 2018).

8       The Government cannot make this showing.  The Airport EO does not prohibit FBOs like

9   Modern from servicing immigration flights.  Ex. 13; *see also* Ex. 4 (Carmen Tr. at 75:8-13).  By its

10   terms, the Airport EO only applies to future leases.  And Modern's leases at Boeing Field run

11   through at least 2048—25 years from now.

12       The County has never prohibited Modern from servicing immigration flights.  *See* Ex. 4

13   (Carmen Tr. at 177:2:-181:11), 198:24-99:10); *see also* Ex. 2 (Parrott Tr. at 207:5-09:25).  Indeed,

14   Modern continued to service immigration flights after the Airport EO was adopted before deciding

15   no longer to do so.  Modern testified that, after the UWCHR published its report linking the

16   County and Modern to immigration flights from Boeing Field, members of the press started

17   contacting and coming to Modern's business to investigate its involvement.  Ex. 4 (Carmen Tr. at

18   100:22-01:9; 130:19-31:10).  Modern became concerned that its other customers would no longer

19   use Modern for FBO services because of its connection to ICE flights.  *Id.* (at 70:19-73:19, 104:9-

20   15, 106:17-07:2).  As a result, Modern decided to stop servicing the flights "[b]ecause [they] were

21   concerned about press and protests and a whole bunch of things" including "concern[s] about this

22   having an adverse effect on [Modern's] business" because of "continued press where [Modern is]

23   named in the press and possible protests."  *Id.* (at 162:23-164:4).  Once Modern had made this

24   decision, they "wanted to put it behind us and reduce risk."  *Id.*  Modern's concern about

25   "something unexpected happening that could harm our business" rather than concerns about any

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 14
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

actions by the County, "drove the timing on [Modern's] side." *Id.*; *see also id.* (at 139:11-143:15)

(describing Modern's concern about press and protests).  When pressed again for an explanation

why it stopped servicing the flights, Modern reiterated that:

> [A]t the end of the day it was our decision to stop accepting these flights.  And
> that's a decision we made as a company for a variety of reasons, many of which
> we've discussed today….  That said, you know, Dow said, you can blame us.  But
> we didn't – you know, it was our decision, so we take responsibility for our
> business decision.

*Id.* (at 179:24-81:11) (cleaned up); *see also* Ex. 2 (Parrott Tr. at 192:17-196:21)

(describing how the County told Modern it could blame its decision to stop servicing the

flights on the County in its discussions with Classic if it would be helpful, which Modern

then did).

The evidence establishes that Modern made its decision to stop servicing immigration

flights for its own business reasons.  Considering this overwhelming evidence, the Government

cannot establish that the Airport EO, which itself was a reaction to the public disclosure of the

UWCHR's story on immigration flights at Boeing Field meant to prevent similar disruptions,

motivated Modern's decision.

### 3.   The Government Cannot Demonstrate that Invalidation of the Airport EO Will Cause Modern to Begin Servicing ICE Flights.

The Government asks the Court to invalidate the Airport EO.  Dkt. No. 1, at 8.  But there is

no evidence that doing so would redress the Government's alleged injury.  To meet its burden on

this element, the Government must show that it is "'likely' as opposed to merely 'speculative,' that

the injury will be 'redressed by a favorable decision." *Lujan*, 504 U.S. 555, 561 (1992).

> When … a plaintiff's asserted injury arises from the government's allegedly
> unlawful regulation (or lack of regulation) of *someone else*, much more is needed.
> In that circumstance, causation and redressability ordinarily hinge on the response
> of the regulated (or regulable) third party to the government action or inaction –
> and perhaps on the response of others as well.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 15
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1    *Parents for Priv.*, 326 F. Supp. 3d at 1091, *citing Lujan*, 504 U.S. at 562; *see also Ctr. for*

2    *Biological Diversity v. Exp.-Imp. Bank of the United States*, 894 F.3d 1005, 1013 (9th Cir. 2018)

3    (plaintiff must establish that requested relief would cause the third party to alter its conduct in a

4    way that redresses its injury).

5         The Government has not presented any evidence that Modern—or any other FBO—would

6    likely start servicing immigration flights if the Executive Order were invalidated.  Ex. 8 (Cordero

7    Tr. at 147:1-148:3).  In fact, the evidence overwhelmingly proves otherwise.  After Modern

8    decided to stop servicing immigration flights, the Government and Classic contacted FBOs and

9    airports throughout Western Washington, none of which were covered by the Airport EO.  Yet

10   none of them were willing to take on the Government's immigration flights.  *Id.* (at 142:5-12).

11   This includes at least Sea-Tac (*id.* at 115:24-117:2, 131:21-32:18); Paine Field (*id.* at 123:724:25);

12   and Bellingham (*id.* at 138:18-140:9).  JBLM, which is federally-owned, also refused.  So did the

13   other two FBOs at Boeing Field.  No evidence suggests that Modern would act differently than all

14   of these other third-parties, especially given its testimony regarding the risks it sees to its business

15   from bad press and protests (*supra* Section C, subpart 2), and where Modern testified that its

16   income from servicing immigration flights is "not material" to its overall business.  Ex. 4 (Carmen

17   Tr. at 155:16-156:2).

18        The Government cannot establish that it has standing to pursue this action, and thus

19   summary judgment in the County's favor is warranted.[7]

20   **D.    The Government's Claims Are Not Ripe.**

21        "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of

22   premature adjudication, from entangling themselves in abstract disagreements."  *Nat'l Park Hosp.*

23   *Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003).  To be ripe, a case must not be "dependent on

24

25   ───────────────────

[7] At a minimum, the County has established a genuine issue of material fact exists as to whether Plaintiff has standing, such that Plaintiff is not entitled to summary judgment in its favor on standing.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 16
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1  'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"

2  *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300

3  (1998)).  The plaintiff must face "a realistic danger of sustaining a direct injury as a result of the

4  statute's operation or enforcement," as opposed to fears that are too "imaginary" or "speculative"

5  to support jurisdiction.  *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th

6  Cir. 2000) (citation omitted).

7        The Government challenges three policy directives contained in the Executive Order.  The

8  first only seeks to limit tenants operating under future leases from servicing of third-party

9  immigration flights; it has no bearing on existing leases.  Until some FBO operating under a future

10  lease indicates that it has been prohibited or precluded from servicing immigration flights due to

11  the Airport EO, any claim under this directive is not ripe.

12        The second directive instructs airport officials to develop procedures to ensure that its

13  lessees are compliant with King County Code Chapter 2.15 (Citizen and Immigration Status), the

14  provisions of which the Government has not challenged, and the Airport EO's future lease

15  directive that has never been implemented.  The County has not developed any such procedures,

16  nor is there any indication regarding what those procedures might entail or how they might impact

17  the Government.  Ex. 2 (Parrott Tr. at 146:21-54:25).  Any challenge to this directive is premature

18  until some action is taken to develop any such procedures and their scope could be assessed.

19        The third directive instructs airport officials to "revise and formally adopt amendments to

20  existing rules and regulations and the King County Code Title 15" relating to the airport.  The

21  County has taken no steps to pursue this directive either.  *Id*.  Generally, only the King County

22  Council, as the County's legislative branch, has the authority to significantly amend existing

23  airport rules and regulations or to adopt new County ordinances.  King County Charter, §§ 210;

24  220.20; KCC 15.12.020.  There is no evidence that the Council has taken any action to do either,

25  or what any such future amendments might entail.  Until and unless it does so, the Government's

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 17
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1    challenge to this directive is premature.

2          For all of these reasons, the Government's claims are not ripe and should be dismissed.

3    **E.**    **The County is Entitled to Summary Judgment on its Tenth Amendment Anticommandeering Defense, Entitling the County to Dismissal of the Government's Intergovernmental Immunity and "Immigration Law" Preemption Claims.**

4

5          Under the Tenth Amendment's anticommandeering doctrine, the Government cannot

6    compel the County to facilitate its immigration program by forcing the County to allow

7    immigration flights at Boeing Field.  As the Ninth Circuit recognized in *California II*, "under the

8    Tenth Amendment and other provisions of the Constitution, 'the Federal Government may not

9    compel the States to implement, by legislation or executive action, federal regulatory programs."

10   *United States v. California*, 921 F.3d 865, 888 (9th Cir. 2019) (citation omitted).  To the contrary,

11   "[f]ederal law provides states and localities the *option*, not the *requirement*, of assisting federal

12   immigration authorities." *Id.* at 889 (emphasis in original).  This includes the right of

13   municipalities like the County to withdraw their resources and facilities from use for immigration

14   purposes.  Likewise, the Fifth Circuit explained "[f]ederal law regulates *how* local entities may

15   cooperate in immigration enforcement; [state and local law] specifies *whether* they cooperate."

16   *City of El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018).

17         The Seventh Circuit's recent decision in *McHenry County*, 44 F.4th at 581, which the

18   Government does not cite, is instructive and persuasive.  The court upheld an Illinois state law that

19   prohibited state agencies and municipalities "from contracting with the federal government to

20   house immigration detainees." *Id.* at 585.  The Government challenged the law, arguing that it was

21   preempted by federal immigration law and violated governmental immunity, just as the

22   Government does here.  The Seventh Circuit rejected those arguments, holding, "[n]o one suggests

23   that Illinois could tell the Attorney General of the United States where to house a particular

24   detainee. **But the State can remove its own facilities – and those of its subordinate localities –**

25   **from the list of options."** *Id.* at 590 (emphasis added).  To hold otherwise, the court noted, would

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 18
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

give rise to anti-commandeering concerns under the 10th Amendment. *Id.*; *see also Galarza v. Szalczyk*, 745 F.3d 634, 643 (3d Cir. 2014) (recognizing that, "[u]nder the Tenth Amendment, immigration officials may not order state and local officials to imprison suspected aliens…").[8]

In *California II*, the Ninth Circuit similarly held that the Tenth Amendment prevented the Government from invalidating California's laws regarding state and municipal cooperation with ICE's deportation program, including by providing information and facilitating the handover of detainees.  The Court recognized that states and municipalities have the right to "opt not to participate in federal programs or enforcement efforts" and that "the choice of a state [or municipality] to refrain from participation cannot be invalid … where, as here, it retains the right of refusal."  *Id.* at 890.  *California II* was an appeal from the district court's decision in *United States v. California*, 314 F. Supp. 3d 1077 (E.D. Cal. July 5, 2018) (*California I*).  In rejecting the Government's claims there, the court recognized:

> [R]efusing to help is not the same as impeding.  If such were the rule, obstacle
> preemption could be used to commandeer state resources and subvert Tenth
> Amendment principles.  Federal objectives will always be furthered if states offer
> to assist federal efforts.  A state's decision not to assist in those activities will
> always make the federal object more difficult to attain than it would be otherwise.
> Standing aside does not equate to standing in the way.

*California I*, 314 F. Supp. 3d at 1104-05.[9]

The Government's attempt to invalidate the Airport EO infringes on the County's rights under the Tenth Amendment.  The Government cannot compel the County to use its own airport to for immigration flights any more than the Government could force municipalities to use their jails as ICE detention centers.  The County is entitled to summary judgment on its anti-commandeering

---

[8] In this way, the Government's reliance on *Geo Group* is misplaced.  *Geo Group* involved privately operated detention centers, not solely those owned by California or local governments.  Here, the Airport EO applies only to the County's airport; it has no application at other airports in King County.

[9] Without the anti-commandeering doctrine, lines of responsibility become "blurred" and "[v]oters who like or dislike the effects of the regulation [do not] know who to credit or blame."  *Murphy v. NCAA*, 138 S. Ct. 1461, 1477 (2018).  Municipalities forced to participate in federal programs would be "put in the position of taking the blame for its burdensomeness and for its defects."  *California I*, 314 F. Supp. 3d at 1107.  These same types of concerns (e.g., UWCHR's report accusing the County and Modern of "collaborating" with ICE) led the County to adopt the EO.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 19 (Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1   affirmative defense.  The Government's preemption and intergovernmental immunity claims

2   should be dismissed.

3   **F.     The County is Entitled to Summary Judgment on its Market Participant Defense,
            which Requires Dismissal of the Government's Preemption and Intergovernmental
4           Immunity Claims under the Supremacy Clause.**

5          The Supreme Court has recognized that generally "pre-emption doctrines apply only to

6   state [or local] regulation."  *Airlines for Am. v. City and County of San Francisco*, 598 F. Supp. 3d

7   748, 754 (N.D. Cal. 2022) (*A4A*) (alterations in original), *citing Bldg. & Constr. Trades Council of*

8   *Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218 (1993).  "In

9   other words, federal law generally preempts state or local government action that has 'the force

10  and effect of law.'"  *A4A*, 598 F. Supp. 3d at 754-55 (citations omitted).  "When a state or local

11  government buys services or manages property as would a private party, it acts as a 'market

12  participant,' not as a regulator, and [courts] presume that its actions are not subject to preemption."

13  *LAWA*, 873 F.3d at 1079.  When acting in its proprietary role, the municipality "stands for the

14  community in the administration of local affairs *wholly beyond* the sphere of the public purposes

15  for which its governmental powers are conferred."  *Vilas v. City of Manila*, 220 U.S. 345, 356

16  (1911) (emphasis added).

17         The Ninth Circuit has expressly recognized that municipal airport owners act as

18  "proprietor[s] of a commercial enterprise."  *LAWA*, 873 F.3d at 1081.  In *LAWA*, the court

19  evaluated whether the City of Los Angeles had acted in a "regulatory" (i.e., governmental) or

20  "proprietary" capacity by imposing certain contractual requirements on airport service providers

21  that were aimed at preventing service disruptions at the airport.  *Id.* at 1080-82.  Two trade

22  associations, representing airport service providers and airline companies, sued, arguing that these

23  contractual requirements were "effectively municipal regulations," that were preempted by the

24  ADA, among other federal statutes.  *Id.* at 1077.

25         The court applied the two alternate, independent tests developed in *Cardinal Towing &*

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 20
(Case No. 2:20-cv-203 RJB)

*Auto Repair, Inc. v. City of Bedford, Tex.*, 180 F.3d 686 (5th Cir. 1999), to determine whether the City was acting in a proprietary or governmental capacity.  First, the court considered whether the "challenged governmental action [was] undertaken in pursuit of the 'efficient procurement of needed goods and services,' as one might expect of a private business in the same situation[.]"  *Id.* at 1080 (internal citations and quotations omitted).  It found that the City's "attempt[] to avoid disruption of its business," was the same as that of a private business because "[i]f the City operates the airport poorly, fewer passengers will choose to fly into and out of LAX, fewer airlines will operate from LAX, and the City's business will suffer."  *Id.* at 1080-81.

Second, the *LAWA* court considered whether the City's requirements were "narrowly tied to a 'specific proprietary problem.'"  *Id.* at 1082.  The court held that the City's concern over service disruptions reflected legitimate proprietary interest.  *Id.*

The court in *A4A* similarly ruled that San Francisco, as the proprietor of San Francisco International Airport, acted as a market participant when it imposed a health insurance requirement on its airline lessees through adoption of an ordinance.  598 F. Supp. 3d at 769-74.  The Court analyzed the factors laid out by the Ninth Circuit in *LAWA*, finding that the ordinance was not preempted by the "numerous" federal statutes alleged by the plaintiffs because the City had adopted the ordinance for the proprietary purpose of reducing airline and other lessees' employee turnover by recruiting and retaining high-quality employees and because the City's ordinance was narrow in scope.  *Id.* at 773.

Here, the County was motivated by the same types of business concerns.  The County adopted the Airport EO to prevent operational disruptions and lost business as well as property damage and personal injury that likely would occur from potential increased protest activity.  These were the same concerns that private actors like Modern also considered, which led them to cease doing business with the Government's contractors.  The Airport EO also is narrowly tailored to address this specific issue of concern—it affects only future leases and specifically exempts the Federal Government.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 21
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

The Government argues that the County was not acting as a market participant, ignoring that the County specifically cited its proprietary concerns regarding ongoing use of Boeing Field for immigration flights as one of the key drivers of the Airport EO:

> WHEREAS, the use of [Boeing Field] in this manner is inconsistent with the County's obligation to operate the airport in a safe and efficient manner for all persons, not just citizens, and further use of King County International Airport in this manner would be detrimental to the public welfare and could adversely affect the willingness or ability of other persons to use, or engage in businesses at, King County International Airport with a negative effect on the financial sustainability of King County International Airport;

Ex. 13.  The County also testified extensively about ongoing immigration-related protests including in Seattle and its fears that extensive personal injuries or property damage could occur if the flights were to continue.  Ex. 2 (Parrott Tr. at 136:3-137:9; 176:23-177:15; 212:9-214:4).  All of these are the type of proprietary concerns that a property or business owner might have and would take action to avoid.

The Government also claims that the County did not support the Airport EO with findings based on industry research or consultations, ignoring that the court in *A4A* rejected this same argument.  598 F. Supp. 3d at 771.  And as the court made clear in *LAWA*, the mere fact that a municipality might have multiple purposes when acting to solve proprietary problems does not mean it was not acting as a market participant.  873 F.3d at 1084.  "[L]urking political motives are an inevitable part of a public body's actions and are not 'a reason for invalidity.'"  *Id.* (internal citations omitted); *see also Vilas*, 220 U.S. at 356 (municipalities exercise their proprietary powers for the municipal's corporate concerns, but also for the community of local affairs).

The County is entitled to summary judgment on its market participation defense.

**G.    The County is Entitled to Summary Judgment on the Government's Intergovernmental Immunity Claim; the Airport EO does not Discriminate Against the Government or Those With Whom it Deals.**

The intergovernmental immunity doctrine prohibits "[s]tates from interfering with or controlling the operations of the Federal Government."  *Washington*, 142 S. Ct. at 1984.  The

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 22 (Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

doctrine prohibits state laws that either "regulat[e] the United States directly *or* discriminat[e] against the Federal Government or those with whom it deals." *Id.* The Government alleges only that the Airport EO discriminates against the Federal Government or those with whom it deals. The Government does not bring a claim under the direct regulation theory. Dkt. No. 1 at ¶ 36 (basing claim solely on allegation that "[t]he Airport EO discriminates against private parties based on their relationship with federal immigration officials").

A state "does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *California II*, 921 F.3d at 881. In *California II*, the Ninth Circuit recognized that in order to prevail on an intergovernmental immunity claim, the government must demonstrate that the challenged law imposed an ***economic*** burden exclusively on the government. *Id.* at 884 ("Only those provisions that impose an additional economic burden exclusively on the federal government are invalid under the doctrine of intergovernmental immunity").[10] Here, the Government and its contractors admit that their decision to use Yakima to conduct immigration flights has not increased the Government's costs. For this reason alone, the Government's intergovernmental immunity claim fails.

But the Government's claim also fails because a challenged law that treats the government worse than someone else does not violate the intergovernmental immunity doctrine if significant differences exist between the government and third parties that justify the different treatment. *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 815-17 (1989). "[T]he relevant inquiry is whether the inconsistent…treatment is directly related to, and justified by, 'significant differences between the two classes.'" *Id.* at 816.

More recently, in *McHenry County*, the Seventh Circuit made clear that a state law does not discriminate against the federal government merely because "it affects an exclusively federal

---

[10] Tellingly, the Government omits the court's holding in *California II* that the burden must be economic from its intergovernmental immunity discussion in its brief. Mot. at 11, 17.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 23
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

domain." 44 F.4th at 594. "Differential treatment is critical to a discrimination-based intergovernmental immunity claim," and the Government must identify "other similarly situated constituents" that are treated more favorably. *Id.* at 594, *citing North Dakota*, 495 U.S. at 438.[11]

As was the case in *McHenry County*, the Government has not, and cannot, identify any actors who are "similarly situated" to the government that receive more favorable treatment under the Airport EO. *Id.* The County's decision was driven by its good faith and legitimate concern that immigration flights posed a unique threat of disruption, protests, associational harm, and liability from serious personal injury and property damage at Boeing Field. The Government has not identified any other "similarly situated" group of airport users that presented similar challenges.[12] The Government's intergovernmental immunity claim should be dismissed.[13]

**H.    The County is Entitled to Summary Judgment on the Government's Claim for Preemption under Immigration Law.**

The Government does not move for summary judgment on its generic "immigration law" preemption claim. Because the Government cannot establish any facts entitling it to relief on this claim, however, summary judgment in the County's favor is appropriate.

Congress may preempt a state law "through express language in a statute," or "implicitly," either "through 'field' pre-emption' or 'conflict' pre-emption." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376-77 (2015). "In all cases, the federal restrictions or rights that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress." *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020).

---

[11] Unlike California's private detention center law in *Geo Group*, which "favored" California by including a number of exceptions that only applied to California, the Airport EO "represents only a policy choice by the [County] not to cooperate with the federal government's detention operations" on its property. *McHenry Cnty.*, 44 F.4th at 594.

[12] The Government cites two newspaper articles about isolated, non-immigration related protests at Starbucks headquarters and Boeing's facility in Everett, but that does not suffice to show they are similarly situated to ICE or its immigration flights, or that those protests posed the same threat of disruption to airport operations or its business.

[13] At a minimum, the County has established that fact issues regarding, among other things, similarities between and amongst the issues presented by different types of flights conducted at Boeing Field, and whether any other types of flights or users of Boeing Field were similarly situated to ICE's immigration flight contractors, such that summary judgment in Plaintiff's favor would be inappropriate.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 24
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1    Here, the Government alleges only that "the Airport EO significantly obstructs and burdens

2    federal activities" (presumably related to immigration) but does not identify any particular statute

3    with which the Airport EO allegedly conflicts.  Dkt. No. 1, at ¶37.  As the Supreme Court has

4    explained, "a high threshold must be met if a state law is to be preempted for conflicting with the

5    purposes of a federal Act."  *Chamber of Com. of the United States v. Whiting*, 563 U.S. 582, 607

6    (2011).  Laws enacted pursuant to a state or local government's historic police powers should be

7    presumed valid "unless [preemption] was the clear and manifest purpose of Congress."  *Arizona v.*

8    *United States*, 567 U.S. 387, 400 (2012) (citations omitted).  And invoking "some brooding federal

9    interest" is not enough to support a preemption claim.  *Virginia Uranium, Inc. v. Warren*, 139 S.

10   Ct. 1894 (2019) (lead opinion of Gorsuch, J).

11   The Washington Constitution grants counties broad powers to "make and enforce within its

12   limits all such local police, sanitary and other regulations as are not in conflict with general laws."

13   Wash. Const. art. XI, § 11.  The Washington Revised Airport Act, which was enacted in 1945,

14   specifically empowers airport operators like the County to lease airport property to private parties,

15   determine the terms and conditions under which such properties may be used, and "exercise all

16   powers necessarily incidental to the exercise of the general and special powers granted in this

17   section."  RCW 14.08.120(1)(d), (f), & (j).  Finally, "[t]he Supreme Court has recognized that the

18   landlord-tenant relationship is an area of traditional state regulation."  *Barrientos v. 1801-1825*

19   *Morton, LLC,* 2007 WL 7213974, at *10 (C.D. Cal. Sep. 11, 2007) (citing *Loretto v. Teleprompter*

20   *Manhattan CATV Corp.*, 458 U.S. 419 (1982)).

21   The Government cannot identify any specific statutory section that conflicts with the

22   Airport EO.  The Government cites 8 U.S.C. § 1231, but nothing in that section addresses the

23   transportation of detainees from one place of detention to another.  More importantly, courts

24   recognize that Section 1231 and the Immigration and Nationality Act, 8 U.S.C. § 1101, et seq.

25   (INA), generally cannot preempt a state or municipality's decision to not participate in the

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 25
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

Government's immigration program by withdrawing their facilities from use by the Government, for the reasons outlined in Section E above.  *See, e.g.*, *McHenry Cnty.*, 44 F.4th at 592; *California II*, 921 F.3d at 865.[14]  And as the Fifth Circuit recognized in *El Cenizo*, 890 F.3d at 164, nothing in the INA evinces any congressional intent to "to prevent states from regulating *whether* their localities cooperate in immigration enforcement." [15]

Nor is the "ICE Air Operations Fact Sheet" the Government cites throughout its brief entitled to preemptive effect.  "Because the Supremacy Clause privileges only '[l]aws of the United States,' an agency pronouncement must have the force and effect of federal law to have preemptive force."  *Reid v. Johnson & Johnson*, 780 F.3d 952, 964 (2015).  This means agency pronouncements only have force of law when they are adopted through some "[r]egularity of procedure—whether it be the rulemaking and adjudicatory procedures of the APA or others which Congress may provide for a particular purpose."  *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 245 (3d Cir. 2008); *Reid*, 780 F.3d at 964 (adopting test in *Fellner*).  Informal agency pronouncements like the Government's one-page "ICE Air Operation Fact Sheet" do not satisfy this requirement.  *Id.*; *see also Christensen v. Harris County*, 529 U.S. 576, 587 (2010) ("[P]olicy statements, agency manuals, and enforcement guidelines, all … lack the force of law.").

Even if the Government could establish that a conflict existed between the Airport EO and the INA, summary judgment would still be warranted because the Airport EO presents no obstacle to the Government's deportation activities.  *See Goldstein v. California*, 412 U.S. 546, 554-55

---

[14] To the contrary, the statute makes clear states retain significant sovereignty by requiring their agreement before their resources can be used to further the Government's immigration aims.  For example, Section 1103(a)(11)(B) contemplates agreements with state and local governments for the use of municipally-owned detention centers.  And Section 1357 similarly provides for agreements with local governments before personnel can be deputized by ICE for purposes of "investigation, apprehension, or detention of aliens in the United States (**including the transportation of such aliens across State lines to detention** centers)" and that nothing "require[s] any State or political subdivision of a State to enter into an agreement" to do so.  8 U.S.C. § 1357(g)(1) & (g)(9) (emphasis added).

[15] The Government argues that the Court should disregard the savings clause in the Airport EO (Mot. at 8), but the Ninth Circuit recognizes that a savings clause like the one set forth in the Airport EO, which states that it applies only as "permitted by applicable law," eliminates any conflict with federal law.  *City and County of San Francisco v. Garland*, 42 F.4th 1078, 1086 (9th Cir. 2022).

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 26 (Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1    (1973) ("mere possibility of inconvenience" is not a sufficient obstacle); *Kelly v. Washington ex*

2    *rel. Foss Co.*, 302 U.S. 1, 10 (1937) ("repugnance or conflict" must be so 'direct and positive'

3    that the two acts cannot 'be reconciled or consistently stand together'" (citation omitted)).  Classic

4    continued immigration flights from Boeing Field after the Airport EO was issued.  When Modern

5    decided to no longer service those flights, the Government and Classic found a new airport,

6    Yakima Air Terminal, to service the flights in less than a week.  Moreover, there are multiple other

7    airports in Washington and Oregon from which the Government could conduct its immigration

8    flights.  At least three of these airports—Sea-Tac International Airport, McChord Air Force Base,

9    and Renton Municipal, are closer to the Northwest Detention Center than is Boeing Field.  Further,

10   both ICE and its contractor have confirmed that the switch to Yakima has not increased the costs to

11   the Federal Government.  Nor is there any evidence that the switch has had any impact on where

12   any detainee was detained or resulted in any detainee not being deported within the removal period

13   contemplated by the INA.[16]

14        The County is entitled to summary judgment on the Government's immigration law

15   preemption claim.[17]

16   **I.    The County is Entitled to Summary Judgment on the Government's ADA Claim.**

17        **1.    The Government's Immigration-Related Flights do not Constitute "Air**
            **Transportation" under the ADA.**

18

19        The Government correctly labels this a "straight-forward ADA preemption case," (Mot. at

20   18), but that is because the statute does not apply.  The ADA provides that:

21        Except as provided in this subsection, a … political subdivision of a State … may

22   _____

     [16] Even if it could be easier for ICE to effect removals if the County facilitated its use of Boeing Field to do so, it
23   would not create a conflict.  As other courts have recognized in deportation cases, "[m]erely because a state law
     'inconveniences' the federal government does not render it preempted—'the repugnance must be so direct and positive
     that the two acts cannot be reconciled or consistently stand together." *County of Ocean v. Grewal*, 475 F. Supp. 3d
24   355, 382 (D.N.J. 2020) *quoting California I*, 314 F. Supp. 3d at 1088 (cleaned up).

     [17] The County also is entitled to summary judgment under the Court's holding in *Murphy*, that preemption applies only
25   where federal law regulates the conduct of "private actors, not the States."  138 S. Ct. at 1477; *see also McHenry Cnty*,
     44 F.4th at 587-88 (applying *Murphy* preemption to INA's regulation of municipalities); *Colorado v. United States*,
     455 F.Supp.3d 1034, 1057 (D. Colo. 2020) (same).

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 27
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide **air transportation** under this subpart.

49 U.S.C. § 41713.  The Government skips straight to arguing about the definition of "price, route, or service," under this statute, ignoring that by its very terms that the ADA only regulates air carriers providing "air transportation," which is a defined term under the Federal Aviation Act (of which the ADA is a part).  49 U.S.C. § 40102(5).  "Air transportation" means "foreign air transportation, interstate air transportation, or transportation of mail by aircraft."  *Id.*  "Interstate air transportation," in turn, means "the transportation of passengers or property by aircraft *as a common carrier for compensation.*"  49 U.S.C. § 40105(25) (emphasis added).

While the ADA does not specifically define the term "common carrier," its meaning is well-settled.  It "refers to a commercial transportation enterprise that 'holds itself out to the public' and is willing to take all comers who are willing to pay the fare, 'without refusal.'"  *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408 (D.C. Cir. 2011); *Las Vegas Hacienda, Inc. v. C.A.B.*, 298 F.2d 430, 434 (9th Cir. 1962) (common carriers "hold[] out to transport the property or person of any member of the public who might choose to employ the proffered service").

*CSI Aviation Services* is instructive.  The court was asked to consider whether a government air charter broker (like Classic here) for various federal agencies was engaged in "air transportation."  The court held that CSI was not operating as a common carrier in connection with the charter services it was providing the government because it was not holding the flights out to the public, and thus was not engaged in "air transportation" under the statute.  *Id.* at 415.

The Government likewise cannot establish that its privately-chartered immigration flights are "air transportation."  Classic's sole business is servicing its contract with ICE. Ex. 11 (Carson Tr. at 17:5-22).  Classic also testified that the aircraft used for deportation flights are exclusively leased to the government specifically for immigration flights, that members of the public are not permitted to fly on these aircraft, and that seats are never advertised or offered for sale to the public. *Id.* (at 136:8-37:20).  Thus, the Government's immigration-related flights do not constitute

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 28
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1   "air transportation" under the ADA.  The Government's claim should be dismissed.

2   **2.**   **The Government has Not Met Its Burden of Establishing that the Airport EO has the Force and Effect of Law.**

3

4   By its very terms, the ADA only preempts a "law, regulation, or other provision having the

5 force and effect of law."  But the Airport EO was not enacted pursuant to the County's legislative

6 authority and does not have the force and effect of law.  *See LAWA*, 873 F.3d at 1079; *A4A*, 598 F.

Supp. 3d at 754-55.

7   The King County Charter lays out the powers granted to the various branches of County

8 government.  The Charter makes clear that the County's "legislative branch" is the King County

9 Council and that the Council "shall be the policy determining body of the county and shall have all

10 legislative powers of the county under this charter."  King County Charter, §§ 210; 220.20.

11 Charter Section 320.20 defines the "Powers and Duties" of the County Executive, which do not

12 include any legislative powers.

13   The Airport EO was not enacted as an ordinance by the County Council.  Nor was the

14 Airport EO enacted as a regulatory rule adopted "to implement an ordinance or other law" by any

15 executive department.  King County Code § 2.98.020.  The Airport EO is simply an Executive

16 Order, which unlike an ordinance or rule, has no force of law and is instead simply a "formal

17 statement[] issued exclusively by the Executive mainly for the purpose of delegation of authority

18 and responsibility, often to establish a value, and/or set a direction and/or require action for

19 something that may not be a legal mandate."  Ex. 17.  For this reason too, the Government's ADA

20 claim should be dismissed.

21   **3.**   **The Airport EO Does Not have Any Effect on Competition and Does Not Implicate "Prices, Routes, or Service"**

22   Summary judgment also should be granted in the County's favor because the Government

23 has not shown that the Airport EO has any relationship to the ADA's statutory purpose, and

24 therefore cannot be preempted by it.  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383

25 (1992) (holding that ADA preemption analysis "is one of statutory intent.") (internal citations

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 29
(Case No. 2:20-cv-203 RJB)

1    omitted).  Congressional purpose "'is the ultimate touchstone' in every pre-emption case."

2    *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  A statute's plain text, as well as its legislative

3    history can illuminate its purpose.  *Gundy v. United States*, 139 S.Ct. 2116, 2126 (2019).  Here, the

4    ADA's text and history militates against finding Congress intended to preempt the Airport EO.

5         The ADA was enacted to foster a more competitive air transportation industry.  *See* H.R.

6    Rep. No. 95-1211, at *2 (1978).  Prior to 1978, the economics of the airline industry were heavily

7    distorted by artificial regulatory constraints on supply and demand, which resulted in too few

8    flights offered at too high a price.  *Id.*  To solve this market failure, the House Committee on

9    Public Works and Transportation concluded that regulatory reform was necessary to encourage

10   pro-customer, market competition.  H. R. Rep. No. 95-1779, p. 53 (1978).  Congress achieved this

11   by enacting the ADA, directing that it be interpreted to create "maximum reliance on competitive

12   markets and on actual or potential competition."  49 U.S.C. § 40101(a)(6).

13        The Ninth Circuit has held that Congress intended only to preempt state laws that interfere

14   with market competition.  *See Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259 (9th Cir. 1998).

15   The proper inquiry is whether the challenged provision, directly or indirectly, "binds the air carrier

16   to a particular price, route or service and thereby interferes with competitive market forces within

17   the air carrier industry."  *Air Transport Ass'n of Am. v. City and County of San Francisco*, 266

18   F.3d 1064, 1072 (9th Cir. 2001).  In *Charas*, multiple passengers sued airlines for injuries suffered

19   because of various airline services, such as in-flight beverages or luggage.  *See id.* at 1261-62.  The

20   airlines argued that these types of personal injury claims were preempted by the ADA, because

21   they related to airline "services."  *Id.*  The court disagreed, holding that the "state laws underlying

22   the claims [did not] frustrate the goal of economic deregulation by interfering with forces of

23

24

25

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 30
(Case No. 2:20-cv-203 RJB)

competition," therefore they cannot be preempted by the ADA.  *Id.* at 1263.[18]

The Government argues that the Airport EO regulates both routes and services.  However, unlike the case in *Arapahoe Cnty. Pub. Airport Auth. v. F.A.A.*, 242 F.3d 1213 (10th Cir. 2001), there has been no factual finding that the Airport EO banned government aircraft or their contractors from using Boeing Field to conduct flights.  Nor does the Airport EO attempt to regulate the "course of travel" of immigration flights by regulating the routes that those aircraft can fly.  The undisputed evidence is that ICE contractors continued to use Boeing Field just as they had prior to the Airport EO's adoption until Modern chose for its own business reasons to stop servicing immigration flights, and nothing in the Airport EO prevents the Government or its contractors from landing or taking off from Boeing Field.  Nor has the Government come forward with any evidence demonstrating any action by the County that has interfered with the forces of competition in connection with the Government's immigration flights.

### 4.    The County Adopted the Airport EO through an Exercise of Propriety Power, Which Congress Expressly Intended to Exempt from Preemption.

The Government argues that a municipal airport's proprietary powers are limited to a small range of activities, such as establishing curfews and landing fees.  Not so.  In *American Airlines, Inc. v. Dep't of Transp.*, the Court recognized that "the scope of proprietary rights [is not limited to] those which have been previously recognized."  202 F.3d 788, 808 (5th Cir. 2000).  The critical inquiry is whether the airport proprietor's regulation is intended to address or advance a local interest.  *Id.* at 806 (recognizing that courts "have upheld route restrictions as within proprietary powers when they are targeted at advancing a specific local interest.").

In *Alaska Airlines, Inc. v. City of Long Beach*, the Ninth Circuit held that the rationale for

---

[18] Other circuits concur with the Ninth Circuit's interpretation.  *See, e.g.*, *Branche v. Airtran Airways, Inc.*, 342 F.3d 1248, 1258 (11th Cir. 2003) (holding that the definition of "services" in the ADA's preemption provision is "limited to the *bargained-for* aspects of airline aspects over which carriers compete) (emphasis in original); *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 194 (3d Cir. 1998) (holding that "services" relates to "competitive forces of the market"); *Hodges v. Delta Airlines*, Inc., 4 F.3d 350 (5th Cir. 1993) ("Services' generally represent a bargained-for or anticipated provision of labor from one party to another."); *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423 (7th Cir. 1996) (adopting the Fifth Circuit's holding in *Hodges*).

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 31
(Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

the proprietary powers exemption "extends beyond purely financial concerns… [and applies where airport owners have] 'a rational belief that the ordinance will reduce the possibility of liability or enhance the quality of the City's human environment." 951 F.2d 977, 982 (9th Cir. 1991) (quoting *Santa Monica Airport Ass'n v. City of Santa Monica*, 659 F.2d 100, 104 n.5 (9th Cir. 1981)).

Moreover, "[t]he proprietary power, as characterized by the courts and commentators, generally encompasses [a municipality's] ability as an owner to enter into private commercial relationships." *Air Cal, Inc. v. City and County of San Francisco*, 865 F.2d 1112, 1117 (9th Cir. 1989); *S.D. Myers, Inc. v. City and County of San Francisco*, 253 F.3d 461, 473 (9th Cir. 2001) (holding that an Ordinance requiring contracts to include non-discriminatory provisions for domestic partners was an appropriate exercise of a municipality's "proprietary power… as [an] owner to enter into commercial relationships."); *see also Montauk-Caribbean Airways, Inc. v. Hope*, 784 F.2d 91, 96-97 (2d Cir. 1986) (recognizing that airport operator's refusals to allow air carrier to serve as FBO year-round or to lease necessary equipment that would permit such service was not preempted by ADA because "leases are valid exercises of the Town's proprietary rights" under state law).

Here, as described in section F, above, the evidence demonstrates that the County sought to accomplish a reasonable, proprietary purpose by enacting the Airport EO.  The County's airport director testified at length about the concerns he and other County leaders had as owners and operators of Boeing Field after they were notified by the UWCHR that it planned to publicly release a report detailing the use of Boeing Field for immigration flights:

> If ICE flights continued and the advocacy groups changed from being advocates to being activists that we were very likely to see protests and disruption of the business at the airport and at that point our tenants both the FBO's and our corporate individual tenants could very well decide that this was not the airport they wanted to operate at and take their business elsewhere.

Ex. 2 (Parrott Tr. at 136:25-137:13).

Pressed further by the Government, Mr. Parrott explained that the County was drawing on "protests that ended up being violent in this area concerning immigration policies that people were

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 32 (Case No. 2:20-cv-203 RJB)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

upset about, and that [the County was] attempting to preclude having to deal with that kind of incident at the airport." *Id.* (at 176:23-177:15). Mr. Parrott also pointed to the immigration protests that took place at Sea-Tac, which showed how vulnerable airports were to protest activity, and how that helped drive home that the County had to be prepared that something similar would happen at Boeing Field, especially given the layout and lack of security around Boeing Field and the risk such protests created to the "billions of dollars of tenant assets" around the airport. *Id.* (at 212:13-14:4).

Reducing risks and exposure to liability that might come from potentially destructive or violent protest activity is exactly the type of action a property owner would take, and falls squarely within the proprietary powers exception. *See Alaska Air*, 951 F.2d at 952. Modern took similar steps to protect itself and its business. ICE also recognized that airports and their tenants can be uniquely impacted by immigration protests and that these impacts can lead to an airport being "not a viable option" for immigration flights. Ex. 12. While ICE was discussing protest activity at Portland International Airport, its conclusions apply with equal force to Boeing Field.

The undisputed facts demonstrate that the County was exercising its proprietary powers. The Government's ADA preemption claim should be dismissed.[19]

**J.     The County, Not the Government, is Entitled to Summary Judgment on the Government's Instrument of Transfer Claim.**

The Government argues that the County violated the Instrument of Transfer that conveyed part of Boeing Field to the County in 1947. The Instrument of Transfer provides in relevant part:

> By the acceptance of this deed or any rights hereunder, [the County] for itself, its successors and assigns, also assumes the obligations of, covenants to abide by, and agrees to, and this transfer is made subject to, the following reservations and restrictions set forth in paragraph (1 to 7), inclusive, of this paragraph, which shall run with the land…:
>
> (2) That the United States of America (hereinafter sometimes referred to as the "government") through any of its employees or agents shall at all times have the right to make nonexclusive use of the landing area of the airport at which any of

---

[19] At a minimum, the County has presented evidence sufficient to raise a question of fact as to whether it was acting as a proprietor, such that summary judgment in the Government's favor on its ADA preemption claim should be denied.

the property transferred by this instrument is located or used, without charge."

Ex. 18.

The Government labels this grant an easement while citing a federal case describing similar language as creating "an easement or a license." Mot. at 22. The Instrument of Transfer characterizes this reservation as a covenant. For purposes of this motion, the form of the encumbrance does not matter, but its scope does. The Court interprets the relevant language based on the parties' intent as expressed in the deed, and which is a question of fact. *Pelly v. Panasyuk*, 413 P.3d 619, 628 (Wash. Ct. App. 2018) (The parties' intent "is a question of fact and the legal consequence of that intent is a question of law."). In determining the parties' intent, the court may consider the circumstances of the transaction and the subsequent conduct of the parties. *Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc.*, 277 P.3d 18, 24-25 (Wash. Ct. App. 2012). Where doubt remains as to the parties' intent, in general, "a deed will be construed against the grantor." *Id.* (internal quotations omitted).

The Instrument of Transfer provides a right to the nonexclusive use of the landing area at Boeing Field. Ex. 18. Nothing in the Airport EO prevents the Government (or its contractors) from using the landing area at Boeing Field. Ex. 13 (Airport EO); Ex. 2 (Parrott Tr. at 65:25-66:13) ("I would say that the airport does not have the authority to ban the use of the runway"); 68:4-22 (same).[20]

The Government tries to circumvent this deficiency by arguing that the reservation contained in the deed applies to areas outside the "landing area," to include areas where aircraft might "park," "fuel," or load and unload a plane. But the Government's overbroad interpretation finds no support in the language of the Instrument of Transfer. None of these services take place in the landing area. Nor are they necessary to use a landing area. Ex. 4 (Carmen Tr. at 50:3-52:9).

---

[20] The Government cites comments the County made in 2019 about potential legal challenges that could be brought under the Instrument of Transfer if the County tried to stop government aircraft from landing at Boeing Field. But as Parrott testified, those comments were made with respect to flights operated by the Government directly, not private third-party contractors, which are materially different. Ex. 2 (Parrott Tr. at 104:11-06:13). Moreover, by its terms, the EO does not attempt to stop any flights from landing or taking off at Boeing Field.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 34
(Case No. 2:20-cv-203 RJB)

But even if the Instrument of Transfer could be read that broadly, the Government's claim would still fail because by its express terms, the EO **does not** prohibit FBOs from providing any of services—including fuel, parking, and loading—to government aircraft, now or in the future.  *See* Airport EO, ¶ 3 (expressly carving out "federal government aircraft" from the Executive Order). This argument is a red herring.

The Government next focuses its analysis on what it means to act "through" its employees and agents.  But this argument also misses the mark.  The Instrument of Transfer only applies to the United States, acting through its "employees and agents."  The Government has admitted that Classic and its employees are not an agent of the Government.  Ex. 19.[21]

This interpretation is also corroborated by the parties' past performance with regard to immigration flights.  The Government's use of the landing area shall be "without charge" under the Instrument of Transfer.  Ex., 18 at p. 15, ¶ 2.  Consistent with this language, the County historically has not charged landing fees for government flights.  *See* Ex. 2 (Parrot Tr. at 105:14-06:13; 163:20-165:24).  However, landing fees have been historically charged to, and paid by, government contractors conducting immigration flights at Boeing Field, because they are not the Government or its agents.  Ex. 2 (Parrott Tr. at 45:10-46:23); Ex. 20.  This is compelling evidence that the parties always understood and intended the Instrument of Transfer to only apply to government-operated flights, not those of their independent contractors.

For all these reasons, the County is entitled to summary judgment on the Government's instrument of transfer claim.[22]

## IV.    CONCLUSION

For the foregoing reasons, the County requests that the Court deny the Government's renewed motion for judgment on the pleadings and for summary judgment, and instead grant the

---

[21] *See Geo Group*, 50 F.4th at 755 ("[f]ederal contractors are not federal instrumentalities), *citing United States v. Mexico*, 455 U.S. at 736-738 (contractors are not "so assimilated by the Government as to become one of its constituent parts").

[22] At a minimum, the term "agent" is ambiguous as used in the Instrument of Transfer, which precludes a grant of summary judgment to the Government on its motion for summary judgment on this claim, which should be denied.

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1    County's motion for summary judgment dismissal of the Government's complaint.

2           DATED this 11th day of January, 2023.

3                                          HARRIGAN LEYH FARMER & THOMSEN LLP

4                                          By:  *s/ Timothy G, Leyh*
                                           By: *s/ Shane P. Cramer*
5                                          By: *s/ Ariel Martinez*
                                           By: *s/ Ashley D. Burman*
6                                              Timothy G. Leyh, WSBA #14853
                                               Shane P. Cramer, WSBA #35099
7                                              Ariel Martinez, WSBA #54869
                                               Ashley D. Burman, WSBA #58754
8                                              999 Third Avenue, Suite 4400
                                               Seattle, WA 98104
9                                              Tel:  (206) 623-1700
                                               Email: timl@harriganleyh.com
10                                             Email: shanec@harriganleyh.com
                                               Email: arielm@harriganleyh.com
11                                             Email: ashleyb@harriganleyh.com

12
                                           LEESA MANION
13                                         King County Prosecuting Attorney

14
                                           By:  *s/ Timothy P. Barnes*
15                                             Timothy P. Barnes, WSBA #29929
                                               Senior Deputy Prosecuting Attorney
16                                             516 Third Avenue, Suite W400
                                               Seattle, WA 98104
17                                             Tel:  (206) 477-1120
                                               Fax:  (206) 296-0191
18                                             Email: timothy.barnes@kingcounty.gov

19                                         *Attorneys for King County and Dow Constantine*

20

21

22

23

24

25

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT - 36
(Case No. 2:20-cv-203 RJB)