1
2
3
4
5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>    v.<br><br>KING COUNTY, WASHINGTON; DOW CONSTANTINE, in his official capacity as King County Executive,<br><br>            Defendants. | CASE NO. 2:20-cv-00203-RJB<br><br>ORDER ON UNITED STATES' MOTION FOR JUDGMENT ON THE PLEADINGS AND THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT |

This matter comes before the Court on the United States' Renewed Motion for Judgment on the Pleadings, or, in the Alternative, for Summary Judgment (Dkt. 69) and Defendants King County, Washington and King County Executive Dow Constantine's (collectively "King County" or "County") Cross Motion for Summary Judgment (Dkt. 72). The Court has considered the pleadings filed in support of and in opposition to the motions, oral argument on March 21, 2023, and the file herein.

## I. FACTS AND PROCEDURAL HISTORY

### A. Introductory Facts.

This case has its roots in World War II. After December 7, 1941, the United States found itself on a war footing, and felt the need to federalize several properties in its desire to prepare

for the worst that the war might offer.  Included in its acquisitions was what is now known as King County International Airport, commonly known as Boeing Field (also referred to herein as "airport") from King County, Washington.  During the war years, after 1941, the United States further developed Boeing Field, improving its value as an airport.  When the war ended, many properties – including Boeing Field – were no longer needed for war purposes, and the United States determined to return some of the confiscated properties to the original owners.  It negotiated the returns, considering the potentially increased value of the property and the public interest involved in the transfer to the original owner.  Thus it was here, and on May 26, 1948, the United States (the Plaintiff in this case) transferred Boeing Field and all its parts to Defendant King County by the Instrument of Transfer attached hereto as Exhibit A.  The Instrument of Transfer refers to the "entire landing area" as defined in WAA Regulation 16, dated June 26, 1946; that definition is attached to, and part of, Exhibit A.  The Instrument of Transfer has many parts, but at its heart, it is a contract, binding Plaintiff United States and Defendant King County together in a series of permanent agreements.

Time passed.  Boeing Field was improved as a public airport.  The United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE") used Boeing Field and its Fixed Base Operators ("FBOs") for flights to transfer and deport immigration detainees.  Political winds and public views changed.  As a result of perceived concerns over airport safety and possible disturbances regarding the United States' movement of non-citizens through Boeing Field to unknown destinations, the Defendants, King County and its Executive, Dow Constantine, issued King County, Washington Executive Order PFC-7-1-EO, "King County International Airport—Prohibition on Immigration Deportations" ("Executive Order") attached hereto as Exhibit B.  The Executive Order addresses King County's concerns, and

orders certain actions regarding the Plaintiff United States' use of Boeing Field and its FBOs for immigrant transportation.

On February 10, 2020, the United States filed this case challenging the Executive Order on a number of grounds, alleging that the Executive Order violates the United States' rights and responsibilities. Dkt. 1. King County supports the validity of the Executive Order. Validity of the Executive Order is the issue that is before the Court.

Readers of this opinion should be aware that the attached Exhibits A and B are critical parts of this opinion.

**B. Additional Facts.**

The Executive Order was signed on April 23, 2019. In order to understand this case and the Executive Order, background on the United States' immigration powers, ICE and its operations at Boeing Field, and on Boeing Field itself is helpful.

### 1. United States' Immigration Powers Generally, ICE and Its Operations at Boeing Field

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *United States v. California*, 921 F.3d 865, 873 (9th Cir. 2019). "Congress exercises its authority to regulate the entry, presence, and removal of noncitizens" through various statutes, including the Immigration and Nationality Act, 8 U.S.C. § 1101 *et. Seq.,* and "has specified which aliens may be removed from the United States and the procedures for doing so." *Id.* The Secretary of the Department of Homeland Security is charged with arranging for places of detention for "aliens detained pending removal or a decision on removal." 8 U.S.C. §1231(g)(1). The Secretary has broad authority to "make contracts . . . as may be necessary and proper to carry out the Secretary's responsibilities." 6 U.S.C. § 112(b)(2). "ICE, a component of DHS, carries out immigration detention." *GEO Grp., Inc. v. Newsom*, 50

1  F.4th 745, 751 (9th Cir. 2022).  ICE also has the authority to enter contracts to arrange for

2  services to further its mission.  48 C.F.R. § 3017.204-90.

3        Although the United States fails to point to specific statutory authority for ICE to

4  transport noncitizens, the parties do not dispute that ICE Air Operations ("ICE Air") is the air

5  transportation arm of ICE and facilitates the movement and removal of noncitizens by both

6  commercial flights and air charter services.  Dkt. 70-1 at 2.  Since 2006, ICE Air has transferred

7  or removed hundreds of thousands of noncitizens using air charter services.  Dkt. 70-1 at 2.  It

8  procures the majority of its charter flight services from vendors on the General Services

9  Administration Schedule.  *Id.*  As it relates to this case, ICE contracted with Classic Air Charter

10 to charter planes from Swift Air, LLC ("Swift Air") for charter flights transiting Washington

11 state (Dkts. 73-2 at 6; 73-11 at 2-4; and 77-4).  Prior to the Executive Order, ICE charter flights

12 in this area used Boeing Field.

13       2.  Boeing Field and its Fixed Based Operators

14       Now, over 180,000 flights a year take off and land on Boeing Field, including those of

15 small commercial passenger airlines, cargo carriers, private aircraft, corporate jets, and military

16 aircraft.  Dkt. 73-1 at 2. The airport is responsible for the safety and security of people and

17 property at the airport.  Dkt. 73-2 at 25.  It has five or six miles of perimeter with a chain link

18 fence and three law enforcement officers assigned from the King County Sheriff's Office.  *Id.*

19       The airport is an "enterprise fund" within the County; it is expected to be self-sufficient

20 and does not receive money from the County's general fund.  Dkt. 73-2 at 3.  To that end, it

21 leases portions of the airport to corporate entities like Boeing Corp., United Postal Service,

22 Starbucks and Nordstrom.  Dkt. 73-2 at 6.  It also enters leases with "fixed base operators,"

23 sometimes referred to as "FBOs," who are contractors that provide logistics services at the

24

airport, including storing, fueling, maintaining, and managing aircraft based at the airport and transiting in and out of the airport.  Dkt. 70-3 at 6.

One of the fixed base operators at Boeing Field is Modern Aviation ("Modern").  Dkt. 70-2.  Modern provided FBO services to ICE Air prior to the Executive Order.  Modern serviced two flights shortly after the Executive Order was issued, then did not service ICE Air further.

3.  Events Leading up to the Executive Order

Almost ten months before the Executive Order was signed, on June 8, 2018, the County became aware that Boeing Field was being used by ICE Air charter planes to either relocate or deport immigration detainees.  Dkt. 70-3 at 8.  County employees, including airport officials, met with various immigration rights advocacy groups.  Dkt. 70-3 at 9-11.  In particular, they met with people from the University of Washington Center for Human Rights.  Dkt. 70-3 at 11.

The County states that it became concerned about the threat of protests and violent behavior at the airport.  Dkt. 70-3 at 12.  After the University of Washington Center for Human Rights, informed the County on April 16, 2019 that on April 23, 2019 it was going to publish two reports "Hidden in Plain Sight:  ICE Air and the Machinery of Mass Deportation," and "Hidden in Plain Sight: King County Collaboration with ICE Air Deportation Flights at Boeing Field," the County felt the need to take action.  Dkts. 73-2 at 12 and 73-9.  The County states that it felt that "if ICE flights continued and the advocacy groups changed from being advocates to being activists that [they] were very likely to see protests and disruption of the business at the airport and at that point, tenants both the [fixed base operators] and [their] corporate individual tenants could very well decide that this was not the airport they wanted to operate at and take their business elsewhere."  Dkt. 73-2 at 14.  The County states that there had been "protests that ended up being violent in this area concerning immigration policies that people were upset about.

[They] were attempting to preclude having to deal with that kind of incident at the airport." Dkt. 73-2 at 20. With only three law enforcement officers on site, it felt that they did not have adequate personnel to deal with protests. Dkt. 73-2 at 25.

King County, through the Executive Order, concluded that ICE Air's use of Boeing Field marked "troubling immigration practices," "could lead to human rights abuses and violations" was "inconsistent with the County's obligation to operate the airport in a save and efficient manner for all persons," further use of King County International Airport in this matter would be detrimental to the public welfare," could adversely affect the willingness or ability of the other persons to use or engage in business at King County International Airport," and "deportations raise troubling human rights concerns." Executive Order, Exhibit B.

It is clear that the County's concerns regarding ICE Air's use of the airport were based on speculation of possible impacts, rather than direct proof of impending impacts on safe use of the airport.

### 4.  Events After the Executive Order

After issuance of the Executive Order, ICE Air's use of Boeing Field dried up, substantially because of the Executive Order and FBOs' reaction to it. Dkts. 73-4 at 16 and 73-2 at 23.

ICE explored using SEA-TAC International Airport, Portland International Airport, an airport in Bellingham, Washington, the airfield at Joint Base Louis McChord, and other airfields but in the end, either the airports themselves or FBOs indicated that they would not take ICE Air charter flights. Dkts. 73-5 at 6-8 and 73-8 at 5-10.

Eventually, the ICE Air charter flights were moved to an airport in Yakima; ICE indicates that there were operational costs associated with having to switch from Boeing Field to

the Yakima airport.  Dkt. 75-1 at 3.  For example, ICE agents in the Seattle office and Yakima

office had to spend more time transporting detainees rather than "conducting immigration

enforcement activities in that area."  *Id.* at 3-7.  Further, because detainees are now transported to

Yakima by bus for about three hours, ICE feels that there are greater safety and comfort concerns

for the detainees.  *Id.* at 7-8.  ICE states that it requires that they send two buses (one with an

extra driver and security officer in case the other breaks down) and that it takes all day whereas a

trip to Boeing Field used to require staff to be gone only half a day.  Dkt. 75-2 at 3.

**C. Procedural History.**

On February 10, 2020, the United States filed this case seeking a declaration invalidating

and permanently enjoining the enforcement of the Executive Order as violative of the United

States' rights in the parties' "Instrument of Transfer," the supremacy clause of the U.S.

Constitution, and the Airline Deregulation Act, 49 U.S.C. § 41713 ("ADA").  Dkt. 1.

The County asserts that the United States' claims are barred by: (1) lack of standing, (2) lack

of ripeness, (3) the United States' lack of rights in the Instrument of Transfer, (4) the Tenth

Amendment to the U.S. Constitution and its anticommandeering rule, and (5) that the County is

acting as market participant.  Dkt. 13.

**D.  Organization Of Opinion - Summary Judgment.**

1.  Organization.  It appears to the Court that these motions should be addressed on

summary judgment standards rather than judgment on the pleadings standards.  The Court will

set out the summary judgment standards and facts not in issue.  It will then turn to defenses

raised, then to the United States' claims that the Instrument of Transfer invalidates the Executive

Order, and then to the issue of intergovernmental immunity.

1    2.  Summary Judgment Standard.  Summary judgment is proper only if the pleadings, the

2 discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

3 as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R.

4 Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving

5 party fails to make a sufficient showing on an essential element of a claim in the case on which

6 the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

7 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not

8 lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith*

9 *Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant

10 probative evidence, not simply "some metaphysical doubt").  Conversely, a genuine dispute over

11 a material fact exists if there is sufficient evidence supporting the claimed factual dispute,

12 requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty*

13 *Lobby, Inc.,* 477 U.S. 242, 253 (1986); *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*,

14 809 F.2d 626, 630 (9th Cir. 1987).

15    The determination of the existence of a material fact is often a close question.  The court

16 must consider the substantive evidentiary burden that the nonmoving party must meet at trial,

17 which is a preponderance of the evidence in most civil cases.  *Anderson,* 477 U.S. at 254; *T.W.*

18 *Elect.,* 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of the

19 nonmoving party only when the facts specifically attested by that party contradict facts

20 specifically attested by the moving party.  The nonmoving party may not merely state that it will

21 discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

22 to support the claim.  *T.W. Elect.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).

23

24

1  Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not

2  be "presumed."  *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888–89 (1990).

3      3.  Facts set forth in Parts IA and IB above are not in issue.

4  **II.  DEFENSES**

5  **A.  Standing.**

6      "[N]o principle is more fundamental to the judiciary's proper role in our system of

7  government than the constitutional limitation of federal-court jurisdiction to actual cases or

8  controversies.  One element of the case-or-controversy requirement is that plaintiffs must

9  establish that they have standing to sue."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408

10  (2013)(*internal quotation marks and citations omitted*).  "A plaintiff seeking to establish

11  standing must show that: (1) he or she has suffered an injury in fact that is concrete and

12  particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged

13  conduct; and (3) the injury is likely to be redressed by a favorable court decision."  *W.*

14  *Watersheds Project v. Grimm*, 921 F.3d 1141, 1146 (9th Cir. 2019).

15      1.  Injury in Fact

16      Article III standing requires the United States here to show that the pleadings

17  demonstrate it suffered "an invasion of a legally protected interest" that is "concrete and

18  particularized" and "actual or imminent, not conjectural or hypothetical."  *Spokeo, Inc. v. Robins*,

19  136 S. Ct. 1540, 1548 (2016).  "If the plaintiff is not the target of the challenged government

20  action or inaction, standing is not precluded, but it is ordinarily substantially more difficult to

21  establish."  *United States v. City of Arcata*, 629 F.3d 986, 989 (9th Cir. 2010)(*internal quotation*

22  *marks and citations omitted*).

23

24

The United States has demonstrated that it is injured by the Executive Order.  The United States indicates that it would like to continue using Boeing Field.  It cannot meaningfully use Boeing Field without FBO support.  Taking off and landing, without access to FBO services like stairs and fuel, do not allow it to use the airport to further its mission of relocating and deporting noncitizens.  The Executive Order attempts to indirectly limit with whom ICE Air can contract and from whom it can receive a benefit.  It diminishes the United States' right to use the airport that was guaranteed under the Instrument of Transfer.  These are "concrete and particularized" and "actual or imminent" injuries.  *Spokeo* at 1548.

Further, although the County asserts that it has no plans to further implement the Executive Order, it acknowledges that if an FBO indicated that it was going to start servicing ICE Air charter flights, the County would take action to enforce the Executive Order.  Dkt. 73-2 at 18.  The United States has demonstrated that it has suffered an injury.

2.  Fairly Traceable

The second prong in establishing Article III standing requires the United States to show that its "injury is fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014).  The fact that harm to a plaintiff – the United States here - "may have resulted indirectly does not in itself preclude standing.  Causation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain."  *Id.*

The United States maintains that to show causation it need only show that it is willing to contract with an FBO and that the Executive Order makes "it more difficult for the Federal Government to obtain ground support by imposing restrictions on and intimidating FBOs."  It

1   asserts that this establishes that the Executive Order caused its injury – an inability or difficulty

2   to contract for FBO services at the airport.

3          When a plaintiff "alleges that government action caused injury by influencing the

4   conduct of third parties, more particular facts are needed to show standing . . . because the third

5   parties may well have engaged in their injury-inflicting actions even in the absence of the

6   government's challenged conduct." *Id.* at 1013 (*internal quotation marks and citations omitted*).

7   "To plausibly allege that the injury was not the result of the independent action of some third

8   party," the United States here must show that the County's allegedly "unlawful conduct is at

9   least a substantial factor motivating the third parties' actions." *See, Id.*

10         The United States has sufficiently shown that third parties' actions were, and will be,

11  substantially motivated by the Executive Order such that the United States' injuries can be said

12  to be "fairly traceable" to the Executive Order.  Though other events, like potential protests, may

13  have contributed to the result, it is clear that the FBOs' decisions to stop servicing ICE Air

14  charter flights were substantially motivated by the Executive Order.

15         Prior to the Executive Order, pursuant to the Instrument of Transfer, the United States

16  had use of Boeing Field, with FBO support.  The United States has carried its burden to show

17  that its "injury is fairly traceable" to the Executive Order.

18         3.  Redressability

19         "To establish Article III redressability, the plaintiffs must show that the relief they seek is

20  both (1) substantially likely to redress their injuries; and (2) within the district court's power to

21  award.  Redress need not be guaranteed, but it must be more than 'merely speculative.'"

22  *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020).

23

24

1      The United States has demonstrated that its injury will be redressed by a favorable

2  decision.  While there is no guarantee that any particular FBO would contract with it at Boeing

3  Field, its injury stems from not having the freedom to contract without County objection and thus

4  gain the benefit of FBO services.  Although the County maintains that the United States must

5  show that one or other of the FBOs would agree to contract with the United States if the

6  Executive Order were not in place, it fails to recognize that invalidation of the Executive Order

7  would redress the injury of not having the opportunity to freely contract with the FBOs without

8  County objection.  It is that injury that is redressable.  Further, the Executive Order operates, in

9  many ways, as a partial repudiation of the Instrument of Transfer.  Correcting that repudiation is

10 also a redressable injury here.

11      **B.  Ripeness.**

12      "The ripeness doctrine is drawn both from Article III limitations on judicial power and

13 from prudential reasons for refusing to exercise jurisdiction."  *Wolfson v. Brammer*, 616 F.3d

14 1045, 1057 (9th Cir. 2010)(*internal quotation marks and citation omitted*).  "Through avoidance

15 of premature adjudication, the ripeness doctrine prevents courts from becoming entangled in

16 abstract disagreements."  *Id.*  "The constitutional component of ripeness overlaps with the 'injury

17 in fact' analysis for Article III standing."  *Id.*, at 1058.

18      This case is sufficiently ripe to consider the issues presented.  As stated above, the United

19 States has pointed to an adequate "injury in fact" such that this is not an "abstract disagreement."

20      **C.  Anticommandeering.**

21      The County maintains that the outcome of the case is driven by the anticommandeering

22 doctrine which has its roots in the Tenth Amendment to the U.S. Constitution.  Under the

23 anticommandeering doctrine, the "federal government may not command the States' officers, or

24

those of their political subdivisions, to administer or enforce a federal regulatory program."

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1477 (2018)(*cleaned up*).  "This rule

applies . . . not only to state officers with policymaking responsibility but also to those assigned

more mundane tasks." *Id*

 While the United States cannot compel a state or local government to use its own law

enforcement for immigration activities (921 F.3d 865) or compel a state or local government to

allow it to use their prisons or jails to house noncitizen detainees (s*ee McHenry County v. Raoul*,

44 F. 581 (7th Cir. 2022)), there is no authority that provides that the Tenth Amendment's

anticommandeering doctrine allows a County to block private parties from contracting with the

federal government, even on County property, under the circumstances presented here.

### D.  Market Participation.

 The County also contends that through the Executive Order it is acting as a market

participant and so the United States' claims for intergovernmental immunity and for preemption

in general do not apply.  Dkt. 74 (*citing Airline Serv. Providers Ass'n v. Los Angeles World

Airports*, 873 F.3d 1074, 1079 (9th Cir. 2017)).  The County fails to show how participation in

the "market" prevents the government from enforcing its rights to enforce the Instrument of

Transfer, nor it's rights to enforce any immunity or preemption privileges it may have made

under the facts presented here.

### III.  CLAIMS

### A.  Executive Order Violates Instrument of Transfer.

 This case is, at its essence, a contract case.  Does the Executive Order violate the

contractual agreements in the Instrument of Transfer?

 1.  Jurisdiction

The parties have discussed whether this Court has jurisdiction to consider the United States' claim that the Executive Order violates the Instrument of Transfer.  The County points to 49 U.S.C. § 47151(b), which provides that "[o]nly the Secretary may ensure compliance with an instrument conveying an interest in surplus property under this subchapter.  The Secretary may amend the instrument to correct the instrument or to make the conveyance comply with law." The United States points to 49 U.S.C. § 47111(f), that provides:

> Judicial enforcement.—For any violation of this chapter or any grant assurance made under this chapter, the Secretary may apply to the district court of the United States for any district in which the violation occurred for enforcement. Such court shall have jurisdiction to enforce obedience thereto by a writ of injunction or other process, mandatory or otherwise, restraining any person from further violation.

As advocated by the United States, the plain language of 49 U.S.C. § 47111(f) indicates that the United States may bring an action for a violation of chapter 471 of Title 4 (of which the Surplus Property Act is a part) in the U.S. district courts.  By including the expansive language in § 47111(f), "any violation of this chapter," it is clear that Congress did not intend for 49 U.S.C. § 47151(b) to provide the United States with its sole remedy.  Accordingly, the undersigned concludes that this court has jurisdiction to consider the United States' claim relating to the Instrument of Transfer.

Furthermore, it appears that § 47151(b) applies to property transfers, not to violations of the terms of the Executive Order.

### 2.  Burdens on King County in the Instrument of Transfer

The instrument is clearly a mutual contract between the Plaintiff and Defendants here: the language makes clear that it is a joint document, signed by both parties, with all obligations running with the land, and binding forever, and with joint obligations burdening both parties.

The Instrument of Transfer clearly places upon the County the obligation to use the airport for "public airport purposes for the use and benefit of the public, on reasonable terms and without grant or exercise of any exclusive right for use of the airport . . . ."  Exhibit A at 2.

The Instrument of Transfer also provides:  "The entire landing area . . . shall be maintained for the use and benefit of the public."  *Id.* at 15.

"That no exclusive right for the use of the airport . . . shall be vested . . . in any person or persons to the exclusion of others in the same class . . . ."  *Id.* at 16.

The federal government reserved access to the airport "without charge" and the contract also provided enforcement authority.  *Id.*  at 16-18.

The United States properly points out that it "may bring suits to enforce [its] contracts and protect [its] property" and "ha[s] the right to have [its property rights] protected by the local laws."  *Cotton v. United States*, 52 U.S. 229, 231 (1850).  Characterizing the above provision related to government use as an easement, the United States notes that it may bring suits to "enjoin interference with an easement expressly reserved" in a land grant.  *S. Idaho Conf. Ass'n Seventh Day Adventists v. United States,* 418 F.2d 411, 416 (9th Cir. 1969).  While the County argues that the provision is a covenant, both parties agree that the scope of the provisions at issue are determined from the intent of the parties as expressed in the document.  *See Pelly v. Panasyuk,* 2 Wn. App. 848, 864 (2018); *Brown v. Voss,* 105 Wn.2d 366, 371 (1986)(extent of express easement "is to be determined from the terms of the grant properly construed to give effect to the intention of the parties").

The question, then, is whether the Executive Order violates the United States' rights that it reserved in the Instrument of Transfer.  The Executive Order directs County officials to "take appropriate actions . . . to minimize County cooperation with, facilitation of, and permission for,

operations associated with transportation of immigration detainees." Exhibit B at 3. Officials are to "[e]nsure that all future leases, operating permits and other authorizations for commercial activity" at the airport "contain a prohibition against providing aeronautical or non-aeronautical services to enterprises engaged in the business of deporting immigration detainees." *Id.* They are further directed to "[d]evelop procedures for exercising King County rights under existing leases . . . to ensure compliance with applicable laws, ordinances, rules, regulations and policies of King County regarding . . . the servicing of any aircraft engaged in the business of deportation of immigration detainees. . . ." *Id.* The provisions in the Executive Order are based on a supposition about the possibility of bad results from these flights. *Id.* at 2-3 (use of the airport for detainee transport "could lead to human rights abuses" or "could adversely affect the willingness or ability" of other persons to use the airport). There are no allegations that would trigger some sort of emergency justification to violate the Instrument of Transfer. Such speculation does not authorize a unilateral contract change. As explained more fully below, these portions of the Executive Order violate the United States' rights under the Instrument of Transfer, both in what it reserved for itself as a governmental entity and what was denied to the government as part of the flying public. Further, the Executive Order contains an anticipatory breach: officials are directed to "[r]evise and formally adopt amendments" to existing regulations and the King County Code in a manner consistent with the Executive Order. *Id.* at 4.

The restrictions in the Executive Order violated King County's obligation to maintain Boeing Field as a <u>public</u> facility, not a facility where some users, such as ICE Air and its FBOs, were denied the use of the public facility.

The County contends that ICE Air charter flights are not flights of the United States "through its employees or agents." ICE Air charter flights have federal ICE officers on board

executing ICE's Congressionally mandated mission.  These flights are flights of the United

States "through its employees or agents."  The County's assertion that the charter flight

companies (either Classic Air Charter or Swift Air) are not considered by the United States to be

its agents does not change the analysis nor does its reliance on cases construing the limitations of

the United States' sovereign immunity in Federal Tort Claims Act cases.  Whether the United

States opted to complain about being charged landing fees in violation of the Instrument of

Transfer does not convert these flights into flights by private parties for private purposes.  It is

the unique and sole purpose of these flights that make them United States flights.  It is

undisputed that they are used **only** to move noncitizen detainees with or without their consent.

Only the United States has authority to do so.  The FBOs used by ICE Air are government

contractors and are entitled to the same rights as the government in performing federal work.

The next issue to be considered is whether the Executive Order interferes with the United

States' right to use the "landing area of the airport."  The United States maintains that it cannot

meaningfully use the landing area of the airport without access to services provided by FBOs.

That is, in order to use the landing area, it needs to be able to access parking space, fuel, stairs

and like services.  Accordingly, the United States concludes that the provision in the Instrument

of Transfer must also include access to those services, and that the Executive Order

impermissibly blocks that access.  The County argues that the United States can still use the

"landing area" because its flights could still land and take off.

Apparently, the definition of "landing area" was overlooked by the County in its

preparation of the Executive Order.  The correct definition is part of Exhibit A.

The "WAA Regulation 16," or War Assets Administration Regulation 16, provides that:

"'Landing area means any land, or combination of water and land, together with improvements

thereon and necessary operational equipment used in connection therewith, which is used for landing, take-offs, and parking of aircraft. The term includes, but is not limited to, runways, strips, taxiways, and parking aprons.'" *Nat'l Aircraft Maint. Corp. v. U. S.*, 171 F. Supp. 946, 948 (Ct. Cl. 1959)(*quoting* WAA Regulation 16 and 1946 Supp. § 8316.1(b)(5)).  As it is defined in Webster's Third New International Dictionary, the word "use" has two helpful definitions: "to put into action or service: have recourse to or enjoyment of: employ" and "to carry out a purpose or action by means of: make instrumental to an end or process: turn to account; utilize." *Webster's Third New International Dictionary,* 2523-24 (1993).  While the County maintains that there are issues of fact on this claim, there is no reasonable dispute here that given the sole purpose of the ICE Air charter flights, that the United States cannot make "use" of the "landing area" without access to FBO services.  There is no dispute that, at a minimum, the United States needs FBO services to park aircraft and provide the stairs required for detainees and the ICE officers to board the flights.  The Executive Order bars or recommends that FBOs refuse to provide that service to the United States in violation of the Instrument of Transfer.

The United States offers proof that access to FBO services is reasonably necessary for it to make use of the landing area as it is defined in the Instrument of Transfer.  The County fails to point to evidence to the contrary, but faces the contractual agreement that the property is to be used for "public airport purposes for the use and benefit of the public . . . without unjust discrimination;" that the County's promises "run with the land," that the Plaintiff has special rights to use the Airport, and that violation of its agreement can result in reversion to the United States in the event of default by King County.  Exhibit B at 15, 17-18.

The Executive Order discriminates against the United States and blocks its use of the airport in common with others.  It violates the Instrument of Transfer.

1    2.  Sanction

2          Pursuant to the Declaratory Relief Act 28 U.S.C.  § 2201 (a), "any court of the United

3    States . . . may declare the rights and other legal relations of any interested party seeking such

4    declaration, whether or not further relief is or could be sought. Any such declaration shall have

5    the force and effect of a final judgment or decree and shall be reviewable as such."  The Act

6    additionally provides that "[f]urther necessary or proper relief based on a declaratory judgment

7    or decree may be granted, after reasonable notice and hearing, against any adverse party whose

8    rights have been determined by such judgment."  28 U.S.C. § 2202.

9          Specific performance is an equitable remedy available to an aggrieved party for breach of

10   contract where there is no adequate remedy at law.

11         By the language of the Executive Order, and by its position in this case, it appears clear

12   that King County has violated its obligations in the Instrument of Transfer in regard to public use

13   of the airport and in regard to the government's use of the airport, thereby repudiating in part its

14   contract with the government, and anticipating further repudiation.  Neither party anticipates any

15   sanction other than the government's suggestion of removal of the repudiating language.  That is

16   an ultimately fair result and will be reflected in the order of the Court.

17   **B.  United States' Claim Under Intergovernmental Immunity Doctrine**

18         With foundations in the Supremacy clause of the U.S. Constitution, the intergovernmental

19   immunity doctrine prohibits state or local laws that "either 'regulate the United States directly or

20   discriminate against the Federal Government or those with whom it deals' (e.g., contractors)."

21   *United States v. Washington*, 42 S. Ct. 1976, 1984 (2022)(*quoting North Dakota v. United States*,

22   495 U.S. 423, 435 (1990)).  A state or local law "discriminates against the Federal Government

23

24

or its contractors if it singles them out for less favorable treatment or if it regulates them

unfavorably on some basis related to their governmental status." *Id.* (*cleaned up*).

The Executive Order does not regulate the United States directly, but discriminates

against potential federal ICE contractors (FBOs) at Boeing Field because they may choose to

deal with the United States.  The Executive Order violates intergovernmental immunity

principles by singling out potential federal contractors for less-favorable treatment; that is, an

unwillingness to deal with them solely based on their willingness to deal with the federal

government.  That direct involvement with the federal government's authority discriminates

against the federal government because other users of the airport are not subject to the limitations

found in the Executive Order.

## IV.  CONCLUSION

The United States has standing to bring this case and the controversy is ripe for

adjudication.  There are no material issues of fact and the United States is entitled to a judgment

as a matter of law on its claims that portions of the Executive Order impermissibly violate the

Instrument of Transfer and intergovernmental immunity doctrine.  Accordingly, the United

States is entitled to declaratory relief.  The United States has shown that the entire Executive

Order should be declared invalid.  The Executive Order has some parts that may be valid, but the

form of the Executive Order makes it appropriate to strike the whole document in its present

form.

Defendants' Motion for Summary Judgment should be denied as not supported by the

facts and law.

It is unnecessary to reach the parties' remaining arguments.  Issues of the Airline Deregulation Act application, and preemption, should be denied as moot, as should Plaintiff's Motion for Judgment on the Pleadings.

To the extent the United States moved for future injunctive relief at oral argument, that was not proven, and except as to the enforcement of the present Executive Order, that motion should be denied.  Plaintiff has failed to show that such prospective relief is necessary given the declaratory relief provided here.

All issues being decided, all deadlines should be stricken and this case should be closed.

**V.  ORDER**

Therefore, it is hereby **ORDERED** that:

- Defendants King County, Washington and King County Executive Dow Constantine's Cross Motion for Summary Judgment (Dkt. 72) **IS DENIED;**

- United States' Renewed Motion for Judgment on the Pleadings **IS DENIED** as moot;

- The United States' Motion for Summary Judgment (Dkt. 69) **IS GRANTED**. King County, Washington Executive Order PFC-7-1-EO, "King County International Airport—Prohibition on Immigration Deportations" **IS INVALID**. Defendants are enjoined from enforcing that Executive Order.  Plaintiff is entitled to costs of suit;

- The United States' motion for other prospective injunctive relief, made at oral argument, **IS DENIED;** and

- All deadlines **ARE STRICKEN** and this case **IS CLOSED**.  Judgment consistent with this opinion may be entered.

1    The Clerk is directed to send uncertified copies of this Order to all counsel of record and

2    to any party appearing pro se at said party's last known address.

3    Dated this 30th day of March, 2023.

4

5    ROBERT J. BRYAN
     United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER ON UNITED STATES' MOTION FOR JUDGMENT ON THE PLEADINGS AND THE PARTIES'
CROSS MOTIONS FOR SUMMARY JUDGMENT - 22