**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-35362 |
| *Plaintiff-Appellee*, | D.C. No. 2:20-cv-00203-RJB |
| v. | |
| KING COUNTY, Washington; DOW CONSTANTINE, in his official capacity as King County Executive, | OPINION |
| *Defendants-Appellants*. | |

Appeal from the United States District Court
for the Western District of Washington
Robert J. Bryan, District Judge, Presiding

Argued and Submitted July 9, 2024
Seattle, Washington

Filed November 29, 2024

Before:  Michael Daly Hawkins, Richard R. Clifton, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge Bress

## SUMMARY[*]

### Article III Standing / Intergovernmental Immunity

The panel affirmed the district court's summary judgment for the United States in the government's action alleging that King County Executive Order PFC-7-1-EO, which directed county officials to ensure that future leases at Boeing Field prohibit fixed base operators (FBOs) from servicing U.S. Immigration and Customs Enforcement (ICE) charter flights, violated both the Supremacy Clause's intergovernmental immunity doctrine and a World War II-era contract reconveying Boeing Field to King County.

The panel held that the United States had Article III standing to bring the suit. First, the United States had two related concrete and individualized injuries. The United States' inability to conduct the charter flights—which has increased ICE's operational costs—constituted a de facto injury that affected the United States in a particularized, individual way. The United States also faced an imminent risk of future injury from the Executive Order. Second, the United States' injuries were fairly traceable to the Executive Order. Third, the United States' injuries are likely, as opposed to merely speculative, where there is a strong inference that an FBO would resume servicing ICE charter flights in the absence of the Executive Order.

The panel held that the United States' claims were ripe where the Executive Order has already caused FBOs at

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Boeing Field to stop servicing ICE charter flights, forcing the United States to shift its operations elsewhere.

The panel held that the district court (1) had jurisdiction to evaluate the United States' claim that the Executive Order violated the parties' Instrument of Transfer for Boeing Field, and (2) correctly concluded that the Executive Order violates the Instrument of Transfer, which required King County to reserve to the United States through any of its employees or agents the right to make nonexclusive use of the landing area of Boeing Field.

The panel held that the Executive Order violated the intergovernmental immunity doctrine because the Executive Order (1) improperly regulated the way in which the federal government transported noncitizen detainees by preventing ICE from using private FBO contractors at Boeing Field, and (2) on its face discriminated against the United States by singling out the federal government and its contractors for unfavorable treatment.

---

**COUNSEL**

McKaye L. Neumeister (argued) and Mark B. Stern, Attorneys, Appellate Staff; Michael J. Gerardi, Trial Attorney, Commercial Litigation Branch; Tessa M. Gorman, Acting United States Attorney; Brian M. Boynton, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Plaintiff-Appellee.

Shane P. Cramer (argued), Timothy G. Leyh, Ariel A. Martinez, and Caleb T. Mathena, Bryan Cave Leighton Paisner LLP, Seattle, Washington; Timothy P. Barnes,

Senior Deputy Prosecuting Attorney; Leesa Manion, Prosecuting Attorney; King County Office of the Prosecuting Attorney, Seattle, Washington; for Defendants-Appellants.

## OPINION

BRESS, Circuit Judge:

For some years, United States Immigration and Customs Enforcement (ICE) chartered flights out of Washington's King County International Airport, also known as Boeing Field, to transport removable aliens from this country elsewhere. At Boeing Field, fixed base operators, or FBOs, lease space from the airport and provide flights with essential services, such as fueling and landing stairs. In 2019, based on its stated disagreement with federal immigration policies, King County promulgated Executive Order PFC-7-1-EO, which directed county officials to ensure that future leases at Boeing Field prohibit FBOs from servicing ICE charter flights. Shortly after the County issued the Executive Order, all three FBOs operating at Boeing Field announced that they would no longer service ICE.

The United States responded by suing King County. It alleged that the Executive Order violated the Supremacy Clause's intergovernmental immunity doctrine as well as a World War II-era contract reconveying Boeing Field to King County. The district court granted summary judgment for the United States on both grounds. We affirm.

I

A

In 1941, the United States acquired Boeing Field from King County for use in World War II.  In 1948, the United States returned Boeing Field to King County under the Surplus Property Act of 1944, which, as relevant here, imposed terms and conditions for the use of airports that the United States granted to state or local governments after the war.  *See* 49 U.S.C. §§ 47151–47153.  When the United States conveyed Boeing Field to King County under the Act, the parties executed an "Instrument of Transfer."  The Instrument of Transfer provided that "the United States of America . . . through any of its employees or agents shall at all times have the right to make nonexclusive use of the landing area of the airport at which any of the property transferred by this instrument is located or used, without charge."  *See* 49 U.S.C. § 47152(6).

For many years, ICE has chartered flights at airports across the country to transport hundreds of thousands of noncitizens who are lawfully removable from the United States.  In 2012, ICE began using Boeing Field for these charter flights.  ICE contracted with a charter flight operator, Classic Air Charter, which in turn contracted with Swift Air to provide the airplanes and pilots.  At Boeing Field, fixed based operators, or FBOs, lease space from the airport and provide necessary logistical services for charter flights, such as fueling, landing stairs, lavatory maintenance, and aircraft parking.  ICE flights received FBO services from Modern Aviation (Modern), one of three FBOs operating at Boeing Field at the relevant time.

According to the Executive Order that forms the basis for this case, in 2018 King County officials became aware

that ICE was chartering flights out of Boeing Field to transport immigration detainees within and outside the United States.  At this time, King County Executive Dow Constantine directed county employees to support the efforts of immigration rights advocacy groups and to develop a response to ICE's operations at Boeing Field.

County employees, including Boeing Field officials, met with immigration rights groups, including the University of Washington Center for Human Rights (UWCHR).  The County concluded that ICE's operations at Boeing Field "could lead to human rights abuses" and "would be detrimental to the public welfare."  The County claims it was also concerned with the threat of disruptive anti-ICE protests, akin to those that had occurred in recent years at Seattle-Tacoma International Airport (Sea-Tac), the Northwest Detention Center in Tacoma, and other ICE facilities in Washington.

In April 2019, the UWCHR sent King County two reports that it planned to release a week later regarding ICE's operations at Boeing Field.  The reports accused the County of "provid[ing] the infrastructure through which private parties . . . profit from operating the deportation machine." The reports identified Modern as the FBO responsible for servicing ICE charter flights at Boeing Field.  On April 23, 2019, the eve of the UWCHR releasing its reports, King County Executive Constantine signed Executive Order PFC-7-1-EO, entitled "King County International Airport – Prohibition on immigrant deportations."  We will refer to this as the Executive Order.

The Executive Order first lays out the County's evident disagreement with federal immigration policies, explaining that "deportations raise deeply troubling human rights

concerns which are inconsistent with the values of King County." The Executive Order then "order[s] and direct[s]" that Boeing Field "shall not support the transportation and deportation of immigration detainees in the custody of Immigration and Customs Enforcement, either traveling within or arriving or departing the United States or its territories."

To that end, the Executive Order directs King County officials "to take" certain specified "action[s]." Among other things, King County officials shall "[t]ake appropriate actions, consistent with the County's federal obligations, to minimize County cooperation with, facilitation of, and permission for, operations associated with transportation of immigration detainees." In addition, and importantly, County officials shall

> Ensure that all future leases, operating permits and other authorizations for commercial activity at King County International Airport contain a prohibition against providing aeronautical or non-aeronautical services to enterprises engaged in the business of deporting immigration detainees (except for federal government aircraft), to the maximum extent permitted by applicable law.

To accomplish this, the Order instructed county officials to "[d]evelop procedures for exercising King County's rights" to ensure compliance with the laws and policies of "King County regarding human trafficking and the servicing of any aircraft engaged in the business of deportation of immigration detainees."

The import of the Executive Order was clear.  In a press conference announcing the Order, the director of Boeing Field explained that the "long-term goal" of the Executive Order is to "ban the practice of transporting immigration detainees at the King County Airport."  The director noted that the Executive Order "specifically applies" to FBOs, and that the County intends to "draft all future leases for any commercial activities at King County Airport to prohibit transporting immigration detainees."

The record demonstrates that the Executive Order had its intended effect almost immediately.  Shortly after the Executive Order was issued, King County conveyed to Modern that it was "very important" for Modern to stop providing FBO services to ICE flights.  County Executive Constantine suggested to Modern CEO Mark Carmen that Modern should "blame[] the county" for its decision to stop servicing ICE flights.

In response to the Executive Order and the County's overtures, Modern decided to "stop accepting [ICE] flights, effective immediately."  Modern explained to ICE's chartering agent at Classic Air that "if we continue to allow the repatriation flights to use our FBO, King County will make it difficult for Modern to successfully operate at [Boeing Field] in a manner that allows us to provide the level of service to our existing and future customers."  Modern's CEO further testified that, "if not for the Executive Order, we would have continued servicing" ICE charter flights.  As CEO Carmen explained: "Once we learned it was important to [the County], we made our decision."

After Modern announced that it would no longer service ICE charter flights, King County officials contacted the other two FBOs at Boeing Field to inform them of Modern's

decision.    The two FBOs then communicated to airport officials that they would not service ICE charter flights either.    In a May 2, 2019 press release, King County announced that "[f]ollowing [its] April 23 Executive Order, executives from Modern Aviation informed Executive Dow Constantine that the company will cease serving Swift Air flights carrying immigration detainees to and from King County International Airport."    In the press release, Constantine applauded Modern and the other two FBOs for "accommodat[ing] the values of the people of King County."

Without access to FBO services, ICE could not charter flights out of Boeing Field.    ICE explored the possibility of shifting its operations to nearby airports, including Sea-Tac and Portland International Airport, but its efforts were unsuccessful.    Ultimately, ICE relocated its flights to Yakima Air Terminal in Yakima, Washington.    The relocation increased operational costs due to the greater distance from ICE detention facilities to the airport.    It also led to increased security concerns.

At present, King County has not taken additional steps to implement the Executive Order.    However, the director of Boeing Field confirmed that if any FBO at Boeing Field decided to start servicing ICE charter flights, the County would resume implementation of the Executive Order, because the Order was "not just symbolic."

B

In February 2020, the United States sued King County and King County Executive Constantine in the United States District Court for the Western District of Washington.    The United States sought a declaratory judgment invalidating the Executive Order and a permanent injunction barring its enforcement.

In a thorough opinion, the district court granted summary judgment for the United States.  After finding that the United States had standing to sue and that its claims were ripe, the court held that the Executive Order violated both the parties' Instrument of Transfer and the intergovernmental immunity doctrine.  The district court consequently enjoined King County from enforcing the Executive Order.

King County appeals.  We have jurisdiction under 28 U.S.C. § 1291.  Our review is de novo.  *Rojas v. FAA*, 941 F.3d 392, 401 (9th Cir. 2019).

II

Before turning to the merits, we must first address King County's argument that the United States lacks standing to bring this suit and that its claims are unripe.  King County argues that because the Executive Order is a general policy statement with no legal force or effect, "the standing and ripeness inquiries both lead to the conclusion that judicial resolution of this dispute is premature." *Trump v. New York*, 141 S. Ct. 530, 536 (2020) (per curiam).

King County's justiciability arguments turn on a mischaracterization of the Executive Order and the plain impact it has already had on ICE's operations at Boeing Field.  The County's apparent theory that the Executive Order does nothing and means nothing is not accurate, and is belied by the County's extensive litigation efforts in support of the Order's claimed legal validity.  We conclude that the United States has Article III standing and that its claims are ripe for resolution.

A

To demonstrate standing, a plaintiff must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to

the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The United States has made this showing.

*First*, the United States has satisfied the injury-in-fact requirement. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 & n.1). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Id.* at 340.

Here, the United States has two related concrete and particularized injuries—one actual and one imminent. To start, the Executive Order has already prevented ICE from accessing FBO services at Boeing Field. As we explained above, Modern and the two other FBOs at Boeing Field have decided not to support ICE charter flights because of the Executive Order. And without essential FBO services, ICE cannot charter flights at Boeing Field. The United States' inability to conduct these charter flights—which has increased ICE's operational costs—constitutes a de facto injury that affects the United States in a particularized, individual way.

The United States also faces an imminent risk of future injury from the Executive Order. The Order instructs King County officials to "[e]nsure that all future leases . . . at [Boeing Field] contain a prohibition against providing aeronautical or non-aeronautical services to enterprises engaged in the business of deporting immigration detainees

(except for federal government aircraft)."  If implemented, this directive would guarantee that Boeing Field remains a no-fly zone for ICE charter flights.  While it is true that the County has not taken such formal actions, the County has been clear that if FBOs resume servicing ICE charter flights, the County would enforce the Executive Order.  In the words of the director of Boeing Field, "if Modern or one of the other FBOs change their minds and . . . welcome the ICE flights back, we would then, I believe go back to implementing the executive order."

This substantial risk that the County will formally prohibit Boeing Field FBOs from servicing ICE charter flights is thus not merely hypothetical.  It too constitutes injury in fact.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 & n.5 (2013))).

*Second*, the United States' injuries are "fairly traceable" to the Executive Order.  *Spokeo*, 578 U.S. at 338.  Traceability "may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain."  *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014).  Here, the decisions of Modern and the other FBOs to stop servicing ICE charters may reflect the last link in the chain of causation.  In these circumstances, "when a plaintiff alleges that government action caused injury by influencing the conduct of third parties," the plaintiff "must offer facts showing that the government's unlawful conduct 'is at least a substantial factor motivating the third parties' actions.'"

*Id.* at 1013 (quoting *Tozzi v. U.S. Dep't of Health & Hum. Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001)).

The United States has made this showing.  Modern quite understandably interpreted the Executive Order—and the County's communications surrounding the Order—to mean that if Modern did not stop servicing ICE charter flights, it would face adverse action from the County.  And Modern's CEO testified that Modern would not have revoked its services to ICE absent the Executive Order.  It is more than apparent from the record that Modern and the other FBOs decided to stop servicing ICE charter flights because of the Executive Order.

The County nonetheless contends that the FBOs' refusal to service ICE charters at Boeing Field resulted not from the Executive Order but from the FBOs' own "business" concerns.  But these business concerns arise most readily from the FBOs' fears that County officials would put the FBOs out of business at Boeing Field if the FBOs continued servicing ICE.  An asserted business concern that is itself rooted in the Executive Order does not demonstrate a lack of traceability between the Order and the injuries at hand.  And to the extent King County is pointing to FBOs' broader business concerns, such as avoiding protests, that does not change matters.  It may be true, as the district court recognized, that potential protests could have contributed to the FBOs' decisions.  But the Executive Order was still—at minimum—a substantial factor motivating the FBOs to stop servicing ICE.  *See Mendia*, 768 F.3d at 1013.  Indeed, the record reflects that it was the overriding factor.

To support its traceability argument, the County relies on *Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022).  But that case is easily distinguishable.  There, three states challenged a

Homeland Security guidance document that "prioritizes enforcement with respect to noncitizens who pose a threat to national security, public safety, and border security." *Id.* at 380. The three states alleged that the guidance document would injure them by "decreas[ing] the number of noncitizens detained and removed," resulting in "downstream costs to the States in the form of additional crime and public-welfare costs." *Id.* at 383. In reversing the district court's grant of a preliminary injunction, the Sixth Circuit held that the states lacked standing because "[s]peculation abounds over whether and how" the guidance document's prioritization would injure the states, especially when immigration "officers retain control over the volume of removals and detentions they effect." *Id.* at 383–84.

Here, no such speculation abounds over how, let alone whether, the Executive Order has injured or could injure the United States. The Executive Order specifically "order[ed] and direct[ed]" King County officials to ensure that FBOs at the airport not service ICE charter flights. Seeing the writing on the wall (and feeling the County's pressure), the FBOs immediately fell in line with the Executive Order. The clear directives in the Executive Order and its manifest effects on FBOs do not present the same causation uncertainties at play in *Arizona v. Biden*.

The County's reliance on the Supreme Court's recent decision in *Murthy v. Missouri*, 144 S. Ct. 1972 (2024), fares no better. In *Murthy*, several states and individual plaintiffs claimed that federal officials violated the First Amendment by coercing social media platforms to remove certain content that allegedly spread misinformation about COVID-19. *Id.* at 1983–84. The Supreme Court held that the plaintiffs lacked Article III standing. The reason is that the social media platforms had themselves moderated similar content

on their own, which "complicate[d] the plaintiffs' effort to demonstrate that each platform acted due to 'government-coerced enforcement' of its policies." *Id.* at 1988 (quoting *Missouri v. Biden*, 83 F.4th 350, 370 (5th Cir. 2023) (emphasis omitted)). This problem was made only more severe by the "sprawling" nature of the lawsuit, which involved "speech restrictions on different platforms, about different topics, at different times." *Id.* These traceability concerns are simply not present here. This lawsuit concerns a single Executive Order and the FBOs' clear (and fairly predictable) response to it. *Murthy* is inapposite.

*Third*, and for the same reasons that the United States' injuries are traceable to the Executive Order, "it is likely, as opposed to merely speculative," *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000), that a favorable decision from a court will redress the United States' injuries. Modern serviced ICE charter flights for many years prior to the Executive Order. Modern's CEO testified that it stopped doing so because of the Executive Order, and that Modern would have continued working with ICE but for the Order.

Thus, the "predictable effect" of invalidating the Executive Order is Modern (or another FBO) resuming services for ICE charter flights at Boeing Field. *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 750–51 (9th Cir. 2020) (observing that a third party's practices prior to plaintiffs' injury offer "persuasive evidence" of what the third party would do if plaintiffs obtained injunctive relief (quoting *Wieland v. U.S. Dep't of Health & Hum. Servs.*, 793 F.3d 949, 957 (8th Cir. 2015))). Because Article III does not demand that we "be *certain*" as to how third parties will respond to the relief requested, *id.* at 750, the strong inference that an FBO would resume

servicing ICE charter flights in the absence of the Executive Order suffices to establish redressability.

B

King County also contends that the United States' claims are not ripe for adjudication because they are "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump*, 141 S. Ct. at 535 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). King County is incorrect, and its reliance on the Supreme Court's *Trump* decision is misplaced.

In *Trump*, New York challenged an Executive Branch memorandum on the 2020 census that announced an intended policy of excluding noncitizens who were "not in a lawful immigration status" from the apportionment base. *Id.* at 533–34. The Supreme Court held that New York's claims were not ripe because the Court "simply d[id] not know whether and to what extent the President might direct the Secretary to 'reform the census' to implement his general policy with respect to apportionment." *Id.* at 535 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992)). "Any prediction how the Executive Branch might eventually implement this general statement of policy [was] 'no more than conjecture.'" *Id.* (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)).

Here, there is no need to predict the effects of the Executive Order, and there is nothing conjectural about the United States' injury. The Executive Order has already caused FBOs at Boeing Field to stop servicing ICE charter flights, forcing the United States to shift its operations elsewhere. The Executive Order also contains clear directives to County officials, which the County has said it will enforce if ICE charter flights resume at Boeing Field.

"The basic rationale of the ripeness requirement is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022) (quoting *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993)) (internal quotation marks and citations omitted). There is nothing premature or abstract about the dispute before us.

## III

We now turn to the United States' challenges to King County's Executive Order. We hold that the Executive Order violates both the parties' Instrument of Transfer for Boeing Field and the intergovernmental immunity doctrine.

## A

We begin with the Instrument of Transfer. Pursuant to the Surplus Property Act of 1944, the Instrument of Transfer between King County and the United States returned Boeing Field to King County upon the conclusion of World War II. *See Rohr Aircraft Corp. v. San Diego Cnty.*, 362 U.S. 628, 631–32 (1960) (explaining how "[t]he termination of the war quickly threw substantial portions of . . . property into disuse, there being no further need for the mass production of war material"); *Rex Trailer Co. v. United States*, 350 U.S. 148, 149–50 (1956) (recounting the history and objectives of the Surplus Property Act).

Most relevant here, the parties' Instrument of Transfer required King County to reserve to the United States "through any of its employees or agents . . . the right to make nonexclusive use of the landing area of [Boeing Field]." We hold that the district court (1) had jurisdiction to evaluate the United States' Instrument of Transfer claim and (2) correctly

concluded that the Executive Order violates the Instrument of Transfer.

1

We first reject King County's argument that the district court lacked jurisdiction to consider whether the Executive Order violates the Instrument of Transfer.  Ordinarily, district courts have original jurisdiction "of all civil actions arising under the . . . laws . . . of the United States," 28 U.S.C. § 1331, and "of all civil actions, suits, or proceedings commenced by the United States," *id.* § 1345.  In the case of the Surplus Property Act, Congress specifically directed that "[f]or any violation of this chapter . . . , the Secretary [of Transportation] may apply to the district court of the United States for any district in which the violation occurred for enforcement."  49 U.S.C. § 47111(f).  The Attorney General filed this lawsuit, citing the fact that the United States is "responsible for regulating the air transportation industry through its Executive Branch agency, the U.S. Department of Transportation, including its component agency, the Federal Aviation Administration."    The district court therefore had jurisdiction under 28 U.S.C. § 1345 over the United States' claims concerning the Instrument of Transfer.

The County resists this conclusion.  Pointing out that Congress can strip federal district courts of jurisdiction, *see Patchak v. Zinke*, 583 U.S. 244, 251 (2018) (plurality op.); 28 U.S.C. § 1345, the County claims that Congress did so in the Surplus Property Act.  It relies on 49 U.S.C. § 47151(b), which states that "[o]nly the Secretary [of the Department of Transportation] may ensure compliance with an instrument conveying an interest in surplus property under [the Act]."  According to the County, this provision means that the Department of Transportation must handle any Surplus

Property Act issues relating to airports at the administrative agency level, or at least that the dispute resolution must begin there.

The County is mistaken.  Section 47151(b) does not strip district courts of jurisdiction to entertain claims by the United States relating to contractual agreements under the Surplus Property Act.  Unlike other provisions that do limit federal court jurisdiction, § 47151(b) does not "use[] jurisdictional language" or "impose[] jurisdictional consequences."  *Patchak*, 583 U.S. at 251.  It says nothing about taking away the usual jurisdiction of the district courts for claims brought by the United States.  *See* 28 U.S.C. § 1345.  All that § 47151(b) confirms is that the government itself, and not private persons, may enforce the Act.

Finally, King County argues that, even if there is federal court jurisdiction over the United States' Instrument of Transfer claim, we should nonetheless refer the claim to the Federal Aviation Administration (FAA) under the doctrine of primary jurisdiction.  Primary jurisdiction "is a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts."  *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 780 (9th Cir. 2002).  The doctrine "is properly invoked when a claim . . . requires resolution of an issue of first impression, or a particularly complicated issue that Congress has committed to a regulatory agency."  *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002).

Even assuming this argument is not forfeited for failure to raise it before the district court, King County has not shown that it would be appropriate for us to invoke the

primary jurisdiction doctrine.  Whether the Executive Order violates the Instrument of Transfer is not an especially complicated issue, and referring this matter to the FAA would only "significantly postpone a ruling that [we are] otherwise competent to make."  *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 761 (9th Cir. 2015).  Indeed, it would result in us roundaboutly sending the matter to the agency when the government has already brought this lawsuit seeking relief.  The circumstances of this case do not support application of the primary jurisdiction doctrine.

2

We now turn to the merits of the Instrument of Transfer claim.  The Surplus Property Act provides that, when the federal government transfers surplus property to a state or local entity for airport purposes, the United States "is entitled to the nonexclusive use, without charge, of the landing area of an airport at which the property is located."  49 U.S.C. § 47152(6).  Consistent with this statutory requirement, the Instrument of Transfer for Boeing Field states that "the United States of America . . . through any of its employees or agents shall at all times have the right to make nonexclusive use of the landing area of [Boeing Field] . . . without charge."

The district court correctly concluded that the Executive Order violates this provision of the Instrument of Transfer. The Order precludes FBO services to ICE charter flights at Boeing Field, which effectively prevents ICE from using the airport.  ICE charter flights are quite plainly flights of the United States through its agent, Classic Air Charter.  The flights are also performing a quintessential function of the federal government.  *See United States v. California*, 921 F.3d 865, 873 (9th Cir. 2019) ("The Government of the

United States has broad, undoubted power over the subject of immigration and the status of aliens." (quoting *Arizona v. United States*, 567 U.S. 387, 394 (2012))).  The ICE charter flights fit well within the plain language of the Instrument of Transfer and Surplus Property Act.

King County's contrary arguments fail.  We reject the County's assertion that the Instrument of Transfer applies only to government-owned or leased aircraft, as opposed to charter flights.  There is no basis for reading such a limitation into either the Instrument of Transfer or the Surplus Property Act.  Nor is it relevant, as the County asserts, that the United States has paid landing fees for ICE charter flights.  As the district court explained, the United States' decision not "to complain about being charged landing fees in violation of the Instrument of Transfer does not convert these flights into flights by private parties for private purposes."

We thus hold that the Executive Order violates the Instrument of Transfer.[1]

B

But even setting aside the Instrument of Transfer, King County's Executive Order also fails under the intergovernmental immunity doctrine.  This doctrine is an outgrowth of the Constitution's Supremacy Clause.  U.S.

---

[1] The district court also found that the Executive Order violates another provision of the Instrument of Transfer that obligates King County to use Boeing Field "for public airport purposes for the use and benefit of the public, on reasonable terms and without unjust discrimination and without grant or exercise of any exclusive right for use of the airport." *See* 49 U.S.C. § 47152(2).  Our holding that King County violated the anti-discrimination principle of the intergovernmental immunity doctrine, which we discuss below, also demonstrates that King County violated the anti-discrimination provision of the Instrument of Transfer.

Const. art. VI, cl. 2; *United States v. Washington*, 596 U.S. 832, 838 (2022); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 754 (9th Cir. 2022) (en banc).  In recognition of the federal government's independence from state control, the intergovernmental immunity doctrine prohibits states from "interfering with or controlling the operations of the Federal Government." *Washington*, 596 U.S. at 838.  It does so by proscribing "state laws that *either* 'regulate the United States directly *or* discriminate against the Federal Government or those with whom it deals' (*e.g.*, contractors)." *Id.* (brackets omitted) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality op.)).

We hold that the Executive Order violates the intergovernmental immunity doctrine and that the anti-commandeering and market participant doctrines do not apply.

1

The Executive Order violates the intergovernmental immunity doctrine in two related ways.

*First*, the Executive Order improperly regulates the way in which the federal government transports noncitizen detainees by preventing ICE from using private FBO contractors at Boeing Field.  It is of course true that "[p]rivate contractors do not stand on the same footing as the federal government, so states can impose many laws on federal contractors that they could not apply to the federal government itself." *Geo Grp.*, 50 F.4th at 750.  That said, "any state regulation that purports to override the federal government's decisions about who will carry out federal functions runs afoul of the Supremacy Clause." *Id.*

Our en banc decision in *Geo Group* is highly instructive and guides our analysis. At issue in *Geo Group* was a California law prohibiting the operation of private detention facilities within the state. *Id.* Because ICE in California "relies almost exclusively on privately operated detention facilities," *id.*, California's law "g[a]ve California the power to control ICE's immigration detention operations in the state by preventing ICE from hiring the personnel of its choice." *Id.* at 757. This state of affairs amounted to "a 'virtual power of review over the federal determination' of appropriate places of detention" and impermissibly "breach[ed] the core promise of the Supremacy Clause." *Id.* at 757–58 (quoting *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956) (per curiam)).

The core logic of *Geo Group* governs this case. King County's Executive Order "prevent[s] ICE's contractors from continuing to" operate flights out of Boeing Field, thereby "requiring ICE to entirely transform its approach to" its sovereign function of transporting and removing noncitizen detainees. *Id.* at 750. In so doing, the Executive Order effectively grants King County the "power to control" ICE's transportation and deportation operations, forcing ICE either to stop using Boeing Field or to use government-owned planes there. *Id.* at 757. Because this impermissibly "override[s] the federal government's decision, pursuant to discretion conferred by Congress, to use private contractors to run its" flights, the intergovernmental immunity doctrine bars the Executive Order. *Id.* at 750–51. Analogous to *Geo Group*, the Executive Order effects at Boeing Field "an outright ban on hiring any private contractor" to transport noncitizens, a necessary step in the classically federal function of immigration enforcement. *Id.* at 757. As we said in *Geo Group*, "[a]s part of its protection of federal

operations from state control, the Supremacy Clause precludes states from dictating to the federal government who can perform federal work." *Id.* at 754. The Executive Order violates this precept.

*Second*, and in this way even more problematic than the California law in *Geo Group*, King County's Executive Order on its face discriminates against the United States "by singling out" the federal government and its contractors "for unfavorable treatment" or "regulat[ing] them unfavorably on some basis related to their governmental 'status.'" *Washington*, 596 U.S. at 839 (quoting *North Dakota*, 495 U.S. at 438). The Executive Order "explicitly treats" contractors who serve ICE charter flights "differently" from those who do not. *Id.* Under the Executive Order, FBOs may use Boeing Field for any purpose other than servicing flights "engaged in the business of deporting immigration detainees." And the only entity in the business, so to speak, of deporting immigration detainees, is the federal government. By "burden[ing] federal operations, and *only* federal operations," *California*, 921 F.3d at 883, the Executive Order violates the anti-discrimination principle of the intergovernmental immunity doctrine. *See Washington*, 596 U.S. at 839.

King County nevertheless argues that the United States has not demonstrated improper discrimination under the intergovernmental immunity doctrine because "significant differences" exist between the federal government and other charterers at Boeing Field that "justify the inconsistent . . . treatment." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 816 (1989). According to the County, singling out ICE charter flights is permissible because those flights pose a "unique risk of protest, property harm, liability, and business disruption" at Boeing Field.

We fully recognize that a state or local law does not run afoul of the intergovernmental immunity doctrine "just because it indirectly increases costs for the Federal Government, so long as the law imposes those costs in a neutral, nondiscriminatory way." *Washington*, 596 U.S. at 839. But whether a state or local government can justify discrimination against the United States "depends on how the State has defined the favored class." *Dawson v. Steager*, 586 U.S. 171, 177 (2019). Here, the Executive Order does not bar FBOs from servicing charter flights based on their potential to disrupt airport operations; it instead specifically bars FBOs from servicing ICE charter flights because of their role in carrying out the federal immigration laws. And the Executive Order expressly draws this distinction based on the County's opposition to federal policy, namely, that "deportations raise deeply troubling human rights concerns which are inconsistent with the values of King County."

The Executive Order thus does not draw lines based on disruption level but on the FBOs' role in carrying out a specific federal objective. The title of the Executive Order is, after all, "Prohibition on immigrant deportations." Even if the disruption risk of a non-ICE charter flight "turned out to be *identical*" to that of an ICE flight, the Executive Order would still permit the non-ICE flight, but not the ICE flight, to access FBO services at Boeing Field. *Dawson*, 586 U.S. at 179. The Executive Order therefore discriminatorily burdens the United States specifically because of federal immigration operations, based on the County's disagreement with federal policy. This discrimination, plain on the face of the Order, contravenes the intergovernmental immunity doctrine.

2

The anti-commandeering doctrine provides no defense to the Executive Order. Or, put another way, invalidating the Order does not lead to a violation of the Tenth Amendment's anti-commandeering principle.

The anti-commandeering doctrine prohibits the federal government from "compel[ling] the States to implement, by legislation or executive action, federal regulatory programs." *California*, 921 F.3d at 888 (quoting *Printz v. United States*, 521 U.S. 898, 925 (1997)); *see also, e.g.*, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473 (2018); *New York v. United States*, 505 U.S. 144, 161 (1992). Here, the United States does not seek to compel King County to implement a federal immigration program. Rather, the United States seeks, at least in part, to enforce its contractual right under the Instrument of Transfer to use Boeing Field. Requiring a municipality to uphold its end of a contractual bargain is not commandeering.

And even setting the Instrument of Transfer aside, the United States is not asking King County to "enact and enforce" or otherwise "administer" any federal immigration program. *Murphy*, 584 U.S. at 472–73 (first quoting *New York*, 505 U.S. at 161; and then quoting *Printz*, 521 U.S. at 935). This is not a situation in which King County officials are being conscripted into carrying out federal immigration laws on the federal government's behalf. *See California*, 921 F.3d at 876, 889–90 (finding that the anti-commandeering principle protected a California law limiting the cooperation of state and local law enforcement officers with federal immigration authorities); *McHenry County v. Raoul*, 44 F.4th 581, 586, 592–94 (7th Cir. 2022) (upholding an Illinois law that prohibited state or local governments

from housing or detaining individuals for federal immigration violations). Instead, the United States is asking King County, in its capacity as the owner of a public airport facility, to lift a discriminatory prohibition on private parties' ability to engage in business with the federal government that supports federal immigration efforts. King County identifies no authority that would treat this as an anti-commandeering question.

Requiring this form of non-discriminatory access to county property consistent with the intergovernmental immunity doctrine does not create a back-end anti-commandeering problem. We would not perceive a threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways. Similarly, we discern no anti-commandeering issue here.

To the extent King County argues that it has expended resources ensuring the safety of Boeing Field in response to ICE charter flights, it identifies no case treating this degree of background support as rising to the level of unconstitutional commandeering. And in any event, there is no indication that the federal government has ordered King County to provide additional support in connection with ICE charter flights at Boeing Field. The anti-commandeering principle prevents the federal government from "harness[ing] a State's legislative or executive authority." *Haaland v. Brackeen*, 599 U.S. 255, 281 (2023). Invalidating a restriction on the federal government's use of private contractors at Boeing Field does not lead to that result.

3

The County's attempt to evade the intergovernmental immunity doctrine through a market-participant defense likewise fails.  In the preemption context, "[w]hen a state or local government buys services or manages property as a private party would, it acts as a 'market participant,' not as a regulator, and we presume that its actions are not subject to preemption."  *Airline Serv. Providers Ass'n v. L.A. World Airports*, 873 F.3d 1074, 1079 (9th Cir. 2017).  Similarly, in the dormant Commerce Clause context, "if a State is acting as a market participant, rather than as a market regulator, the dormant Commerce Clause places no limitation on its activities." *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 93 (1984).

As the County acknowledges, no court has previously applied the market participant doctrine as a defense to state or local actions that otherwise violate principles of intergovernmental immunity.   But even assuming the County could mount a market participant defense in this context, the County was not acting as a market participant.

A state or local government functions as a market participant when it acts (1) "in pursuit of the 'efficient procurement of needed goods and services'" or (2) with a sufficiently "narrow scope" so as to "'defeat an inference that its primary goal was to encourage a general policy rather than [to] address a specific proprietary problem.'"  *Airline Serv. Providers Ass'n*, 873 F.3d at 1080–81 (alteration in original) (quoting *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1023–24 (9th Cir. 2010)).  Here, King County has repeatedly stated that it adopted the Executive Order in response to perceived human rights abuses in the federal immigration system.  That is the clear substance and

tenor of the Executive Order and the County's many comments surrounding it.  The County's broad objection to federal immigration policy does not reflect King County acting in the capacity of a market participant.

The County argues otherwise by claiming that it issued the Executive Order "due to its concerns about business disruptions and liability from potential protests on airport property."  To begin with, there is a lack of evidence of such disruptions.  Regardless, the County's claimed concerns about protests—which are referenced only obliquely in one small part of the Executive Order—cannot overcome the Order's overwhelming import.  The Executive Order is based on King County's view that "deportations raise deeply troubling human rights concerns which are inconsistent with the values of King County."  While King County and its leaders are entitled to hold that view, the obvious policy and regulatory basis for the Executive Order prevents King County from invoking the market participant doctrine, even assuming it could be invoked as a defense to otherwise improper discrimination against the federal government.

*     *     *

King County's Executive Order PFC-7-1-EO breached the Instrument of Transfer and violated the Supremacy Clause.  The judgment of the district court is

**AFFIRMED.**